UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-223 (NEB/DTS)

UNITED STATES OF AMERICA,

               Plaintiff,

      v.

1. AIMEE MARIE BOCK,
3. SALIM SAID,
4. ABDULKADIR NUR SALAH,
   and
6. ABDI NUR SALAH,

              Defendants.

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS IN LIMINE**

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Joseph H. Thompson, Harry M. Jacobs, Matthew S. Ebert, and Daniel W. Bobier, Assistant United States Attorneys, respectfully submits the following consolidated response to the defendants' motions in limine. Dkt. #407, 423-433, 441-448.

**I.    Abdi Nur Salah's Motion to Preclude Evidence of His Failure to Disclose Consulting Payments (Dkt. #407).**

Salah moves to preclude admission of evidence (which the government identified in its 404(b) notice) that he failed to disclose to his then-employer, the City of Minneapolis, the income he earned from entities involved in the fraud scheme. Because this evidence is intrinsic to the charged crimes, and, in all events, is admissible prior bad act evidence, the Court should deny Salah's motion.

During the fraudulent scheme, Abdi Salah worked as a Senior Policy Aide for Minneapolis Mayor Jacob Frey. Like many government entities, the City of

Minneapolis required city employees to obtain written permission before accepting outside employment or entering into consulting contracts to provide services outside their city employment. This policy applied to Abdi Salah. Nevertheless, he failed to disclose his involvement in the federal child nutrition program and with entities involved in the program, including Stigma Free International, Tunyar Trading, Optimum Community Services, and The Produce LLC. Abdi Nur Salah also failed to disclose his ownership and involvement in various entities used to receive and launder fraud proceeds, including Stone Bridge Development LLC, ANS Properties LLC, Five A's Projects LLC, and Gophers Logistics Inc.

### A. Evidence of Salah's Failure to Disclose Consulting Payments Is Intrinsic Evidence.

The government disclosed this evidence as potential 404(b) out of an abundance of caution, but the evidence is admissible intrinsic evidence. Intrinsic evidence provides "the context in which the charged crime occurred." *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006). Intrinsic evidence "complete[s] the story," tends to logically prove an element of the charged offense, or shows consciousness of guilt. *See United States v. Forcelle*, 86 F.3d 838, 842–43 (8th Cir. 1996).

Evidence of Abdi Salah's non-disclosure of consulting payments intrinsic consciousness-of-guilt evidence. *See United States v. Frost*, 234 F.3d 1023, 1025 (8th Cir. 2000) (holding that a prior bad act was intrinsic consciousness-of-guilt evidence when it was "direct evidence of fraudulent intent," an element of the charges). In *Frost*, the court found that deposition testimony in which the defendant denied signing documents at issue in his fraud case was intrinsic evidence. *See id*. The

testimony was direct evidence of fraudulent intent and consciousness of guilt—therefore in constituted evidence intrinsic to the overall scheme. *Id.*

Similarly here, Abdi Salah's non-disclosure demonstrates his fraudulent intent and consciousness of guilt. He did not disclose information that would have been a red flag that he was participating in a fraud scheme.

### B. Evidence of Salah's Failure to Disclose Consulting Payments Is Admissible 404(b) Evidence.

Even if Salah's non-disclosure of consulting payments were not intrinsic evidence, it still would be admissible as bad-act evidence under 404(b).

Evidence of prior bad acts is admissible for purposes other demonstrating criminal propensity, including showing "knowledge or intent." *See United States v. Harry*, 930 F.3d 1000, 1006 (8th Cir. 2019); Fed. R. Evid. 404(b). Such evidence need only be: (1) relevant to a material issue; (2) similar in kind and not overly remote in time to the crime charged; (3) supported by sufficient evidence; and (4) higher in probative value than prejudicial effect. *Id.* (cleaned up).

In this case, such non-disclosure shows Salah's fraudulent intent, knowledge of the criminal nature of his actions, and lack of mistake in the participation in the fraud scheme, as demonstrated by the fact that he did not disclose fake consulting payments to a governmental entity when required to do so.

Application of the multi-factor Rule 404(b) test for bad act evidence demonstrates that this evidence is admissible. First, it is relevant to a material issue, namely Salah's intent to commit fraud. Second, the bad act is similar in kind because it involves a false statement and took place at the same time the fraud scheme was

occurring. Third, there is sufficient evidence to support a jury finding that Salah committed this bad act, including the City of Minneapolis's policy and the fact of Salah's nondisclosure. Finally, the evidence is highly probative because it shows Salah's knowledge and intent, and it far outweighs and limited prejudice of failing to adhere to the City's disclosure policy.

For these reasons, evidence of Abdi Salah's non-disclosure of consulting payments is admissible as intrinsic evidence, and, in the alternative, as 404(b) prior bad act evidence. Salah's motion should be denied.

## II.    Abdulkadir Nur Salah's Motion to Preclude Evidence of Salah's Gang Affiliation (Dkt. #423)

Salah moves to preclude admission of evidence, including evidence the government found in his text messages and on his Google drive, which the government identified in its 404(b) notice.

The government believes it likely will not seek to introduce this evidence at trial. However, upon discovering it, the government disclosed it consistent with the requirements of Rule 404(b). Several witnesses interviewed by the government during its ongoing investigation into the broader Feeding Our Future scheme have reported being afraid to come forward or speak honestly and having received threats against doing so, including from defendants charged in the Feeding Our Future cases. The government accordingly provided notice of Salah's gang affiliation so that, in the unlikely scenario that these issues arise during trial and become an issue of witness credibility, the defense will have received pretrial notice.

The government submits that the Court should reserve judgment on admission of this evidence until and unless such issues arise in the trial.

### III.    Abdulkadir Nur Salah's Motion to Exclude Certain 404(b) Evidence (Dkt. #424)

Salah moves to exclude evidence related to two items the government included in its 404(b) notice. Before reaching the substance of his objections, however, Salah contends the Court should disallow such evidence because, he contends, the government's 404(b) notice was insufficiently detailed. The Court should reject that invitation for two reasons. First, even assuming the government's notice was insufficient, this response provides an extensive explanation of how the government intends to prove up and use both of the objected-to items.[1] Trial is more than three weeks away, which is more than the "reasonable" advance notice required by Rule 404(b). *See, e.g.*, *United States v. Crow Ghost*, 79 F.4th 927, 934 (8th Cir. 2023) (approving 404(b) notice given 22 days before trial and amended 14 days before trial). Second, as stated in the 404(b) notice and as described in detail below, each of the objected-to items is intrinsic to the charged conspiracy. The government included them in its 404(b) notice out of an abundance of caution, but as the discussion below makes clear, this bad-act conduct is intrinsic and so not subject to Rule 404(b)'s notice

---

[1] This is also true of the other items identified in the government's 404(b) notice that the defense challenges via in limine motions and which the government addresses herein.

requirements. *See United States v. Beltz*, 385 F.3d 1158, 1162 (8th Cir. 2004) ("Evidence that is relevant to the crime charged is not other crimes evidence.").

### A. Immigration Records

Salah first objects to the introduction of an immigration record he signed and submitted to the United States government in which he failed to report as income the millions of dollars of fraud proceeds he obtained from the charged scheme. He contends such evidence should be precluded by Rule 403, that the government cannot prove by a preponderance that such misstatement was intentional, or that the government could do so, but not without a mini-trial delving into "the rules of the forms and … why Salah had to submit them." Dkt. #424 at 6. He is wrong on all counts.

This conduct falls squarely within the charged conspiracy. Salah is charged with participating in a conspiracy to commit concealment money laundering. That is, a conspiracy to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" of the fraud scheme. 18 U.S.C. § 1956(a)(1)(B). The evidence will show that: (i) Salah used Safari to run a bogus food site that falsely claimed to be serving 6,000 meals to kids, day after day, week after week; (ii) from such claims, Safari (and its co-owner, Salah) received millions of dollars in fraud proceeds; (iii) Salah and his co-conspirators repeatedly acted to conceal the location, source, and ownership of fraud proceeds, including through the use of shell companies, a web of complicated transfers, and purchases; and (iv) when submitting an official application to the U.S. Department of Justice Executive Office

for Immigration Review, Salah reported his income from Safari as $0 / week. Such evidence will establish that Salah acted on this occasion consistent with his and his co-conspirators other steps taken in furtherance of the scheme, that is, to conceal, especially from the government, the millions of dollars he obtained in fraud proceeds. This misrepresentation is intrinsic to the scheme.[2]

Proving as much will not require a deep dive into immigration proceedings in general nor into Salah's in particular. The jury need only understand that: Salah submitted this form to a government office; the form required full and accurate disclosures; and Salah reported $0 in Safari income. The government does not intend to introduce anything further about Salah's immigration status, which would have

---

[2] That differentiates this case from Salah's citations. In some of those cases, there was no rationale whatsoever for the relevance or probativeness of the challenged evidence. *See United States v. Limon-Urenda*, No. CR 13-4067-2-MWB, 2014 WL 11322259, at *1 (N.D. Iowa Feb. 13, 2014) (defendant charged with drug trafficking; government offered no argument for probativeness of immigration status); *Lucas v. Jerusalem Cafe, LLC*, 721 F.3d 927, 932 (8th Cir. 2013) (immigration status not relevant in civil action brought by alien against former employer because Fair Law Standards Act does not preclude "illegal aliens … from recovering unpaid wages"). In others, limited references to immigration status did not warrant reversal. *See United States v. Ceja-Rangel*, 688 F. App'x 203, 208 (4th Cir. 2017) (no error in kidnapping case where government made one reference to immigration status); *United States v. Diaz*, 494 F.3d 221, 226 (1st Cir. 2007) (no mistrial warranted in drug trafficking case for introduction of defendant's immigration status); *but cf. United States v. Amaya-Manzanares*, 377 F.3d 39, 45 (1st Cir. 2004) (remanding for consideration of "debatable" Rule 403 question of whether the government could introduce, against a defendant charged with using a forged green card, evidence that she had entered the country unlawfully). Indeed, Salah's only Eighth Circuit citation supports the government's argument. *United States v. Almeida-Perez*, 549 F.3d 1162 (8th Cir. 2008) (finding no error, and observing that unlawful entry into the country—*unlike an "immigration violation[] … involv[ing] a false statement"*—bears debatable probativeness as to defendant's character for truthfulness).

less probative value. But it should be allowed to introduce evidence of, and prove, the knowing misrepresentation by Salah in these government submissions—especially given that said misrepresentation is in lockstep with his charged concealment activities undertaken elsewhere in furtherance of the conspiracy. The government submits that, to the extent the Court harbors any Rule 403 concerns regarding these documents, a combination of redactions and limitations of the scope of this inquiry will more than suffice to eliminate unfair prejudice given the uniquely and highly probative nature of this bad act conduct.

Finally, Salah argues these misrepresentations should be disallowed either because they could have innocently resulted from the "complex" nature of the form or because the form may have been prepared by Salah's attorney instead of Salah alone.[3] These are grounds for cross examination and for closing argument, but such contentions go to the weight of the evidence, not its admissibility. The government's position, which it intends to prove at trial, is that this submission is simple. Salah was asked to report his income from the Safari entity he used to wrongfully reap millions in taxpayers dollars. He reported those earnings as $0.

**B. Cosmopolitan's Tax Records**

Salah next objects to the introduction of 1099s issued by Cosmopolitan Business Solutions—the entity controlled by Salah and co-defendant Abdi Nur Salah,

---

[3] Of course, this second contention is not tenable because it ignores black letter law that a principal is responsible for the acts of his agent. *See, e.g.*, *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 954 (8th Cir. 2021). If Salah intends to defend on the ground that his immigration attorney advised against reporting any Safari income, Salah can call the attorney to testify to as much.

and which operated Safari Restaurant. These 1099s include bogus Tax Identification Numbers (TINs), which the government intends to prove Cosmopolitan deliberately included to frustrate IRS efforts to investigate the flow of funds—in short, to help conceal fraud proceeds.

Salah objects, arguing this bad act is too "far afield" of the charged misconduct, too ministerial in nature to be probative, or (contradictorily) too complicated for the government to prove. Again, he is wrong on all counts.

This conduct falls squarely within the charged conspiracy. Both Salahs are charged with participating in a conspiracy to commit concealment money laundering. By using fake TINs, the Salahs precluded (or attempted to preclude) the IRS from comparing the 1099s against other records for the 1099 recipients to get an accurate figure for their income (which, to be clear, chiefly consisted of fraud proceeds).

This is not some ministerial error, like the blown filing deadline in *United States v. Reiss*, No. 04-cr-156, 2005 WL 2337917, at *3 (D. Minn. June 9, 2005) (Salah's case). Rather, the government intends to prove this conduct was a knowing and deliberate fraud, consistent with and in furtherance of the concealment conspiracy. It is intrinsic conduct.[4]

This act will not be difficult for the government to prove by a preponderance of the evidence. Testimony at trial will indicate the conspirators knew of the importance of Tax and Employer Identification Numbers (TINs / EINs) and used them

---

[4] For this reason, Salah's discussion and citations concerning the government's obligation to prove up a separate, "subsequent scheme" are off-point. Dkt. #424 at 8 (citing *United States v. Thomas*, 791 F.3d 889, 893 (8th Cir. 2015)).

strategically in the scheme. In particular, the conspirators created shell companies, purportedly to operate food-distribution sites, and used them to launder the food-program proceeds obtained after claiming meals they did not serve. An important early step in establishing those shell companies was securing, for each, an EIN. As the evidence at trial will show, the conspirators consistently followed a pattern: they created a shell company by registering with the Minnesota Secretary of State, obtained an EIN from the IRS, and then immediately—usually within days—began claiming reimbursements for purportedly having served thousands of meals per day.

Thus, the government will establish that the defendants: (i) understood these tax IDs and used them in the scheme; (ii) repeatedly acted to conceal the location, source, and ownership of fraud proceeds, including through the use of shell companies, a web of complicated transfers, and purchases; (iii) the TINs on these 1099s are fake; and (iv) the use of fake 1099s frustrates government efforts to follow the scheme's proceeds. Such facts (among others) will establish by a preponderance that Cosmopolitan deliberately used bogus tax IDs in furtherance of the charged concealment scheme.

Contrary to Salah's insistence, such proof does not require the government to present any complicated tax concepts to the jury. To appreciate this bad act evidence, the jury need only hear what tax IDs are and how they work generally—evidence the government intends to introduce irrespective of this particular bad act evidence, given its need to explain the defendants' serial applications for such IDs as part of

the scheme. Such presentation simply does not implicate any of the "notoriously complex" tax concepts about which Salah expresses concern. Dkt. #424 at 9.

Finally, Salah argues that by proving up Cosmopolitan's deceptive 1099s, the government will unfairly ascribe responsibility to Salah. He points out that Cosmopolitan was co-owned by his co-defendant, Abdi Nur Salah, and the deceptive conduct (once proved) might not have been Abdulkadir's doing. This misses the mark. This is not a case of "vilification by association," as Salah contends, but rather run-of-the-mill conspirator liability. Simply put, under the law, it does not matter whether only one Salah, or both together, chose to use the bogus TIN. The government will show by a preponderance that such use occurred during and in furtherance of the conspiracy and was foreseeable. That makes both Salahs responsible for the misconduct.

The use of bogus TINs in the Cosmopolitan 1099s is intrinsic to the charged conspiracy. Salah's motion seeking exclusion of this probative and central conduct should be denied.

## IV.   Abdulkadir Nur Salah's Motion to Preclude Improper Questioning (Dkt. #425)

As explained below, the United States anticipates that it will need to recall certain witnesses to allow for the orderly presentation of evidence. Accordingly, pursuant to Rule 611(a), the United States requests leave to recall witnesses to facilitate orderly presentation of evidence.

### A. Challenge to "Summary" Testimony

Abdulkadir Nur Salah seeks an order precluding the introduction of improper lay witness testimony. He claims such order is necessary to prevent government witnesses from expressing a view concerning the amount of meals defendants claim to have served. But nothing is *per se* improper about such testimony.

It is black letter law that lay witnesses can testify to their "perceptions based on [their] experience." *United States v. Turner*, 781 F.3d 374 (8th Cir. 2015 (citing Fed. R. Evid. 701)); *accord United States v. Espino*, 317 F.3d 788, 797 (8th Cir. 2003) (courts have "latitude [to] permit a witness to state his conclusions based on common knowledge or experience"). The testimony Salah envisions falls squarely within that rule.

For example, the government anticipates calling at trial multiple witnesses who have owned or worked in restaurants, or who operated legitimately in the food program and provided meals. Such witnesses can testify to the significant logistical demands of their kitchens, like hiring and training cooking and cleaning staff, coordinating and paying for deliveries of ingredients, maintaining sufficient space to store those ingredients, and allowing staff sufficient time to prepare the meals. Such witnesses also can provide their lay opinions as to whether the number of meals defendants claimed were prepared in and/or served from the kitchens of small restaurants across the state (including Safari) seem high given the timeframe of such claims. (For example, defendants claimed that Safari—a small restaurant located on Lake Street in Minneapolis—consistently prepared 6,000 meals a day, every day,

seven days a week.) Comparing those kinds of figures to one's personal experience is prototypical lay witness testimony permissible under Rule 701.

To be clear, however, the rules also permit such conclusions and/or opinions from witnesses who haven't personally worked in food service, which is not the only experience that can provide proper and relevant foundation. To the extent Salah intends to object to his envisioned testimony on such grounds,[5] he should raise those objections if and as they arise at trial.

**B. Leading Questions**

Abdulkadir Nur Salah seeks an instruction precluding leading questions. The government recognizes, and will abide at trial by, the rules of evidence. It did so in the *Farah* trial—and Salah's citation to seven objections over the course of a six-week trial does not demonstrate otherwise. The government submits that the parties should make such routine objections as trial as they arise, and the Court will then be best positioned to rule on them.

**V.    Abdulkadir Nur Salah's Motion to Preclude Use of Legal Terms (Dkt. #426)**

Defendant Abdulkadir Nur Salah moves to preclude the government from using certain terms, including "victims," "fraud," and "scams." *See* Dkt. #426 at 1. He argues that such terms are overly prejudicial and cannot be used by anyone other than an expert witness. He is wrong in both respects.

---

[5] Salah cites three objections from the trial in *United States v. Abdiaziz Farah*, 22-cr-124. These were not improper-opinion objections, but rather objections that individual lines of questioning were leading or lacked foundation. Again, the Court will be best positioned to rule on such objections at trial, as they come.

First, Courts have routinely found that such language does not run afoul of Federal Rule of Evidence 403. Such terms, which merely describe the charged conduct, are appropriately used by the government in its arguments to the jury. As the Eighth Circuit has explained, "[t]he use of colorful pejoratives is not improper." *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998) (appropriate for government to describe defendant in opening and closings as a "con man" where that language described the crime). For the same reason, such terms are also permissible from witnesses on the stand. For example, in *United States v. Lussier*, this Court denied the defendant's motion to preclude the government and its witnesses from using the term "victim," explaining that "[t]he term 'victim' is not inherently prejudicial." No. 18-CR-281 (NEB/LIB), 2019 WL 2489906, at *5 (D. Minn. June 15, 2019). This Court emphasized that "victim" is a term "commonly used in the English language that does not by its nature connote guilt." *Id.*

That ruling accords with decisions by the Eighth Circuit and other Courts of Appeals permitting the use of the term "victim" in the context of jury instructions. *See United States v. Washburn*, 444 F.3d 1007, 1013 (8th Cir. 2006) (finding that "the use of the term 'victim' in jury instructions is not prejudicial to a defendant's rights"); *Server v. Mizell*, 902 F.2d 611, 615 (7th Cir. 1990) (same); *United States v. Granbois*, 119 F. App'x 35, 38–39 (9th Cir. 2004) (same); *see also United States v. Hsia*, 24 F. Supp. 2d 14, 26-27 (D.D.C. 1998) (refusing to strike words such as "unlawful," "secret," "disguised," "illegal," "covered-up," and "falsely," because those words, read in context, were relevant to the offenses charged and were not overly prejudicial).

14

And, insofar as such descriptive language comes from the mouths of the defendants or their co-conspirators, they underscore the illegality of their scheme. *United States v. Atkins*, 52 F.4th 2022, 753 (8th Cir. 2022) (finding that "the district court did not abuse its discretion in admitting [into] evidence" depictions "of a defendant using vulgar [and] highly inflammatory language" because they "were highly probative of [the defendant's] plan to recruit woman . . . for prostitution").

Second, Salah suggests that in fraud trials, none of the challenged terms can be uttered by anyone apart from a Rule 702 expert. He invokes no Eighth Circuit authority in support of that proposition, and the government is not aware of any. Testimony is not transmogrified into expert opinion merely because a witness characterizes some part of the defendants' conduct as a "scam"; it is black letter law that lay witnesses can testify to their "perceptions based on [their] experience." *United States v. Turner*, 781 F.3d 374 (8th Cir. 2015); *accord United States v. Espino*, 317 F.3d 788, 797 (8th Cir. 2003) (courts have "latitude [to] permit a witness to state his conclusions based on common knowledge or experience"). Under the law, a witness's use of such terms is afield of testimony going to the ultimate legal issue in a case. *See Kostelecky v. NL Acme Tool / NL Indus.*, 837 F.2d 828, 830 (8th Cir. 1988) (Defendant's negligence case affirming district court exclusion of testimony that accident "was caused by the injured's own conduct").

And, contrary to Salah's suggestion, a witness's informal use of a term that may also be legal in character does not inexorably turn that testimony into improper "legal conclusion" evidence. *See United States v. Locke*, 643 F.3d 235, 242 (7th Cir.

15

2011) (holding witnesses' use of the word "fraud" in the colloquial sense, "employing the vernacular of their financial professions," was not improper lay testimony); *United States v. Hearst*, 563 F.2d 1331, 1351 (9th Cir. 1977) (testimony not objectionable when average laymen would understand the terms used and ascribe them the same basic meaning intended by the witness).

The Court should reject Salah's attempt to shoehorn garden-variety, lay witness testimony into Rule 702.

## VI.    Abdulkadir Nur Salah's Motion to Preclude Improper Expert and Lay Opinion Testimony (Dkt. #427)

Abdulkadir Nur Salah moves to impose limitations on, or disallow altogether, the testimony of FBI Supervisory Forensic Accountant Mark Danielson. He raises two arguments. Because both arguments rely on a misapprehension concerning the testimony Danielson will offer, the government first explains his anticipated testimony.

Danielson is an FBI Supervisory Forensic Accountant with more than 15 years in law enforcement. He has participated in dozens upon dozens of criminal investigations concerning suspected money laundering. In doing so, he has evaluated all manner of related transfers, including those made in cash, tangible goods, real estate purchases, and other assets. As his title suggests, he has supervised teams of other FBI forensic accountants conducting this work.

Here, Danielson will provide testimony, on the basis of his training and experience, explaining what money laundering is and how it works. This is important testimony in this case, especially, where three of the defendants (including Salah) are

charged with participation in a sprawling money-laundering conspiracy involving over a dozen shell entities and hundreds of related transactions. The charged money laundering scheme involved the purchases of, among other things, luxury vehicles and real estate (including two mansions, a culinary school, and a bar). A presentation of the concepts underlying money laundering—presented from Danielson's personal experience—will assist the jury in understanding the complex network of laundering activity in this case.

Danielson will not, however, be called upon to apply those concepts to any particular transactions. This moots Salah's chief concern, that the government will ask Danielson whether the defendant's particular transfers constituted money laundering. The government will not do so. Nor will the government seek to introduce through Danielson testimony about his (limited) involvement in the investigation in this case.

## A. Danielson's Limited Role Moots Salah's Concern Regarding "Undifferentiated Expert Testimony."

Salah expresses concern that Danielson will play a "dual role" at trial, providing testimony both as an expert and based on his role in the investigation. Danielson will not do so. As described above, the government will not call upon him to testify to any facts related to the investigation. He will not play any "dual role" in this case.

Salah extends his concerns about dual-role testimony to the government's two summary witnesses: case agent Jared Agent and primary case forensic accountant

Pauline Roase, both from the FBI.[6] He needn't. Neither was disclosed as an expert in this case nor will be called upon at trial to act as such. Neither will occupy the dual role that concerns Salah.

### B. Danielson's Anticipated Testimony Does Not Require Rule 702 Expertise.

Salah objects to Danielson acting as an expert at trial, both because Salah contends Danielson cannot so qualify and because Salah believes Danielson "will simply characterize certain straightforward bank transactions as though they are criminal by labeling them as money laundering." Dkt. #427 at 4-5.

First, the government believes that Danielson can present the anticipated testimony without being certified as an expert.[7] The government will call upon Danielson to explain how money laundering works in general, based on his decade-plus of investigative experience. That testimony likely will include description of how criminal actors engage in money laundering, for example through the formation and use of entities like LLCs, and through the purchase of high-value assets, like real estate, vehicles, or luxury goods. Such testimony arises directly from Danielson's personal experience. *See* Fed. R. Evid. 602 (lay witness testimony appropriate when based on personal knowledge).

---

[6] The Eighth Circuit has approved of summary witnesses. *See, e.g.*, *United States v. Beckman*, 787 F.3d 466, 480–81 (8th Cir. 2015) (rejecting challenge to summary-witness testimony from case agent).

[7] As explained in the government's timely disclosure, the government disclosed Danielson as an expert out of an abundance of caution, to ensure the defense received notice lest the Court later determine that his anticipated testimony could only come from an expert. For the reasons stated here, however, his testimony does not require Rule 702 expertise.

If, instead, the government intended to introduce testimony from Danielson opining as to whether the transactions of defendants bore the hallmarks of money laundering, then he would first need to be certified as a Rule 702 expert. The government will not elicit any such testimony from Danielson. (If the government so intended, however, Danielson's extensive technical background in this area would qualify him, and such testimony would be permissible. *See, e.g.*, *United States v. Gonzales*, 90 F.3d 1363, 1367 (8th Cir. 1996) (approving of IRS agent acting as money laundering expert, citing among other "overwhelming evidence … to support the guilty verdict" that the expert testified that "both the transactions at issue fit several money laundering patterns")).

Salah's objections to Danielson's testimony should be rejected. Danielson will not introduce the testimony Salah envisions. Instead, he will provide the type of personal-experience testimony that any lay witness may give.

## VII. Abdulkadir Nur Salah's Motion Regarding Voir Dire (Dkt. #428).

Defendant Abdulkadir Salah files a motion in limine regarding voir dire. First, the defendant requests an order allowing attorney voir dire. The government defers to the Court on its practice for conducting voir dire, but believes that voir dire conducted by the Court is by far the most fair and efficient process for conducting voir dire—especially in a case where the selection process is likely to be extensive as it is, and the further delays imposed by permitting attorney questioning is not necessary.

Second, the defendant requests that the Court include in its voir dire questions "regarding both implicit and potential explicit biases regarding race, ethnicity, nationality, national origin, language, and religion."

Of course, the government believes that voir dire should include questions intended to identify bias. The government is firmly committed, as it the Court and defense counsel, to choosing an unbiased jury. It is the government's understanding that all potential jurors in this district are shown a video on implicit bias prior to the jury selection process. This video is designed to ensure potential jurors can recognize and set aside any implicit bias, whether racial or otherwise. Questioning potential jurors to ensure they can set aside any biases is absolutely appropriate.

But voir dire should have limits on the questions asked to potential jurors and should not contain questions that are intended to lay a foundation for later jury nullification arguments. Considering the nature of the charged fraud, and the events surrounding it, the government does not believe that the Court should further highlight the race or ethnicity of the defendants during jury selection or otherwise take any steps to suggest to potential jurors that they should handle their jury service differently based on the race or ethnicity of the defendants. And the government objects to any suggestion that the qualification or fitness of potential jurors in the state and District of Minnesota depends on the racial and ethnic makeup of their own community and whether and to what extent they have had contact with people with background in East Africa.

The defendant argues that the government "seeks to have it both ways"—meaning that the government intends to introduce exhibits such as "emails that specifically mention race and racism regarding several food distribution site owners of Somali decent." In reality, the government seeks to have it only one way: it objects to injecting race or national original as a jury nullification strategy into this case. The injection of race into the jury selection process is especially problematic here, where the defendants are charged with levying false accusations of racism against government employees who raised concerns and tried to stop their fraudulent scheme. *See* Dkt. #1 ¶34 ("When MDE denied Feeding Our Future site applications, BOCK and Feeding Our Future filed a lawsuit accusing MDE of denying the site applications due to racial animus in violation of the Minnesota Human Rights Act.").

That is precisely what happened in the recent trial of *United States v. Abdiaziz Shafii Farah*, 22-cr-124 (NEB/DTS). In that case, the defendants attempted to inject race into the trial in a manner that seemed to invite jury nullification. In addition to levying false accusations of racism against the government, they regularly asked government witnesses extraneous and irrelevant questions about the defendants' race and culture. As just one example, defense counsel asked one FBI agent whether he had ever had "spicy camel liver" for breakfast (the apparent suggestion being that because the agent had not, he was somehow unable to understand the fraud scheme or the defendants' conduct).

The government is committed to selecting a fair and unbiased jury. However, the government contends that voir dire questions about a potential juror's contact

with the East African community is unnecessary. All defendants and parties, regardless of race or ethnicity, are entitled to the same rights in our criminal justice system. Whether or not a potential juror has known or had contact with people of a certain race or ethnicity does not determine whether they can serve as a fair and impartial juror. The government objects to any question that suggests—to both potential jurors and the community at large—that people who live in communities without a sizable East African population or people who have not had contact with people from the East Africa are somehow less fit or qualified to serve as jurors. This is not true and is counter to our jury system.

### VIII. Abdulkadir Nur Salah's Motion Regarding Foundation for Admission of Video Evidence (Dkt. #429).

Defendant Abdulkadir Salah filed a motion in limine asking this Court to "establish certain principles regarding the proper foundation for video evidence in this case." The government is confident that the Court will follow and apply the Federal Rules of Evidence in determining whether the proponent offering video evidence has laid proper foundation for authenticity and relevance.

To be clear, the only video exhibit that Salah included on his exhibit list is video surveillance that was conducted by the government. The government has great confidence that Salah will be able to establish authenticity of that exhibit (either through a government witness or his own witness). To the extent that the defendant has filed this motion to get clarity about the admissibility of a video exhibit that he has not disclosed and has not included on his exhibit list, the government cannot—

22

and frankly should not have to—weigh in on the admissibility of an undisclosed piece of evidence in the abstract.

Salah references the *Abdiaziz Farah* trial, "anticipating" that similar issues relating to video evidence may arise here. In that trial, defendants repeatedly attempted to introduce videos (and photographs) into evidence without any basis to properly authenticate the videos. The Court correctly denied the admission of those exhibits. But the damage had already been done. Often, in the course of offering these (ultimately not admitted) videos, defense counsel played the videos and narrated their contents in detail, all in front of the jury, under the guise of "laying foundation." However, the witnesses through whom the defense counsel attempted to introduce such videos did not take the videos, had never seen the videos before, and had no basis to testify that the videos were what they claimed to be. Such procedure was prejudicial, and the government has submitted a motion in limine for an order that foundation for such exhibits (those with which the witness is unfamiliar) should be laid outside the presence of the jury.

The defendant's motion does not seek any particular procedure, nor "at this time, seek admission of any specific piece of evidence." But if the defendant intends to offer video exhibits that it has not disclosed to the government and has not included on its exhibit list, he should disclose and identify such videos now, so that the parties and the Court can address their admissibility in an efficient and fair manner outside the presence of the jury.

### IX.     Abdulkadir Nur Salah's Motion Seeking Additional Peremptory Challenges (Dkt. #430).

Salah filed a motion in limine asking the Court to increase the number of peremptory challenges for the defendants to a total of eighteen peremptory strikes. Under the local rules, the defendants are entitled to ten peremptory challenges. The government believes that number is sufficient and appropriate for this trial.[8]

The defendant offers several reasons for why he requires additional peremptory challenges. Each should be rejected.

First, the defendant contends that additional peremptory challenges are necessary "given the significant pretrial publicity initiated by the United States in this case." The government rejects the defendant's contention that it somehow "initiated" significant pretrial publicity. In all events, any possible prejudice that could arise from whatever publicity occurred here (in the normal course of the Department of Justice's operations) will be appropriately addressed via the Court's voir dire.

Second, the defendant argues that additional peremptory challenges are necessary because of "the heinous actions of certain defendants in [the *Farah* case]

---

[8] Salah invokes the *Farah* trial, which involved an unusually high number of contemporaneously-tried defendants—originally eight—and in which the Court allowed those eight defendants a total of eighteen peremptory challenges. By applying the local rules here and allowing the defense a total of ten challenges, the Court would already be providing an even higher ratio of challenges-to-defendant than it provided the defendants in *Farah*.

involving juror tempering." Again, this issue can and should be addressed via cause challenges during voir dire; it does not warrant additional peremptories.

Finally, the defendant claims that additional peremptory challenges are necessary because the "complexity and length of the United States' exhibit and witness list" necessitate "a jury with the fortitude to remain engaged throughout the trial." The government has tremendous faith in the jury system and rejects the defendant's contention that somehow the jury will be disengaged or lose interest if he is not given extra peremptory challenges.

## X.    Abdulkadir Nur Salah's Motion Regarding Evidence of Other Conspiracies (Dkt. 431)

Salah seeks to exclude evidence concerning food distribution sites not mentioned in the indictment, on the basis that such sites purportedly necessarily bear "no connection" to Salah. Dkt. #431 at 3. He contends such sites put him at risk for "spillover" of evidence from conspiracies charged against him with evidence from one or more conspiracies he is not.

As a threshold matter, it simply is not the case that only evidence particularly detailed in the indictment pertains to Salah. There are dozens and dozens of overt acts taken in furtherance of the charged conspiracy—which, to be clear, includes Salah—beyond those specified in the indictment.[9] That makes sense, given the sheer breadth of that conspiracy, through which Safari (of which Salah was co-owner)

---

[9] The indictment here, like each of the other Feeding Our Future indictments, charges the defendants with participation in the single, program-wide conspiracy that "obtained and disbursed more than $240 million" in food program funds. Dkt. 1 ¶ 29.

claimed to have distributed over 3,900,000 meals to children and thereby obtained over $12,000,000 in food program funds. Evidence of such acts is admissible, including against Salah. *See United States v. Longs*, 613 F.3d 1174, 1176 (8th Cir. 2010) ("A single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions."); *United States v. Kirby*, 692 F. App'x 334, 337 (9th Cir. 2017) (government's proof in conspiracy cases not limited to acts identified in indictment); *United States v. Coleman*, 349 F.3d 1077, 1088 (8th Cir. 2003) (same).

Still, Salah expresses concern that certain evidence introduced concerning Aimee Bock's misconduct could spill over to him. His proposed remedy is that such evidence—inculpatory to, at least, co-defendant Bock—be excluded entirely. This is not a serious proposal. "Spillover," which occurs when a jury is "unable to compartmentalize the evidence as it related to separate defendants," *United States v. Mickelson*, 378 F.3d 810, 818 (8th Cir. 2004), is not properly addressed by an exclusion order that badly prejudices the government's case, but by severance, *see United States v. Jones*, 880 F.2d 55, 63 (8th Cir. 1989) (Salah's case in which court rejected claim by defendants that they should have received separate trials due to spillover concerns).

In this case, several defendants (though not Salah) sought severance. *E.g.*, Dkt. ##197, 187, 204. Then, upon agreement of all parties, the Magistrate Judge denied those severance motions as moot. Dkt. #326. Amended trial notices followed, dividing the fourteen defendants charged in this case into three discrete trials. Dkt. ##359-

361. That was the correct disposition then and should not be revisited now, especially given the Eighth Circuit's "strong presumption" in favor of joint trial. *United States v. Lewis*, 557 F.3d 601, 609 (8th Cir. 2009) (joint trial "gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome"). A defendant may only overcome that presumption by showing prejudice that is "severe or compelling." *United States v. Crumley*, 528 F.3d 1053, 1063 (8th Cir. 2008).

No such prejudice exists here, and Salah's proposal to hamstring the government's case because he believes it is stronger against Bock than against him should be rejected. *See United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) ("Severance is never warranted simply because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased.").

Instead, to the extent the government introduces evidence at trial against only one specific defendant, the appropriate and more administrable and just approach is to simply use the Eighth Circuit's "Separate Crime" instruction:

> A separate crime is alleged against the defendant in each count of the Indictment. Each alleged offense, and any evidence pertaining to it, should be considered separately by the jury. The fact that you find the defendant guilty or not guilty of one of the offenses charged should not control your verdict as to any other offense charged against him or her. You must give separate and individual consideration to each charge.

Dkt. #419, Proposed Jury Instruction No. 88. Salah's authorities recognize this as the preferred solution. *See United States v. Ghant*, 339 F.3d 660, 663 (8th Cir. 2003); *United States v. Jones*, 880 F.2d 55, 63 (8th Cir. 1989) (with *Ghant*, Salah's cases in

which court rejected spillover arguments in light of trial court's cautionary instructions). That is why the parties have jointly proposed that instruction, which is more than sufficient to address the concern—and to enhance and protect judicial economy and party resources—given that "jurors are presumed to follow the court's instructions." *United States v. Muhammad*, 819 F.3d 1056, 1063 (8th Cir. 2016).

Salah's motion should be denied.

## XI. Abdulkadir Nur Salah's Motion Regarding Co-conspirator Statements (Dkt. #432).

Salah moves the Court to prohibit the conditional introduction of "any alleged co-conspirator statement that does not involve a co-conspirator whose conduct is clearly within the scope of *this* Indictment's language." Dkt. #432 at 3. Salah does not explain the parameters of such scope, yet he asserts that co-conspirator statements beyond it should be permitted only after the government establishes, for each such statement, that it was made by a co-conspirator during the course and in furtherance of the conspiracy. The wooden approach requested by Salah would grind these proceedings to a halt. The indictment in this case charges fourteen individuals (four to be tried in this trial) with joining an expansive conspiracy with numerous additional co-conspirators. If the Court had to first adjudicate every single co-conspirator statement that the government wishes to introduce, a likely weeks-long pretrial hearing would be required.

Even so, Salah argues that for this trial, the Court should undertake those pretrial proceedings and depart from the Eighth Circuit's *Bell* procedure. *See United States v. Bell*, 573 F.2d 1040 (8th Cir. 1978). He says such departure is necessary

because (he predicts) the government will conditionally introduce co-conspirator statements and then fail to substantiate them under *Bell*. In such event, the defendant contends that a curative instruction will not suffice. *Bell* does not disagree. It holds that while a curative instruction may suffice in some instances, others will require declaration of a mistrial upon appropriate motion.

The government understands its obligations under the *Bell* procedure and will meet them. The potential seriousness of the remedy for a failure under *Bell* is incentive enough for the government to be cautious and selective when seeking conditional admission. The government will conduct itself accordingly, and submits that proceeding via the *Bell* procedure, with respect to all proffered co-conspirator statements, is the only administrable way of trying a case involving a conspiracy as large as the one charged here. Otherwise, the Court and parties alike will be compelled to extend this matter (and likely each of the Feeding Our Future trials to come) for weeks or months more. Salah's motion should be denied.

### XII.    Abdulkadir Nur Salah's Motion Regarding Purported Hearsay Emails (Dkt. #433)

Salah moves the Court to preclude introduction of any communications made to the Minnesota Department of Education accusing the defendants of wrongdoing. He contends admission of such communications would violate the Sixth Amendment's Confrontation Clause and the prohibition against hearsay.

The Sixth Amendment is not implicated here. The Sixth Amendment is concerned with *testimonial hearsay*. *Crawford v. Washington*, 541 U.S. 36 (2004). But the communications Salah challenges are neither testimonial nor hearsay.

Testimonial statements are those made under oath, in police interrogations, or in circumstances that would lead an objective witness reasonably to believe that the statement would be used in later prosecution. *See Crawford*, 541 U.S. at 51-52.

Here, Salah challenges an unsworn email communication sent from a Gmail account to MDE. Such informal communications are not "testimonial," even when sent to state government employees. MDE are administrators and, to a point, regulators. They are not law enforcement, and here there is "no indication anyone made [this statement] with the expectation [it] would be used in a prosecution." *United States v. Garcia*, 778 F. App'x 779, 786 (11th Cir. 2019) (rejecting Sixth Amendment challenge to Instagram posts and messages); *Michigan v. Bryant*, 131 S.Ct. 1143, 1155 (2011) ("[T]he most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial.").

Moreover, statements that are not hearsay "are outside the Sixth Amendment." *United States v. Smith*, 816 F.3d 479, 481 (7th Cir. 2016) (citing *Giles v. California*, 554 U.S. 353, 358–59 (2008)). Such is the case for exhibit A-70, which the government intends to offer not for the truth asserted but for its effect on the listener—MDE. *See United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014) (cleaned up).

The government submits that, to the extent Salah believes at trial that any other offered exhibit runs afoul of these prohibitions, he should object at that time,

30

when the Court will be faced with the exhibit in question—and the government's response—and be better positioned to rule.

### XIII.  Aimee Bock's Motion in Limine to Preclude Allegations Beyond the Indictment (Dkt. #441)

Bock asks the Court to preclude evidence or argument relating to four issues not detailed in the indictment: Handy's Helpers / Empress Watson; School Age Consultants; fraudulent activity at additional food-program sites; and Feeding Our Future's administrative fee. Bock's argument fails, however, given the well-established rule that in conspiracy cases, the government "can submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." *United States v. Kirby*, 692 F. App'x 334, 337 (9th Cir. 2017); *see United States v. Rosenberger*, 502 F. App'x 389, 394 (5th Cir. 2012) (same); *United States v. Coleman*, 349 F.3d 1077, 1088 (8th Cir. 2003) (same).

*Handy's Helpers / Empress Watson.* The government intends to prove at trial that Empress Watson—Bock's then-boyfriend—operated a company nominally providing handyman services, but which Bock actually used to receive fraud and siphon off fraud proceeds from Feeding Our Future. In particular, Bock caused Feeding Our Future to pay Watson's company with food program money, purportedly for work done. Bock insists such payments were "fair, market compensation"; the evidence will show otherwise. Regardless, FoF's transfers to Handy's Helpers are intrinsic to the charged scheme, and their admission should not be precluded in limine.

31

*School Age Consultants.* The government intends to prove at trial that Bock created a company called School Age Consultants purportedly for the purpose of providing certain training to nonprofits, but which Bock actually used to receive and launder kickbacks from food program participants. In particular, Bock at times demanded that food program participants under FoF sponsorship pay checks—each for thousands of dollars—to School Age Consultants purportedly to defray FoF legal expenses arising from its litigation against MDE. This evidence, too, is intrinsic to the scheme, and its admission should not be precluded.

*"Claims other than those identified in the indictment."* Bock seeks preclusion of evidence concerning any food program site, or apparently any claims related to any such site, not explicitly mentioned in the indictment. This request seeks an artificial constraint on conspiracy evidence intolerable under black letter law. As described elsewhere in these consolidated responses, once a conspiracy is established, any acts committed or statements made in furtherance of the conspiracy are admissible as to all other members of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E); *see also United States v. Mickelson*, 378 F.3d 810, 819 (2004). Moreover, "[a] single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions," *United States v. Longs*, 613 F.3d 1174, 1176 (8th Cir. 2010), and the government may introduce evidence of all such activities and transactions—including those not identified in the indictment, *United States v. Coleman*, 349 F.3d 1077, 1088 (8th Cir. 2003). To be clear: the indictment alleges that Bock oversaw a massive scheme to

32

defraud the federal child nutrition program involving sites and entities under the sponsorship of Feeding Our Future. *See* Dkt. 1 ¶ 29 ("Feeding Our Future fraudulently obtained and disbursed more than $240 million" in food program funds.). The government could have charged all 70 FoF defendants in a single indictment. That the government chose not to do so to keep the discrete "clusters" it charged more administrable at trial does not change the nature of the conspiracy nor somehow restrict the government's ability to put on proof of that conspiracy in this, or any other, FoF trial. The Court should reject Bock's invitation to upend settled conspiracy law.

*Feeding Our Future administrative fee.* Bock next argues the government should be precluded from arguing that FoF's administrative fee was improper. To be clear, the food program permitted sponsors to retain a small administrative fee, intended to cover the necessary expenses incumbent to legitimate sponsor activities, like training, site monitoring, and claim review and submission. The program did not, however, permit sponsors to devise and operate a massive fraud scheme to inflate their take, in the form of a wrongfully ballooned administrative take on the order of millions of dollars, as FoF did. The evidence will show as much, and to the extent Bock seeks to exclude evidence of that knowingly fraudulent conduct, her motion should be denied.

### XIV. Aimee Bock's Motion to Preclude "Evidence Related to Bribery." (Dkt. #442)

This motion rehashes the arguments already made, and rejected, concerning the Supreme Court's decision in *Snyder v. United States*, 603 U.S. 1 (2024). The Court

has rejected the defense's efforts to seek dismissal of the indictment's bribery charges. Dkt. #402 at 14-20. That conclusion was correct, and it should stand.

## XV.  Aimee Bock's Motion to Preclude Evidence Relating to False Assurances. (Dkt. #443)

Bock moves to exclude all evidence that Bock or Feeding Our Future "made false assurances," or otherwise failed in its obligations as a sponsor within the food program. He argues such exclusion is appropriate given a rash of purported discovery violations, including that the government "chose not to produce 10 terabytes of data from Feeding Our Future employees." Dkt. #443 at 2. As discussed at length in the government's response to Bock's motion for a continuance, Dkt. #391, the government did no such thing. More than two years ago, the government disclosed the existence of, and made available to all defendants, the data about which Bock now complains—namely data obtained from devices seized from FoF and its employees. Bock is simply wrong to assert that the government has withheld these materials. Bock's motion should be denied.

## XVI.  Aimee Bock's Motion Seeking Specificity As to Defendants and Charges (Dkt. #444)

This motion appears to contain two different requests. Both should be denied.

First, Bock seeks an order requiring the government to "affirmatively identify," for each individual exhibit it seeks it introduce, "the defendant(s) that relate" to that exhibit. Dkt. #444 at 3-4. He asks that such order further obligate the government "to label its proposed exhibits with the individual defendant it relates to." *Id.* This request ignores the nature of the charged offenses.

A conspiracy is an agreement or an understanding between two or more persons to accomplish by joint action a criminal or unlawful purpose. *See United States v. Hansen*, 791 F.3d 863, 870–71 (8th Cir. 2015) (discussing jury instructions on the "three essential elements of conspiracy"). The essence of the crime of conspiracy is the unlawful agreement between two or more people to violate the law. *See United States v. Francis*, 916 F.2d 464, 466 (8th Cir. 1990) (gist of offense of drug conspiracy is unlawful agreement; once agreement is made conspiracy is complete). Once a conspiracy is established, any acts committed or statements made in furtherance of the conspiracy are admissible as to all other members of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E); *see also United States v. Mickelson*, 378 F.3d 810, 819 (2004) ("Co-conspirator statements are admissible … if the prosecution demonstrates that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the declaration was made during the course of and in furtherance of the conspiracy."). That is true even if a defendant was not involved in and had no knowledge of those actions and conversations. *See*, *e.g.*, *Bourjaily v. United States*, 483 U.S. 171, 180–81 (1987) (co-conspirator's out-of-court statements to an undercover agent—in a conversation defendant was not a part of—were properly admitted against the defendant).

Against that backdrop, Defendants' efforts to unnecessarily complicate the exhibits and evidence in this case fall flat. To the extent the actions of one actor within the conspiracy were performed in furtherance of the conspiracy, those actions can

indeed be imputed to every other conspirator as evidence of the conspiracy charged. *See id.*

For those instances in which the government seeks to introduce evidence only as to one specific defendant—for example, Abdi Nur Salah's involvement in the operation of a food site called Optimum Community Services[10] under the sponsorship of Partnership in Nutrition—the appropriate and more administrable approach is to simply use the Eighth Circuit's "Separate Crime" instruction *See supra* (discussing the parties' jointly submitted instructions in Dkt. #419); *United States v. Muhammad*, 819 F.3d 1056, 1063 (8th Cir. 2016) ("[J]urors are presumed to follow the court's instructions.").

Bock's other request in this motion is for an order precluding the government from presenting "improper argument" in jury addresses. Dkt. #444 at 3. The government will not do so. Rather, the government intends to prove that Bock and her co-defendants are guilty on the basis of evidence admissible against them and will argue only that their conduct provides the jury the basis to return guilty verdicts. The government is well aware of the ethical and legal limitations on what it may argue at trial and will abide by those limitations.

---

[10] Abdi Nur Salah operated Optimum with other charged defendants and co-conspirators, but that group did not include the other three defendants set for trial in February.

### XVII. Aimee Bock's Motion to Preclude Testimony of Hadith Ahmed (Dkt. #445)

Bock moves to preclude some or all testimony of cooperator Hadith Ahmed, a former Feeding Our Future employee and "site supervisor" who has pled guilty. Ahmed testified in the *Abdiaziz Farah* trial in spring 2024, explaining that he repeatedly solicited and took kickbacks and failed to exercise the supervision the program required. He also testified that his conduct was representative of Feeding Out Future's sponsorship generally—that is, that Feeding Our Future was not in the business of adhering to the food program's requirements in good faith but rather operated to enrich its operators and conspirators.

Bock, however, insists that Ahmed should be precluded from testifying in this trial because, she says, the government has failed to produce related, exculpatory evidence and because Ahmed "lacks credibility." Dkt. #445 at 8. Both arguments should be rejected.

Yet again, Bock accuses the government of having failed to comply with its discovery obligations. Yet again, she is wrong. She says that "[f]or over three years," the government has held Ahmed's Feeding Our Future cell phone and iPad. False. The government never obtained those devices in its investigation. (Ahmed left Feeding Our Future long before the government executed its search warrants on January 20, 2022.) She also says the government has not disclosed Ahmed's Feeding Our Future emails. But again, the government cannot disclose what it does not have. Law enforcement did not undertake a complete collection of Ahmed's FoF emails. To the extent the government has *some* of those emails, it obtained them from warranted

37

searches of *other* email accounts that happened to have corresponded with Ahmed. Such emails have been produced.

Because Bock cannot accurately invoke any discovery violation, she resorts instead to baselessly impugning the government attorneys' integrity. Citing unspecified "media reports," Bock insists that the testimony the government elicited from Hadith in the *Abdiaziz Farah* trial is disproved by a handful of text messages purportedly drawn from those devices Bock argues the government has long had and withheld—though it hasn't and didn't. She insists the government thus "made an intentional and deliberate decision not to produce" those devices. She suggests that in the last trial, the government suborned perjury. Dkt. #445 (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).

The government invites Bock to withdraw this baseless accusation. The devices she accuses the government of withholding were not withheld. When Ahmed testifies at trial, Bock is free to cross examine him to the extent she believes his prior testimony is inconsistent. But identifying such purported inconsistencies now—on the basis of three text messages, no less—hardly justifies exclusion, much less grounds for a *Napue* violation.[11]

---

[11] Bock's misfire here may owe to her apparent reliance on the one "media report[]" she cites. That source is an online blog, established four months ago, authored under a pseudonym, and dedicated entirely to discrediting the government's prosecution of the broader Feeding Our Future scheme. The entries on that blog also routinely violate the protective order in place in the Feeding Our Future cases that precludes the public disclosure of confidential materials provided to defendants. The blog entries also routinely cite and purport to display materials and communications the government *does not have*. The government believes the text messages Bock cites in

### XVIII.      Aimee Bock's Motion Regarding Feeding Our Future's Administrative Process (Dkt. #446)

Bock next argues that the government should be precluded from introducing at trial at evidence that Feeding Our Future's "process for working with sites and reviewing and processing their claims"—that is, any evidence concerning the program responsibilities FoF is charged with having violated in furtherance of the scheme. She maintains such evidence should be precluded because, on one occasion after more than a year of MDE expressing concerns about FoF's deficient performance, and after FoF sued MDE, invoking purported racial discrimination and seeking an order lifting the MDE stop-pay, MDE sent a letter approving of an FoF corrective action plan.

As the evidence will show at trial, that letter does not represent, as Bock contends, an "administrative determination" that FoF acted properly in all respects or at all times. And even if it did, that still would not be grounds for exclusion of other inculpatory evidence. MDE is not an arbiter of criminal liability. The jury is—and the jury is entitled to hear the government's admissible evidence of the same.

### XIX.  Aimee Bock's Motion Regarding Undisclosed Expert Testimony (Dkt. #447)

Bock moves to exclude a catalogue of certain kinds of testimony, including concerning the number of meals a site could reasonably serve in a day and the costs vendors could expect to pay for program-qualifying food, all on the basis that such testimony cannot possibly come from anyone other than a Rule 702 expert. The

---

her motion are of that kind; again, the government never obtained the FoF devices from which those messages purportedly came.

government will not elicit expert testimony from non-expert witnesses. Certain of Bock's categories of testimony, however, are admissible as lay opinion under Rule 701. As described above, the government anticipates calling at trial multiple witnesses who have owned or worked in restaurants, or who operated legitimately in the food program and provided meals. Such witnesses can testify to the significant logistical demands of their kitchens, like hiring and training cooking and cleaning staff, coordinating and paying for deliveries of ingredients, maintaining sufficient space to store those ingredients, and allowing staff sufficient time to actually prepare the meals. Such witnesses also can provide their lay opinions as to whether the number of meals defendants claimed were prepared in and/or served from the kitchens of small restaurants across the state (including Safari) seem high given the timeframe of such claims.

Bock's motion should be denied. She can raise such objections at trial to the extent she believes they are warranted by particular testimony.

## XX.    Aimee Bock's Motion Regarding Trips and Expenses (Dkt. #448)

Bock moves to exclude evidence about any "trips, expenses, or spending" of individuals other than Bock herself. However, such spending, whether by Bock, her fellow defendants, or unindicted co-conspirators, is intrinsic to the charged conspiracy and is admissible under black letter law.

Lifestyle evidence—that a defendant spent, or spent lavishly—is admissible to show motive. *See United States v. Mitchell*, 31 F.3d 628, 631 (8th Cir. 1994) (evidence of accomplice's lifestyle was relevant to motive of avoiding currency reporting); *see also United States v. Carrera*, 259 F.3d 818, 829 (7th Cir. 2001) ("Expensive trips,

gambling, and other instances of free spending and high living may be pertinent in crimes involving a motive of enrichment."); *United States v. Jackson-Randolph*, 282 F.3d 368, 378-80 (6th Cir. 2002) (affirming district court decision to allow lifestyle evidence of motive and stating that government need not demonstrate a "direct connection" between such evidence and illegitimate sources).

The one example Bock gives—concerning a July 2021 trip to Las Vegas—falls squarely within these principles. Empress Watson (Bock's then-boyfriend) took that trip. As the evidence at trial will show, he paid for that trip using food program money paid into his company, Handy's [sic] Helpers, by Feeding Our Future. Such spending of fraud proceeds by a co-conspirator is admissible. The motion should be denied.

Dated: January 14, 2025                    Respectfully Submitted,

                                           ANDREW M. LUGER
                                           United States Attorney

                                            */s/ Joseph H. Thompson*
                            BY:    JOSEPH H. THOMPSON
                                   HARRY M. JACOBS
                                   MATTHEW S. EBERT
                                   DANIEL W. BOBIER
                                   Assistant United States Attorneys