UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 22-cr-223 (NEB/DTS) |
| Plaintiff, | ) | |
| v. | ) | |
| Aimee Marie Bock(1), Salim Ahmed Said(3), | ) | Courtroom 13W Minneapolis, Minnesota Monday, February 24, 2025 9:01 a.m. |
| Defendants. | ) | |

---

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT DISTRICT JUDGE

**VOLUME IX - JURY TRIAL PROCEEDINGS**

Court Reporter: RENEE A. ROGGE, RMR-CRR
United States Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

* * *

Proceedings recorded by mechanical stenography; Transcript produced by computer.

* * *

APPEARANCES:

For Plaintiff: UNITED STATES ATTORNEY'S OFFICE
BY: JOSEPH H. THOMPSON
HARRY JACOBS
MATTHEW S. EBERT
DANIEL W. BOBIER
600 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

For Defendant Aimee Marie Bock(1): KENNETH UBONG UDOIBOK P.A.
BY: KENNETH U. UDOIBOK
310 Fourth Avenue South, #5010
Minneapolis, Minnesota 55415

For Defendant Salim Ahmed Said(3): COLICH & ASSOCIATES
BY: MICHAEL J. COLICH
ADRIAN SCOTT LAFAVOR-MONTEZ
RAGHEN LUCY
10 South Fifth Street, #420
Minneapolis, Minnesota 55402

* * *

# I N D E X


| | PAGE |
|---|---|
| **JARED KARY** | |
| Cross-Examination By Mr. Udoibok | 1863 |
| Redirect Examination By Mr. Ebert | 1921 |
| Recross-Examination By Mr. Udoibok | 1927 |
| Redirect Examination By Mr. Ebert | 1930 |
| **GABRIELLE RAINES** | |
| Direct Examination By Mr. Bobier | 1931 |
| Cross-Examination By Mr. Udoibok | 1942 |
| Cross-Examination By Mr. Montez | 1944 |
| **ABDULKADIR AWALE** | |
| Direct Examination By Mr. Ebert | 1947 |
| Cross-Examination By Mr. Udoibok | 2001 |
| Cross-Examination By Mr. Montez | 2014 |
| Redirect Examination By Mr. Ebert | 2015 |
| Recross-Examination By Mr. Udoibok | 2017 |
| **BETH SHIPMAN** | |
| Direct Examination By Mr. Bobier | 2019 |
| Cross-Examination By Mr. Udoibok | 2064 |

| GOVERNMENT'S EXHIBITS | REC'D |
|---|---|
| Z3 | 1862 |
| Z4 | 1862 |
| Z6 | 1862 |
| Z7 | 1862 |
| Z9 | 1862 |
| S32 | 1996 |
| S91 | 1983 |
| Z10 | 1862 |
| Z11 | 1862 |
| Z13 | 1862 |
| Z14 | 1862 |
| Z15 | 1862 |
| Z16 | 1862 |
| Z17 | 1862 |
| Z18 | 1862 |
| Z19 | 1862 |
| Z20 | 1862 |
| Z21 | 1862 |
| Z22 | 1862 |
| Z23 | 1862 |

Z24 1862
Z25 1862
Z26 1862
Z27 1862
Z28 1862
Z29 1862
Z30 1862
Z31 1862
Z32 1862
Z33 1862
Z34 1862
Z35 1862
Z36 1862
Z37 1862
Z38 1862
Z39 1862
Z40 1862
Z41 1862
Z42 1862
Z43 1862
Z44 1862
Z45 1862
Z46 1862
Z47 1862
Z48 1862
Z49 1862
Z50 1862
Z51 1862
Z52 1862
Z53 1862
Z54 1862
Z55 1862
Z56 1862
Z57 1862
Z58 1862
Z59 1862
Z60 1862
Z61 1862

* * *

**IN OPEN COURT**

**(JURY NOT PRESENT)**

**9:01 a.m.**

THE COURT: Good morning, everyone. You may be seated.

We are on the record out of the presence of the jury. And my understanding is that the parties have some exhibits to admit that they've agreed to.

Mr. Bobier.

MR. BOBIER: Good morning, Your Honor.

THE COURT: Good morning.

MR. BOBIER: That's right. Those are any exhibits in the Z, as in zeta, series that are not yet in.

By my count, Judge, those are Z3 and Z4, Z6 and Z7, Z9, 10 and 11, Z13 through Z61.

THE COURT: All right. Mr. Udoibok, am I correct -- is Mr. Bobier correct that those are agreed to?

MR. UDOIBOK: Yes, Your Honor.

THE COURT: And Mr. Colich?

MR. COLICH: Yes.

THE COURT: Okay. So those exhibits are admitted.

Any others?

MR. BOBIER: None right now, Your Honor. Thank you.

THE COURT: All right. And let's step off, and

we'll get the jury, and we'll be prepared for Mr. Udoibok's cross of Agent Kary. Yes?

(Recess taken)

9:04 a.m.

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: You may all be seated. Good morning.

And we are prepared for Mr. Udoibok's questioning of Agent Kary.

You may proceed, Mr. Udoibok.

MR. UDOIBOK: Thank you, Your Honor.

JARED KARY,

called on behalf of the government, was duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. UDOIBOK:

Q. Agent Kary, we meet again.

A. Correct.

Q. The second round?

A. Correct.

Q. I want to direct you to I believe the last exhibit that you were talking about, and that's Exhibit V41, which is in evidence.

Ms. Mallet, would you call up V41, please.

I want to walk you through that exhibit, sir. I

want to understand what your testimony is.

What is Exhibit V41?

A. It is an application for the CACFP, a site under the sponsorship of Feeding Our Future with a site ID number and related to Southside Youth.

Q. So I want to walk through the exhibit. So it's, is it, it's a site application and not site ID application, correct?

A. It says Site Application. The red spot up on the top says Application.

Q. So by this time an Exhibit 41 Southside Youth had already been approved with a number, a site ID, with ID 900019728, correct?

A. It appears that there's a site ID number associated with the site on the application, yes.

Q. And the specific year for V41 is 2020 through 2021, correct?

A. The program year states 2020 through 2021.

Q. All right.

And it shows on this, shows under serious deficiency information that no serious deficiency was found, correct?

A. It states that no serious deficiency found, correct.

Q. And the type of center in this case is a nonprofit; is that right?

A. That is what is checked, correct.
Q. And the classification of the site is at-risk center?
A. Correct.
Q. Correct.
Then I'm directing you to page 2, the first line.
Ms. Mallet, would you call out that first line.
What does that say?
A. "This site is legally separate from the sponsoring authority."
Q. And who is the sponsoring authority.
A. From that first page Feeding Our Future.
Q. What does it mean, do you understand what it means that the site is legally separate from the sponsoring authority?
A. My understanding of that would be that it is not the sponsor that is running that site related to the Southside Youth title.
Q. All right. Let's go back to the first page. And what is the address of the site?
Ms. Mallet, would you call out the site address?
A. The address is 2854 Columbus Avenue, Minneapolis Minnesota.
Q. Let's go to the next page, Ms. Mallet.
Officer, I want you to pay attention to that address and that legal relationship that you just described.
Let's go back to page 2.

Now on page 2, what is the exempt status? What does it say?

Highlight please, call out legally exempt. What does that say?

A. "Exempt from DHS or tribal council licensure."

Q. What is the significance of that?

A. I am not certain.

Q. Now on page 3 I believe you testified to the internal application notes.

Ms. Mallet, would you call out that internal application notes.

What does that say in summary?

A. In summary, it is, appears to be MDE personnel entering notes related to an email they received from the sponsor that verifies that different youth are being served at each of the locations in the building related to the two sites that were being operated under the sponsorship Feeding Our Future.

Q. Then do you see the portion that says the other site is Feeding Our Future, Taylor? Do you see that?

A. I do.

Q. All right. And is Taylor different from the Southside Youth?

A. There were two sites with that same address at the Taylor -- so they, Columbus Avenue Feeding Our Future site,

had a Taylor, which had a change of address during the time frame of the 18 months related to the program.
Q. When you mean change of address, change of address to what?
A. Change of address to go to the 2854.
Q. All right. So and then you discuss about the site application certification or truth. Do you see that?
A. I don't see where certification of truth. Oh, at the very bottom, yes.
Q. Yes. Ms. Mallet, would you call out that section.
And I believe you testified that the sponsor needed to attest to the truthfulness of the application, correct?
A. Correct.
Q. Now, Ms. Mallet, I would like you to release the callout, but then call out the paragraph or the sentence starting with, "Department of Agriculture, Minnesota Department of Education" and call out the rest of it. There you go.
What does that say, please?
A. "That officials from the U.S. Department of Agriculture and the Minnesota Department of Education may verify this information and that deliberate misrepresentation may subject me to prosecution under applicable state and federal criminal statutes."

Q. Ms. Mallet, would you highlight "deliberate misrepresentation."

Officer, what does "deliberate misrepresentation" mean to you?

MR. EBERT: Objection. Calls for a legal conclusion.

THE COURT: Sustained.

MR. UDOIBOK: Do you understand what "deliberate misrepresentation" is?

MR. EBERT: Same objection, Your Honor.

THE COURT: Sustained.

MR. UDOIBOK: All right.

BY MR. UDOIBOK:

Q. Well, Officer, does that attestation say that deliberate, that in summary the sponsor attests that it will not deliberately misrepresent? Is that the same meaning?

A. I would agree with that, yes.

Q. Okay. Now let's go to the next page. That's page 4, please.

And what is the site program name on this document? Page 4, please. There you go. It's still Southside Youth, correct?

A. When you ask "program name" under the CACFP program, it would be the top left for applications would be the program.

Q. So go, site program name is what I'm looking for.

A. Yes, I see that. Southside Youth, yes.
Q. And that's the same period 2020, 2021, correct?
A. This says 2021, 2022.
Q. Okay. I'm sorry.
Now go to page 6 and call out the internal application notes. What does that say?
A. Similarly, the site is -- the MDE notes related to getting confirmation from the sponsor, specifically Ms. Bock, that this site has different sets of youth being served at the separate location inside the building.
Q. All right. Now I want to direct you to government Exhibit P70. I believe is already in evidence.
This is the Southside Youth permanent file that was obtained from where, do you know?
A. From the Feeding Our Future office.
Q. All right. Let's go to page 7.
Maybe we should -- would you prefer I go to, just to familiarize yourself with the exhibit, by going to first, through first, second, all the way to seven? Would that help?
A. That would be helpful, yes.
Q. All right. Ms. Mallet, go back to the first page.
And what visit date is on this exhibit?
A. It appears to be either April 1st or April 2nd of 2021.
Q. And what is the site name?

A. Southside Youth.
Q. And the address?
A. 2854 Columbus Avenue.
Q. All right. Go to the next page, just scroll down a bit. And just list through it slowly for the officer to go through. And then when you get to 7, you stop.
So additional forms and followup. What does that say?
A. "Trained, needs red book, posters, clicker."
Q. All right. Continue. Stop. Call out the signature block.
Do you know who the site staff signature is?
A. I believe that to be Khadra Xaashi.
Q. Okay. And whose signature is that?
A. It's also the Khadra Xaashi. That's X-A-A-S-H-I. She is the Metro Area Catering supposed vendor for the site.
Q. We will go back to that page, to that call out.
Do you see the word "sponsor signature"?
A. I do.
Q. All right. It's not Ms. Bock, is it?
A. It does not appear to be her signature.
Q. All right. Continue.
Now this is a W9 for Southside Youth. Do you see that?
A. I do.

Q. And is the 2854 Columbus Avenue, correct?
A. That is listed in the address on line 5 there, yes.
Q. All right. Continue. And it's signed by Khadra Xaashi, correct?
A. Correct.
Q. Not Aimee Bock?
A. That is correct.
Q. Now the license exempt verification is signed by who?
A. Again, Khadra Xaashi.
Q. And it looks like there was a name that was crossed off. What name is that?
A. Mohamoud Warsame.
Q. Again, not Ms. Bock, is it?
A. No.
Q. Ms. Mallet, why don't you continue to scroll down. Stop.
Again, the program is Southside Youth at that address, 2854 Columbus, correct?
A. Correct.
Q. Continue.
Is the same information -- do you see Ms. Bock's signature for sponsoring organization as Feeding Our Future is here. Do you see that?
A. I do see that, yes.
Q. All right. Let's go to, let's go to page 20.

What is, what is that?
A. This looks like a printout of a CLiCS customer admin page from the CLiCS system.
Q. All right. And it's still relating to the 2854 Columbus Avenue, right?
A. It is, yes.
Q. I want to take you now to what is already in evidence, P71, Government Exhibit 71.
Do you recall Exhibit P71?
A. Yes.
Q. And what is it?
A. It's a folder that we obtained during the -- or it's a digital copy of a folder we obtained during the search warrant at the Feeding Our Future office.
Q. All right. Go to the first page.
What is that?
A. It's titled a Summer Food Service Program Site Application Supplement.
Q. We're going to go through it slowly. And the sponsor ID is 2000010264. Who is the sponsor?
A. Feeding Our Future.
Q. All right. Slowly go through. And then you see the title of the site monitor. Who is that?
A. Farhia Sheikhbon.
Q. Keep on scrolling through, please. Just slowly. Now,

keep on going.

Now, do you see that the vendor is Metro Area Catering? Do you see that?

A. I do see that, yes.

Q. All right. Scroll down.

Now, do you see the site name for Feeding Our Future?

A. I do, yes.

Q. Is what's the address?

A. On this piece of paper it's 2501 Northeast Taylor Street.

Q. It's not 2854 Columbus Avenue South, is it?

A. This definitely lists that address. However, there is a site change submitted to have the address changed to the 2854 Columbus.

Q. I'm going to make sure I understand what your testimony is. You agree with me that the site name Feeding Our Future and address is 2501 Northeast Taylor Street, correct?

A. On this piece of paper it says that, yes.

Q. And its site name for Southside Youth is 2854 Columbus Avenue South. Do you see that?

A. I do see that, yes.

Q. Now, Ms. Mallet, go to the second page of this document. Just mark that. We are on page 4.

Isn't that a site application supplement

information sent to MDE?
A. It is, yes.
Q. All right. Continue scrolling on page 4. Stop for a second.
And what date was this contract request?
A. It states May 1st, 2021, through May 1st of 2022.
Q. Do you recall when you did your surveillance of the 2854 address?
A. Yes.
Q. What date?
A. Leading up to putting the pole cam up in November and leading into having the camera up from November 18th through January of 2022.
Q. That was after this date, isn't it?
A. It was right in the middle of this, but we did confirm that the address had switched to the 2854 Columbus Avenue for the Feeding Our Future site as well, and it was also confirmed in an October email.
So I don't want anyone confused. There was purportedly two sites at the 2854 Columbus Avenue.
Q. And my question to you is, in this document Feeding Our Future site is located at 2501 Northeast Taylor Street, correct?
A. Again, to be clear, it says that on this document. However, the sites were always moving around, not always,

but a lot of times they were moving around. So this document could be misleading if you think that it stayed that way the entire time.
Q. This is a document that came from the government pursuant to your search, isn't it?
A. It is in a folder that we obtained when we searched the Feeding Our Future office, yes.
Q. All right. Continue. Scroll down, please, if there's more. Scroll down. Stop.
This document is signed by Ms. Bock, correct?
A. Correct.
Q. All right. Continue. This is also signed by Ms. Bock. And go back to the top of that page, page 12.
Do you know what this is?
A. I am not too familiar with this document, but the title says Independent Price Determination Certificate.
Q. Call out the first paragraph that says, that one, yep.
What is that? What does it say?
A. "The prices in this offer have been arrived at independently, without consultation, communication, or agreement for the purpose of restricting competition, as to any matter relating to such prices with any other officer or with any other competitor."
Q. All right. What does that mean to you?
A. In general, it means that they are kind of a set

contract price is what I would read that as, and independently it's an arm's length transaction so that the other person is not influenced.

Q. All right. Go ahead. Scroll. Continue. I think it's 12 pages or 15. All right. Stop.

What is this document?

A. This looks like a site identification request form to add, change or look up a site number in the CLiCS system.

Q. So, and what is that address?

A. It is the 2854 Columbus Avenue.

Q. And it wants a new site ID number request, correct? Isn't that checked? Call out the box.

A. Yes.

Q. So this is a request for a new number different from what is existing now, correct?

A. It's a request for a new site ID number, yes.

Q. For Feeding Our Future, Taylor located at 2854 Columbus, correct?

A. Correct.

Q. All right. Continue. And then call out the site ID request. Pull it up.

What is the first request?

A. "Is site legally separate or unaffiliated from the sponsoring organization." And the box is checked no.

Q. No. All right. It's a nonprofit, correct?

A. That is what is checked, correct.

Q. All right. And so that's Taylor located at 2854 requesting a new ID. And the location we'll see. Go ahead. Scroll down.

And this request is made by Ms. Bock, correct?

A. Correct.

Q. And who is the title -- well, it's the Feeding Our Future site, correct, and the ID. We now know the ID ends in 264, correct?

A. For Feeding Our Future that is correct.

Q. Yes. And the site name is Feeding Our Future, Taylor, correct?

A. Yes.

Q. Not Columbus?

A. Correct.

Q. All right. And the name of the site monitor is Hamdi Shirwa, correct?

A. Correct.

Q. Scroll down. Continue.

You see the notation, the site name, be the existing site name, that 2854 Columbus?

A. Correct, yes.

Q. All right. And the vendor is Metro Catering?

A. Metro Area Catering, correct.

Q. All right. Continue. And the signatures from sponsor

Feeding Our Future, and the vendor is Metro Area Catering. Do you see that box?
A. I do see that, yes.
Q. Continue. And there's a contract, a food management contract. Call out that section. See.
All right. And that agreement is entered on June 1st, 2021, correct?
A. Correct.
Q. This is before your surveillance, correct?
A. Yes, it is.
Q. Let's just go to the end so that it's complete. Scroll down just a few more pages.
All right. This is a typical site application that you have been, you have seen submitted from Feeding Our Future to MDE for approval, correct?
A. Similar. The application is a little bit different, what happens and when, but yes, it is similar. And I'm familiar with the applications, yes.
Q. I want to take you to Exhibit A72 that is already in evidence. This is an email. Could you call out the email section, please.
This is what you testified to on Thursday regarding from Kendra Pace to Ms. Bock, correct?
A. Yes.
Q. And MDE was also copied.

A. Correct. The MDE email, yes.
Q. Ms. Mallet, would you highlight the subject of this email?
And the subject is what? Site request names?
A. Correct.
Q. All right. Does that mean the names for a site, correct?
A. That's what the subject line says. The context of the email sort of speaks for itself.
Q. Highlight the date of this email.
It is August 20th, 2021, a Friday?
A. Yes, it is.
Q. All right. Let's go to the body of the email that you testified to. Call out the body of the email.
It says, "Good morning. Please see the site list below. In processing we have noticed many of these sites appear to be restaurants, apartment buildings or other office building spaces. Do you have another site name we can use to help identify the location?"
Do you see that?
A. I do see that, yes.
Q. Then call out the box. Let's go specifically to the 2854.
Officer, do you notice that that is Feeding Our Future-7 at 2854 Columbus Avenue South? Do you see that?

A. That's what it says, yes.
Q. Is it Southside Youth?
A. Not for this specific one, no. Southside Youth's a different site under the Metro Area Catering Southwest or Southside Youth.
Q. So --
A. So there's two sites.
Q. All right. Let's just pause for a bit. I want to have some clarity.
Feeding Our Future-7 is a list of sites or ID, rather, list of IDs?
A. Feeding Our Future-7 goes right across and has an address of the 2854 Columbus.
Q. All right. Now, we just reviewed applications that you testified to. My question is, In December when you conducted the surveillance, December 2021, when you conducted surveillance at 2854 Columbus Avenue, were you surveilling Feeding Our Future-7 or Southside Youth?
A. Both, because they were both purportedly located there.
Q. Are you sure that Feeding Our Future was operating Feeding Our Future-7 at 2854 Columbus?
A. Based on what the paperwork indicated, based on the email that MDE sent to Ms. Bock and the clarification, yes.
Q. So you were relying on the paperwork that you found at Feeding Our Future building, correct?

A. The paperwork, the interviews, the --
Q. The interviews?
A. The MDE paperwork that they provided as well, and the CLiCS data that we had. So a number of different factors indicated that there were two sites at the 2854 Columbus Avenue, both the Feeding Our Future site and the Southside Youth.
Q. Let's go, take out the callout. Let's go to the next page, if there is any. There's nothing. So I just want to make sure that this email -- go back to page 1, Ms. Mallet.
You understand that Ms. Bock -- I mean Kendra Pace provided Ms. Bock or Feeding Our Future a list of Feeding Our Future sites, correct?
A. So this is an email, my understanding, based on it, is MDE seeking clarification from Ms. Bock about the 27 plus sites that they were uncertain about their location.
Q. Okay.
A. And one of those addresses includes 2854 Columbus.
Q. They were uncertain about that address, and Ms. Bock is expected to give clarity, correct?
A. Wanting to know if there was another site name to help identify the location.
Q. All right. Let's go to A73.
You testified to this exhibit.
And call out who this exhibit is from and to whom.

So this is Ms. Bock's response to Kendra Pace, correct?
A. Among other people at MDE, correct.
Q. And then call out the subject.
It's regarding site names, correct?
A. Correct.
Q. All right. So let's walk through the correspondence a bit.
So could you read the first, could you read that portion so -- because you read it so well last time?
A. Sure. So this is Ms. Bock's response to Ms. Pace. It says, "I am unclear what you mean by 'many of these sites appear to be restaurants, apartment buildings'. . . If you mean the physical locations, then yes. If you mean sites as that term is used in the federal regulations, then no. These are all Feeding Our Future sites. We are operating them. What do you mean by 'another site name'? Does MDE have preference or protocols that you would like us to follow in naming sites that Feeding Our Future is operating? As you know, we have tried a number of conventions at MDE's request and all have led to problems. To list a couple, MDE has mistakenly denied or delayed applications because two different organizations were operating out of the same physical address. It has denied or delayed applications because it was confused about who was actually operating the

program, and it has called locations asking about receipts when the location has nothing to do with the operation of the food program. Using the location as the site name has also confused parents and the community about who is providing the food."

Q. All right. So Ms. Bock is expressing some confusion about naming convention, correct?

A. The email speaks for itself of what she is saying right there.

Q. All right. So let me direct you to, again, to A72, the list. Right? Now you see the list?

A. I do.

Q. Is Southside listed, Southside Youth listed on that list?

A. Again, Southside Youth is under the sponsorship of Feeding Our Future, but it's a separate site.

Q. All right. My question, the conversation between Kendra Pace and Ms. Bock was regarding this list, correct?

A. It's a reply to this exact email, I believe.

Q. But Southside Youth was never an issue on this exhibit, correct?

MR. EBERT: Objection. Vague question.

THE COURT: Overruled.

You may answer if you can.

THE WITNESS: The address related to that

Southside Youth is on this. However, it is related to the second site that's at that same location.

BY MR. UDOIBOK:

Q. The conversation in the email between Ms. Bock and MDE Kendra Pace does not involve Southside Youth, does it?

A. Not this specific thread.

Q. Okay. That's all I wanted.

Now let's go to V41. I believe that's already in evidence. Do you recall testifying about this?

A. I'm not sure if it was this one, but I am familiar with this. Yes, I think so.

Q. You testified about it. And I believe you testified that Ms. Bock misrepresented to MDE regarding the 2854 Columbus Avenue. Do you recall that?

A. Correct. If this is the one that has the block with the information.

Q. Yeah, but -- would you call out the site address and program name.

Do you see 2854 Columbus Avenue?

A. I do, yes.

Q. And the site program name is Southside Youth?

A. Correct.

Q. Where is your surveillance of the 2501 Taylor?

A. This is --

Q. 2501 Taylor?

A. Not with a pole cam, no.
Q. Let's go to page 2.
COURT REPORTER: Could you pause for a minute?
THE COURT: Let's take a short break.
(Recess taken)
(Recess taken at 9:47 a.m. till 9:51 a.m.)

**9:51 A.M.**

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: All right. Counsel, we're ready to go back.
MR. UDOIBOK: Yes, Your Honor.
BY MR. UDOIBOK:
Q. So, Ms. Mallet, V41, go to the first page. V41.
So I want us to understand, Officer, at V41 is that a site ID application or a site application?
A. The red tab indicates application at the top.
Q. All right. Now, let's go back to A72.
The conversation or the email between Kendra Pace and Ms. Bock, was it relating to a site identification or a site application?
A. It's related to the list of sites under, the 27 sites listed under Feeding Our Future. It's about the sites appearing to be restaurants, apartments or buildings, and they are trying to get to figure out that they know the

actual location, where food is supposed to be served.
Q. All right. Please call out the last sentence there, that, "Do you have another site name?"
Do you see that?
A. I do.
Q. It says, "Do you have another site name we can use to help identify the location?"
Do you see that?
A. I do see that, yes.
Q. The conversation between MDE, Kendra Pace, and Ms. Bock was not a site application, but rather it was a site identification, just the number to identify where they are located, correct?
A. I'm sorry. Could you repeat that?
Q. Exhibit A72, the email correspondence between Kendra Pace and Ms. Bock, was it about a site application. You know what site application is. It's different from a site ID.
A. It's not about the application.
Q. It's not about the application. It is just the name identification, correct?
A. It's about the identification of the location.
Q. Let's go to V40. It's in evidence.
What is this?
A. This is a CACFP application, or the site maintenance

form, application for the Feeding Our Future, Taylor location also at 2854 Columbus Avenue.
Q. What is the name of the program name?
Ms. Mallet, would you call out that?
A. Feeding Our Future, Taylor.
Q. That's different from Southside Youth, correct?
A. Correct.
Q. All right. What time period is this?
A. Program year 2020 through 2021.
Q. All right. And it's a nonprofit?
Call out.
A. It does indicate that, yes.
Q. All right. Let's go to the next page. The first one, what does it say?
A. "This site is legally separated from the sponsoring authority."
Q. So Feeding Our Future, Taylor is separate from Feeding Our Future; is that correct?
A. I don't believe that to be true. I believe this is a misrepresentation on the application.
Q. I know that's what you testified. You don't have any evidence of misrepresentation. I'm saying this exhibit, this is a government exhibit, V40.
What does that document say regarding the legal status of that site?

A. I would disagree that there's no evidence to say that this -- I mean, the other email says this is our site, Feeding Our Future, and then -- so this document says that this site is legally separated from the sponsoring authority. It contradicts what was in the previous email of A72.
Q. Well, did it say, did it say Southside Youth?
A. No. It said Feeding Our Future, and then the other email responding to that is Feeding Our Future is operating these sites.
Q. Are you referring to Exhibit -- let me just go to Exhibit --
A. I think it's A73.
Q. Yeah.
A. Ms. Bock's response to the sites that they were operating.
Q. All right. Let's go to A73.
All right. Ms. Bock says that they are operating those sites. The name, it's just the name operating the sites. The issue was the name.
A. It says, "These are all Feeding Our Future sites."
Q. I agree with you. "These are all Feeding Our Future sites." Well, let's see the list. All right?
Go to the next page.
The next page is Feeding Our Future 1 through 27.

Officer, is the Feeding Our Future, Taylor there?
A. Yes.
Q. What is Feeding Our Future, Taylor?
A. Feeding Our Future-7 is Feeding Our Future, Taylor which is the 2854 Columbus that associates with the site application.
Q. Officer, I just asked you. The State of Minnesota provided the name of the site, and the name of the site is Feeding Our Future-7?
A. I would not agree that they provided the name.
Q. Well, who is the writer of this email?
A. Ms. Pace.
Q. All right. Where does Ms. Pace work?
A. Again, she works at --
Q. The State of Minnesota?
A. -- Minnesota Department of Education. However, she's identifying all the 27 sites that are Feeding Our Future sites, and the site application has the address of Columbus, and it indicates that it's Feeding Our Future, Taylor on the documentation.
Q. Is it your testimony that Feeding Our Future did not have a site named Feeding Our Future 1 through 27?
A. I'm not testifying that -- they have the name and an associated number with it. Who assigned that number, I don't know who specifically did. I'm a little confused by

your question.
Q. I'm sorry if you are confused, because your testimony was confusing me too.
So I just want to make sure that on this list there is no Feeding Our Future, Taylor.
A. The actual words that say that are not on this. However, I am aware of based on the investigation what that site correlates with, which address on this page.
Q. Is there a Feeding Our Future, Southside?
A. Again, that is not on this list, but that same address related to the Southside Youth is also on this document, but this document is not asking about that separate site.
Q. Okay. I want to direct you to -- it's not in evidence -- D1-994 to see what your reaction is.
MR. THOMPSON: Is this a new one?
(Counsel confer)
BY MR. UDOIBOK:
Q. Do you see, do you see that email?
A. I do.
Q. And you reviewed a packet of emails from Ms. Bock to MDE, correct?
A. I have seen emails that way, yes.
Q. And you also testified about site ID requests, correct?
A. I have, yes.
Q. And, and there's a site ID request in February of 2021.

Do you see that?
A. I do, yes.
Q. I want you to go through one more step just to see what your reaction is.
Ms. Mallet, would you scroll down?
MR. EBERT: Your Honor, as to this exhibit, I'm going to object. It's hearsay. Lack of foundation.
THE COURT: Sustained as to foundation.
MR. UDOIBOK: Your Honor, it's offered not for the truth of the matter, but for the officer's reaction.
THE COURT: I sustained it as to foundation, not as to hearsay.
BY MR. UDOIBOK:
Q. All right. Did you, did you review emails regarding Feeding Our Future, Taylor?
A. I have reviewed emails related to Feeding Our Future, Taylor, yes.
Q. And you see the number on the left corner of that document? Are you familiar with that?
A. Not that specific one.
Q. But you've seen those production numbers, correct?
A. I have, yes.
Q. And you have reviewed email correspondence between Ms. Bock and MDE regarding site application, specifically with Taylor?

A. I have, yes.
Q. And are you familiar with Ms. Bock's or Feeding Our Future application for site identification for the Taylor address?
A. Some of them, but not this specific one without looking at the full document.
Q. I'll direct you to look at the second page to see whether it will refresh your recollection.
MR. EBERT: Your Honor, I'm going to object to this line of questioning. There's a lack of foundation, and I would renew my objection as to hearsay. This is a statement of Ms. Bock.
MR. UDOIBOK: Your Honor, before the court rules, I have tried to stay very narrow regarding my objections. The court has orders that we don't do speaking objections.
THE COURT: Fair. I want to see the rest of the document.
MR. UDOIBOK: Please.
THE COURT: That's fair.
Is that the end of it?
MS. MALLET: Yes, it is.
THE COURT: The objection is sustained.
BY MR. UDOIBOK:
Q. All right. I'll ask it this way: Are you aware that Ms. Bock, Feeding Our Future requested a change from 2854

Columbus address to 2501 Taylor?

A. I'm not sure of the timing or what took place. I just believe that during the time frame when we were doing surveillance that two sites were at that location.

Q. No. My question, though, is, Are you aware that Ms. Bock requested that the 2854 Columbus Avenue South be changed to Taylor address of 2501 Taylor?

A. I thought it went the other direction, but I'm not sure.

Q. All right. So if I were to show you correspondence from Ms. Bock to MDE about the site change, would, would you be surprised?

A. I would be confused by that, and I would want to see the other documents related to that folder that we've seen throughout the investigation that confirm that it was at that site.

MR. UDOIBOK: Your Honor, may I offer D1-994?

THE COURT: Any objection.

MR. EBERT: Yes, Your Honor. Lack of foundation and hearsay.

THE COURT: Sustained.

MR. UDOIBOK: Let's go to D1-995.

MR. EBERT: Your Honor, I would renew the same objection, and to any document that like these two is a statement of Ms. Bock. It's hearsay and lack of foundation.

THE COURT: Sustained.

BY MR. UDOIBOK:

Q. Did you review Exhibit D1-995 as part of your investigation?

A. I don't know.

Q. Okay. Let's go to D1-996.

THE COURT: Counsel, may we have a sidebar, please?

**(Sidebar discussion)**

THE COURT: D1-994, '95 and '96 have all been statements authored by Ms. Bock. There's been an objection to hearsay because they are authored by Ms. Bock. I think, Mr. Udoibok, your response was that they weren't offered for the truth, and I'd like to hear the government's response to that.

MR. EBERT: Well, I think that's exactly what he's trying to offer them. I think these are classic hearsay. There's no basis for them to come in. They are hearsay, and there's not any sort of alternative formulation for why they should come in as nonhearsay.

And also, this agent has already indicated that these are the type of documents that he has not seen. So I don't think it's proper or appropriate for Mr. Udoibok to continue to persist in showing these same types of documents that he hasn't seen.

And it's also in addition, Your Honor, not clear

to us as we sit here that we have even seen these exhibits before. So for all of these reasons, we have incredible concerns about counsel continuing to persist in these hearsay exhibits and the same objection we raise each and every time he's going to show one of these documents.

And I think the court's sustaining of those objections is well-founded.

THE COURT: Thank you.

Mr. Udoibok, do you have anything in response?

MR. UDOIBOK: First, I tried to enter the exhibit based on, to see what the witness will react to. It's not offered for the truth of the matter. And, and it's an impeachment evidence because the witness selected the varying emails relating to the Taylor sites and the Southside sites.

And it is the same thread of emails between the same people and Ms. Bock. And he selected one, one email purporting to represent that Ms. Bock misrepresented herself. And the jury is going to be confused when there's an email from Ms. Bock requesting a site ID change from 2854 Columbus to the Taylor address.

MR. EBERT: Your Honor, that is not correct. The agent did not pick and choose and did not select this or necessarily any other exhibits.

To the extent that in any defense case in chief

they want to seek to introduce a series of evidence, that is their right, and if and when they choose to do that, perhaps this is of the type they can seek to introduce then.

This moment now through this agent is an inappropriate vehicle for the defense to try to introduce rank hearsay, and also it lacks in foundation. He's never seen these emails, as he's testified.

And as to impeachment, Your Honor, I don't even think we're close to the realm of this being appropriate fodder for impeachment. I don't think that's an acceptable basis either.

THE COURT: These exhibits just aren't admissible under the theories that you are offering them for, Mr. Udoibok, so my ruling will stand on all of them.

**(In open court)**

BY MR. UDOIBOK:

Q. So we discussed V40. Pull up V40.

And just to confirm, V40 is, what, a site ID application or a site application?

A. This appears to be the site maintenance portion of the CLiCS where it's dealing with the application, as this document changes over time. This relates to the site Feeding Our Future, Taylor.

Q. And this is an application made to update MDE about changes? Is that what it is?

I don't know what you meant by "maintenance."

A. That's what it says up on the top, Application CACFP Site Maintenance. In general this is a live document that can change over time. This is what it is at the end result of everything.

Q. All right. All right. So if we go to V41, and you relied on V41, as well as your video, that the 2854 Columbus Avenue that Feeding Our Future was reporting to MDE what wasn't true, correct?

A. As well as emails and other information related to the site we relied on.

Q. But you also testified that within, before December 2021, will you agree with me that there may have been numerous site request changes sent to MDE, correct?

A. Over time there's definitely different things that were sent to MDE. I am definitely confident that there were two sites at that location based on the email communication specifically from Ms. Bock.

Q. And it is possible that Feeding Our Future on December 1st, 2021, when the pole cam surveillance was going through, Feeding Our Future wasn't operating the 2854 Columbus Avenue site, correct?

A. I guess to understand that, I never believed that they were operating a site because the meal counts never represented anything near what could possibly have happened

at that location. I don't believe that they switched sites.

I believe that the claims would have still come in for the December month related to the Southside Youth and Feeding Our Future, Taylor at that address.

Q. I realize what your belief is, whatever basis there are. Will but my question to you is, do you recognize a possibility that on December 1, 2021, when you were conducting the pole cam surveillance, that Feeding Our Future was not operating the 2854 Columbus Avenue site?

A. Again, when you say "operate," I put that into two different categories of, they weren't really operating, but I do believe they would be submitting claims for that. That's what I --

I don't believe the possibility of they wouldn't have submitted for that dollar amount reimbursement based on operating, and I use that in air quotes.

Q. Well, you've seen, you've seen Ms. Bock representation of the sites that Feeding Our Future was operating in the correspondence with Kendra Pace, correct? If you want me to refresh your recollection, go to, go to A72.

Ms. Bock, pull up A72.

That is the list of sites that MDE had questions about to Ms. Bock, Feeding Our Future, correct?

A. MDE did have questions. Ms. Pace did have questions, yes.

Q. All right. Okay. Based on that site, you believe something else, but Feeding Our Future has the names, Feeding Our Future 1 through 27 as its site, correct?
A. They have a list of 1 through 27 that says Feeding Our Future, yes.
Q. All right. And on this list, there is no name as Southside Youth, is there?
MR. EBERT: This has been asked and answered several times, Your Honor.
THE COURT: Sustained.
MR. UDOIBOK: All right.
BY MR. UDOIBOK:
Q. And I believe you testified that you didn't surveil 2501 Taylor Street, did you?
A. Not with a pole cam.
Q. Okay. And if, if Feeding Our Future was operating a site at 2501 Taylor, your pole cam would not have picked it up, correct?
A. As I said, there was not a pole cam at that location.
Q. Let's go to A75. Call out the correspondence.
And this is what?
A. An email from Ms. Bock to various individuals. Let's see, well, to Ms. Pace at MDE, Norma Cabadas at Feeding Our Future and then copied Ms. Honer, Ms. Johnson-read at MDE.
Q. All right. Take out the callout.

Now you testified about A75. What was this correspondence about?

A. So Ms. Pace had sent an email to Ms. Bock. This is a chain. And in that email Ms. Pace sought clarifications for certain discrepancies or things that she wanted clarification on.

And subsequently in the, in the chain down below, Ms. Bock responds in different font following the questions, her response to Ms. Pace.

Q. All right. So the font is not so clear to me.

The request is review, the first one -- call out the first, first request.

Do you see that?

A. I do see that, yes.

Q. What does it say?

A. "Feeding Our Future created site ID for Southside Child Development, submitted CLiCS site application for 2020-21 (and 2021-22) with all months checked at Number 7. Checked vended and uploaded meal contract begins October 1st, 2021."

And then the different text of Ms. Bock responding is, "We will upload last year's catering contract as well."

Q. Now what about the Southside Development Center, Taylor, in Minneapolis transfer from received at 8/26/2021. The form was dated in April, with the site transfer effective in May.

Do you see that?
A. I do see that, yes.
Q. What site is transferring?
A. The Southside Child Development Center.
Q. Okay. Then what is the next one there?
A. "Clarification needed. What is the effective month of the transfer?"
And response from Ms. Bock is, "The transfer is effective August 2021."
Q. All right. Take that out. Go to the next one that says two.
What does that say?
A. "Two sites at address 2854 Columbus Avenue in Minneapolis, newly created Southside Youth with a site application number of 9000019528, and the existing approved site application for Feeding Our Future, Taylor site ID9000019273. Please double-check."
And Ms. Bock's response, "This is correct. We have verified that it is different youth being served at each of the locations in the building."
Q. There you go. Isn't that the 2854 Columbus Avenue site now being asked, referred to as the Taylor site?
A. Referred to as both the Taylor site and the Southside Youth site, two sites at the address, yes.
Q. At which address?

A. 2854 Columbus.
Q. And was 2854 Columbus we reviewed ever sought transfer to 2501 Taylor?
A. Not during this time frame, no.
Q. Well, when is the request made? When was the request made?
A. I don't know what you are referring to. Related to the request?
Q. All right. Let's go to the first one. The one (a).
The transfer was requested back in April, wasn't it?
A. This is a completely different site. Although it had Southside, it's a different -- so the two different names there, Southside Child Development Center -- I know it's confusing with the "south," but the other sites are Southside Youth and Feeding Our Future, Taylor. Two different sites.
Q. But what address, though?
A. Again, there are two sites at 2854 Columbus.
Q. Okay.
A. And then there is one site at Southside Child Development Center, which is 2501 Taylor. I know there is confusion there with the Taylor name sticking with it, but they move it and are operating, supposedly operating, two sites at the 2854 Columbus.

Q. Was there any request, though -- I believe you testified to it -- that there was a request to move a site from 2854 Columbus to 2501 Taylor?
A. I don't believe I testified to that. And I would be surprised if there was a certain form that indicated that in the months that we were surveilling that there wouldn't be two locations there.
Q. Let's go to A73.
You testified to A73, didn't you?
A. I did, yes.
Q. And in this, in this exhibit there was a list, right?
A. Followed -- yes, this is in response to that table that we've looked at.
Q. Let's go to P70. Scroll to the first page. That's page 2. Stop.
Do you see the site date, I mean the date of visit and the name of the site? All right. And the address?
A. I do, yes.
Q. And you also agree with me that that is a different site from Feeding Our Future-7?
A. I'm sorry. That last --
Q. Is this a different site from Feeding Our Future-7?
A. Feeding Our Future, Taylor-7, yes.
Q. It's a different name. We have that agreement.
And go to page 8. Southside Youth is located at

2854 Columbus Avenue, correct?
A. That's what is listed on this W9 form, yes.
Q. And is it, I believe we looked at it, Feeding Our Future, is the sponsor, not the site, correct?
A. For this one, yes.
Q. Okay. So Feeding Our Future wasn't operating it consistent with the representation that you had just testified to on A73, correct?
MR. EBERT: Objection. That misstates his testimony.
THE COURT: Sustained.
MR. UDOIBOK: All right.
BY MR. UDOIBOK:
Q. Do you agree with me that Southside Youth as a site is not listed on A73?
A. Southside Youth as a site is not. The address is.
Q. I'm talking about the name. The name of the site.
A. The name "Southside Youth" is not on that A73.
Q. Do you remember that the confusion between Ms. Bock and MDE and the need for clarification was the name of the site located at a particular address, correct?
A. I can't speak to Ms. Bock's confusion. I just know that MDE was asking for clarification of the restaurants and the other sites, and they wanted to know what was happening at the sites.

Q. Yes. And the names given went from 1 through 27?
A. Correct.
Q. Look at, go to page 11.
Do you see the agreement between Feeding Our Future and a site? All right?
A. This is not the full -- could you scroll up one page?
Q. Isn't it an agreement?
A. Yes, yes. I just wanted to see that agreement part.
Q. Agreement between Feeding Our Future and a site. And the site is Southside Youth located at 2854 Columbus Avenue South?
A. Correct.
Q. All right. And not a Feeding Our Future operated site?
A. It's a site sponsored by Feeding Our Future, but not operated, yes.
Q. Okay. Now, I want to go to V41.
All right. I believe you testified -- go to page 4.
I believe you testified to the, to the fact that when this surveillance or pole cam was then conducted, and correct me if I am wrong, that Feeding Our Future was operating that site? Was that your testimony?
A. When you say "operating," I don't believe much was happening based on what we were seeing, but, yes, they were going to be claiming meals from that site that were

purportedly prepared on site.
Q. But now you see that that site was operated by someone else and not Feeding Our Future?
MR. EBERT: Objection, Your Honor. That misstates the evidence, and it's a fact not in evidence.
THE COURT: I'm going to overrule it and let Agent Kary answer.
THE WITNESS: I don't believe that to be true at all. I believe Feeding Our Future was operating, or when I say "operating," they were going to claim money for meals that were not being provided.
BY MR. UDOIBOK:
Q. So I understand what you are saying. My question is, is a simple question, Officer.
You've seen Southside Youth, the agreement between Southside Youth with Feeding Our Future, correct?
A. Yes. I've seen that agreement, yes.
Q. Feeding Our Future is the sponsor, correct?
A. Correct.
Q. And Southside Youth is a site?
A. Correct.
Q. And the agreement is signed between Feeding Our Future and others, correct?
A. Again, for the one site, but they are also operating their own site. So two sites at the same location.

Q. Let's just take Southside Youth, for example. Feeding Our Future, you would agree, is the sponsor of Southside Youth, correct?
A. Correct.
Q. And the site, at least the agreement, is operated by someone else, correct?
A. Correct.
Q. All right. And you also saw the Metro, the vendor, all right, you saw the Metro Cater vendor?
A. Metro Area Catering, yes.
Q. Yes. Those are three entities involved in a particular site, correct?
A. Yes.
Q. All right. And so when in December you did your surveillance, Southside Youth was at 2584 Columbus, right?
A. No. 2854.
Q. 2854 Columbus, correct?
A. Yes. Both November and December, yes.
Q. Yes. So it wasn't Feeding Our Future that was operating it.
A. Again, it was Feeding Our Future as well based on the claims or the meal count sheets. It's both at the same location.
Q. We'll get to that. The meal count, did it come from Southside Youth, or did it come from Feeding Our Future?

A. There were two separate folders.
Q. All right.
A. And both location -- two separate folders. One said Southside Youth. One said Feeding Our Future, Taylor.
Q. All right. I want to direct you to Government Exhibit P80.
You testified to this, correct?
A. Correct.
Q. And let's look at the top half.
Could you call out the top half, Ms. Mallet, if you can.
What do you understand that to be?
A. The number of meals submitted to Feeding Our Future for 2854 Columbus Avenue South.
Q. Okay. And what is the name on top there to the left, the name of site?
A. So to the left side, there's the site ID, which has the two different site IDs in that first column.
Q. Just give me the site name.
A. Site names are Feeding Our Future, Taylor and Southside Youth.
Q. And what? And Southside Youth.
Now, when -- so there's moneys, meals, number of meals submitted to FOF. Do you see there's February '21? Do you see that?

A. For the Feeding Our Future, Taylor, yes, February 2021.
Q. And then March?
A. Correct.
Q. And then April?
A. Yes.
Q. Followed by May?
A. Yes.
Q. And then no submission in June, July, August?
A. That's correct.
Q. Do you know why?
A. Presumably that would be the summer food program, but I'm not exactly sure why they did not submit during that time frame.
Q. All right. Is it possible that it had transferred?
A. During that time frame, yes.
Q. Okay. Where did it transfer to?
A. Without looking at the records I could not say at this time.
Q. Is it possible 2501 Taylor?
A. That could be possible, yes.
Q. So when you did your surveillance in December, is it surprising to you that you may not -- there was no activity in June through October?
A. So you are asking me --
Q. Yeah, surprising not --

A. When I'm surveilling in December, I'm looking at December activity, not June, July, and August.
Q. Yeah, but my point is they are transferred by the time your surveillance started, isn't it?
MR. EBERT: Objection, Your Honor. That misstates the evidence.
THE COURT: Sustained.
BY MR. UDOIBOK:
Q. All right. Let's go to the next block. What address is that?
A. Again, the same address, 2854 Columbus Avenue, and this is the dollar amount that came from that specific address.
Q. From what time period?
A. From February 2021 through November of 2021.
Q. All right. What happened to, what happened to December?
A. Again, these are the meal claims that we had that we went over operations and seized money from the accounts of Feeding Our Future. Therefore, it was not paid out.
Q. All right. Pull up P76. See if you can play it. Can you play it?
MS. MALLET: Yeah, just waiting for you.
MR. UDOIBOK: Oh, I'm sorry. Great.
So pause it, please.
BY MR. UDOIBOK:
Q. And this is the December 1, 2021, date that we're

talking about, correct?
A. Correct.
Q. Did you do the same pole cam in September?
A. No. It was not up -- it was put up on November 18th of 2021.
Q. And so if the Feeding Our Future site, the Taylor site, had transferred, you would not see Feeding Our Future distributing food at this location, correct?
A. Correct, yes.
Q. Okay. Now you actually executed a search warrant at this site, didn't you?
A. I was not there, but yes, we did search that location.
Q. And you reviewed the photograph?
A. Correct.
Q. And could you -- was it a warehouse? Did it look like a warehouse?
A. It was not a warehouse, no.
Q. Was there food?
A. There were minimal amounts of food, yes.
Q. But was there food, though?
A. Like I said, there were minimal amounts of food, yes.
Q. Just give me a second.
And was it, was it a distribution site, or was it storage?
A. It appeared to, I mean, there were multiple offices that

were completely empty. There were some pallets of rice, some juice boxes. And it said meals prepared on site. It had like one of those kitchenettes like you would see in an extended stay hotel and a completely empty full size refrigerator.

Q. But if the operator of the site had moved, you are not going to see much activity, correct?

A. Again, the operation and everything indicated that there were two sites operating out of this location even at the time that we searched it. Therefore, the facade of having a food distribution was in place.

MR. UDOIBOK: Your Honor, perhaps we can take a break now because I'm going to another line of questioning.

THE COURT: All right. We'll return at 11:00.

All rise for the jury.

10:41 a.m.

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: Are you all warm?

MR. EBERT: Yes.

THE COURT: We're trying to do something about that.

MR. UDOIBOK: I'm fine. Judge, don't make it too cold.

THE COURT: Are you warm? Yeah, we're trying.

All right. 11:00, everyone. We're in recess.

(Recess taken at 10:41 a.m. till 11:00 a.m.)

11:00 a.m.

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: You may all be seated.

And, Mr. Udoibok, you may continue.

MR. UDOIBOK: Thank you, Your Honor.

BY MR. UDOIBOK:

Q. Officer, we were talking about Feeding Our Future-7 at the 2854 Columbus.

Ms. Mallet, would you call up for me A72, and call out on the first page the Feeding Our Future-7 and the address.

All right. And correct me if I am wrong, Officer. I believe you testified to this multiple times. I just want to make sure it is not confusing to the jury or the court.

Your testimony is Feeding Our Future-7, 2854 Columbus Avenue South, is not a site name and that it is something else. Is that your testimony?

A. Going over this a number of times. Feeding Our Future-7 is also known as, I guess I know it better as the Feeding Our Future, Taylor location, which is located at 2854 Columbus Avenue South.

As far as the seven part of it, that's not

something I was as familiar with, but I am aware of it being associated with that site and location.

Q. So it is possible that Feeding Our Future-7 is a site name?

A. A possibility, yes, associated with that address, correct.

Q. Okay. Now let's go to V40.

And this is a site, an exhibit that you testified to. All right?

Ms. Mallet, could you call out the site information, site application and site address and site name.

Do you see 2854 Columbus Avenue address, specifically Feeding Our Future, Taylor --

A. Correct.

Q. -- as the name?

A. Yes.

Q. Okay. Ms. Mallet, would you please call out P72 and place it side by side, please. I'm asking you to do something tough.

All right. Let's go through P72. All right, Officer?

A. Okay.

Q. And you see it says March 2021?

A. Correct, I see that.

Q. Back-up receipts? Do you see that?
A. I do, yes.
Q. Okay. Let's go to page 1. Ms. Mallet, can you make it lengthy as the other one? Maybe I am asking too much.
Okay. So let's just go through. Do you see, what's the site name?
A. It states Metro Area Catering.
Q. All right. Let's go to -- scroll down. Continue. Stop.
That's an after-school. All right? Is that after-school meal counts?
A. That's what it --
Q. Metro Area Catering, right?
A. That's what it states, yes.
Q. And the name is what?
A. Which name?
Q. The name for supervisor.
A. Khadra.
Q. All right. And we've seen this Khadra associated with Southside Youth, correct?
A. Correct.
Q. And you also testified or we had an agreement that Southside Youth is legally separated from Feeding Our Future, correct?
MR. EBERT: Objection, Your Honor. That misstates

the testimony in evidence.

THE COURT: Sustained.

MR. UDOIBOK: Okay.

BY MR. UDOIBOK:

Q. Let's continue. Continue. Stop. The signature is also Kendra, right?

A. Khadra.

Q. Khadra, and is not Feeding Our Future, correct?

A. It doesn't say Feeding Our Future, no.

Q. It doesn't say Ms. Bock, correct?

A. Not on this page, no.

Q. Continue.

You saw the meal count also signed by the same person, right?

A. Yes.

Q. Stop on this CLiCS.

The payment, all right, general payment data, sponsor is Feeding Our Future. And the site is what?

A. Feeding Our Future, Taylor.

Q. Feeding Our Future, Taylor. And let's go to Exhibit V40. What time period is this?

A. On V40 it states program year 2020/2021. Approval effective date February 2021 through September 2021.

Q. All right. And it's not a Feeding Our Future operating site, correct?

A. I would not agree with that.
Q. Well, what does it say in the payment on page 12? It says, what, Feeding Our Future, Taylor?
A. Correct.
Q. What's the sponsor?
A. Feeding Our Future.
Q. Two separate entities, correct?
A. Again, Feeding Our Future, Taylor is under, if you refer back to I think it's A72, it's Ms. Bock says we are operating these sites. Maybe it's A73.
Q. Well --
A. And that is one of the sites.
Q. Ms. Mallet, could you call up, is it possible to call up A72?
MS. MALLET: Do you want the other two?
MR. UDOIBOK: Sure.
BY MR. UDOIBOK:
Q. So call out Feeding Our Future-7 section and 8.
Do you see the difference, sir?
Feeding Our Future-7, 2854 Columbus, Feeding Our Future-8, 2501 Taylor. And P72, the CLiCS site is different.
Let's go to P72, just so --
A. I'm not sure what you are referring to.
Q. Okay. Go to P72. Is it possible to call out the

sponsor and the site?

Who's the sponsor?

A. Feeding Our Future.

Q. What's the site?

A. Metro Area Catering.

Q. Let's go to X1. You testified to this. What is this?

A. A Feeding Our Future claims by site dollar amount. This is the dollar amount section. Down below there's a meal count.

Q. All right. And this amount represented all the moneys that came from USDA to Feeding Our Future; is that correct?

A. From USDA to the Minnesota Department of Education and then down to the Feeding Our Future, yes.

Q. Could you, Ms. Mallet, could you call out the top four? And this amount, let's take the distribution site Safari Restaurant as an example. I'm not just picking on them.

It's about, how much is that, about $12 million?

A. It's over 12 million, yes.

Q. In this figure, did you take into account the amount of money that Safari Restaurant purchased food and delivered food?

MR. EBERT: I'm going to object as beyond the scope of direct.

THE COURT: Sustained.

BY MR. UDOIBOK:

Q. You testified that this amount represented the amount that Safari Restaurant received, correct?

A. Correct.

Q. And what was the purpose of your producing this figure?

MR. EBERT: Objection. It's beyond the scope.

THE COURT: I'd like a sidebar, please.

**(Sidebar discussion)**

THE COURT: Mr. Udoibok, I don't believe that Agent Kary on this second round of testimony testified at all about Safari. He testified for an hour and 20 minutes on Taylor and Southside Youth and admitted documents under the X and Q series.

We've now had two and almost a half hours of testimony. I want you to keep it to what he testified on that one hour and a half last Friday.

MR. UDOIBOK: I --

THE COURT: Or Thursday.

MR. UDOIBOK: I thought, I thought he testified to the total amount of loss, and I was taking Safari as an example. Safari is part of the total amount of loss. I can go to any other -- the site that he testified to. Safari is part of the total amount. I was just using Safari as an example.

THE COURT: Mr. Ebert, what's your recollection on

the total amount of loss on this second round of testimony?

MR. EBERT: Your Honor, I don't recall dwelling at any particular length about this. It's one that's kind of come up off and on as just a point of reference to reorient the jury.

I certainly don't think that there was any questioning that would make it proper to delve into the minutia of Safari or any other site for that matter.

THE COURT: I think total amount is fine. I'm just trying to keep this on a track that's moving forward.

MR. UDOIBOK: Thank you.

THE COURT: Thank you.

**(In open court)**

BY MR. UDOIBOK:

Q. Officer, you testified about the total amount of loss that came from USDA to the sites, correct?

A. From USDA, yes, I did. Yes.

Q. All right. And in you're coming up -- and what was the total amount now?

A. The total on this is I think around 246 million, yes.

Q. Ms. Mallet, could you call up the total amount. First, now go up first page. First page. First column. There you go. Call it up.

So $246,045,149.65, that's the total?

A. That's the total on this sheet, yes.

Q. And coming with this total, did you take into account the food purchases that any of the sites may have?

MR. EBERT: Objection, Your Honor. Again as beyond the scope.

THE COURT: Overruled.

You may answer.

THE WITNESS: We did not take into account the food, the minimal food purchases, as we believed a lot of that food purchased was a facade.

BY MR. UDOIBOK:

Q. Is your testimony, no, you didn't? You did or you didn't?

A. We did not back out food purchases from that total amount.

MR. UDOIBOK: Thank you.

No further questions, Your Honor.

THE COURT: Thank you.

Mr. Colich or Mr. Montez.

MR. MONTEZ: No questions, Your Honor.

THE COURT: Mr. Ebert.

MR. EBERT: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. EBERT:

Q. Good morning, Special Agent Kary.

A. Good morning.

Q. You were asked a series of questions this morning by counsel about 2854; is that right?
A. Correct.
Q. And that's on what avenue?
A. Columbus Avenue South.
Q. And that's how far from the Safari Restaurant?
A. About a half mile.
Q. Are there any other -- and that restaurant is sponsored by which nonprofit?
A. Feeding Our Future.
Q. Were there any other Feeding Our Future sponsored sites located near that location?
A. Yes.
Q. Such as?
A. S & S Catering we heard from Ms. Qamar Hassan about.
Q. I'm going to direct your attention to A75.
A75 is an email dated October 4th, 2021. Do I have that right?
A. Correct.
Q. And it contains a back-and-forth between two different parties, right?
A. Correct.
Q. Who are those parties?
A. Ms. Bock of Feeding Our Future and the Minnesota Department of Education employees.

Q. And the bottom contains a request for information by which party?
A. The request is coming from MDE and the -- to Feeding Our Future.
Q. And to be clear, what is the question that MDE posed to Aimee Bock on October 4th, 2021?
A. "Two sites at address 2854 Columbus Avenue in Minneapolis, newly created Southside Youth and the existing approved site application for Feeding Our Future, Taylor. Please double-check."
Q. In other words, is it fair to say that there is a measure of confusion that appears to be represented in this inquiry from MDE to Aimee Bock?
A. Correct.
MR. UDOIBOK: Objection. Leading.
THE COURT: Overruled. The answer will stand.
BY MR. EBERT:
Q. Did Ms. Bock respond?
A. She did.
Q. Did she clear up MDE's confusion about two supposed food sites operating from the same location?
A. She did, yes.
Q. Did she?
A. She said that, "This is correct."
Q. Was that correct?

A. Well, the reality of that location, there was not much occurring at that location.

Q. In fact, how did Aimee Bock respond?

A. "This is correct. We have verified that it is different youth being served at each of the locations in the building."

Q. To be clear, did the investigation reveal whether any youth as claimed were being served at that building?

A. The investigation revealed that no youth were being served at that location.

Q. And that is based upon what types of evidence?

A. Various types, specifically the pole camera, also the financial records, as well as interviews definitely indicated there was nothing happening.

Q. And as a reminder to the jury, the location that Aimee Bock is talking about in her email, that location is this image depicted here in P76e; is that right?

A. That's correct.

Q. This is the location that Aimee Bock is saying that she has confirmed that youth are being served?

A. She has confirmed that there are two different sets of youth being served at that location.

Q. And your testimony is that no youth as claimed were being served at that location; is that right?

A. Correct.

Q. Now as to this issue of different sets of youth, that was part of Aimee Bock's response to MDE, correct?
A. Correct.
Q. Has the investigation revealed whether that claim from Aimee Bock was true or false?
A. It does indicate that it was false.
Q. I'm showing you on the left a portion of Exhibit P66 and a portion on the right of Exhibit P77.
The jury will recall on the left, Special Agent, is that a portion of the Feeding Our Future files for the Taylor site?
A. Yes, it is.
Q. On the right, is that a portion of the Feeding Our Future files for the site commonly referred to as Southside Youth?
A. Correct.
Q. And to be clear, both of those sites operated or, rather, food was claimed from which address?
A. For the 2854 Columbus Avenue.
Q. And one of those sites was a Feeding Our Future maintained site. Is that your testimony?
A. Yes.
Q. Which one?
A. The Feeding Our Future, Taylor on the left, the P66 exhibit.

Q. And for both Feeding Our Future, Taylor and Southside Youth, who was the sponsor?
A. Feeding Our Future.
Q. Now, directing your attention back, Special Agent Kary, to this motion of whether or not different sets of youth were being served at that same site, you indicated what?
A. That that wasn't true.
Q. And are these on the screen portions of rosters in support of these claims?
A. Yes, they are.
Q. And do these rosters indicate that children supposedly ate every single day in that graffiti building?
A. They were served meals from that building where nothing was happening.
Q. Is that true?
A. That is not true.
Q. And in fact as exemplified on the screen, does this show some of the exact same names located at both of those sites by Aimee Bock's Feeding Our Future?
A. Exact same names and ages.
Q. What did Aimee Bock tell MDE on October 4th, 2021?
A. That there were separate youth being served at different locations within the building.
Q. But name after name, age after age here shows what?
A. The same name and age.

Q. At the same location?
A. Correct.
Q. Did you see any of that in the video surveillance day after day?
A. No.
Q. Did Aimee Bock tell the truth to MDE on that day?
A. She did not.
Q. What did she do?
A. She lied.
MR. EBERT: Thank you, Your Honor.
THE COURT: Any recross?
MR. UDOIBOK: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. UDOIBOK:
Q. Ms. Mallet, would you pull up P77 at page 54 and P66 at page 48. Put them side by side, if you can.
Could you go to P77, 58. I think that's where you were. All right. It's upside down, but it doesn't matter. And then P66 at 48.
Officer, I believe you testified we've established that there was two sets of Southside Youth, correct? Two sets of youth?
A. A roster for Southside Youth and a roster for Feeding Our Future, Taylor.
Q. All right. And we've also established based on the

CLiCS that there are sites supposedly sponsored by Feeding Our Future, correct?
A. Yes. Both were sponsored by Feeding Our Future, yes.
Q. All right. And do you have any information, any evidence, that Ms. Bock created P77, this roster?
A. All of this documentation was at her office, and she is responsible as the sponsoring entity --
Q. All right.
A. -- for these rosters.
Q. That's not my question.
A. Okay.
Q. So please answer my question. Do you have any evidence that Ms. Bock created this roster?
A. I don't know at this time, no.
Q. All right. Let's go to P66, page 48.
Do you have any evidence of who created it?
A. Not specifically tied to these documents, no.
Q. Do you have any evidence that Ms. Bock created it?
A. Not at this time, no.
Q. Do you have any evidence that Ms. Bock knew that these rosters, using your term, were fraudulent?
A. Yes, I do have evidence to that.
Q. That she knew that this roster, these two exhibits, were fraudulent?
A. Yes. I mean, they're part of the organization to

support the claims. It's at her office. This is her site. One of them, it's her operated site. That's her. And then the other is sponsored by her. They have both of them at the same address.

MDE is asking for clarification. She has this evidence at her office. So, yes, she does have this information at her fingertips.

Q. I believe my question was, you testified already that you have no evidence that Ms. Bock created these documents. You established that.

A. Correct. Not at this time, correct.

Q. All right. And you are assuming that she knew about this roster, correct?

A. She is the sponsoring entity. I believe that documents at her office would make them available to her. That's what I believe.

Q. How many boxes of documents was taken from Feeding Our Future building?

A. Approximately 270.

Q. 270. And how many employees does she have?

A. That's to be determined.

MR. EBERT: Object as being beyond the scope.

MR. UDOIBOK: All right. No further questions.

THE COURT: Sustained.

Any redirect?

REDIRECT EXAMINATION

BY MR. EBERT:

Q. Special Agent Kary.

Yes, Your Honor. Thank you.

Going back to that email, Ms. Bock used a pronoun to describe who had verified whether two different sets of children were being served at that same site. Do you recall?

A. I do, yes.

Q. What pronoun did Aimee Bock use in her own words to MDE?

A. "We."

Q. In other words, including herself Aimee Bock?

A. Correct.

MR. EBERT: Thank you, Your Honor.

THE COURT: You may step down. Thank you, Special Agent.

And the government may call its next witness.

MR. BOBIER: Yes, Your Honor. The government calls Gabby Raines.

THE COURT: Good morning. You may come forward. And I'll have you stand before me to take the oath. Would you raise your right hand.

GABRIELLE RAINES,

called on behalf of the government, was duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

THE COURT: Thank you. You may be seated.

And when you are, please state and spell both your first and last name for the record.

THE WITNESS: Gabrielle Raines, G-A-B-R-I-E-L-L-E, Raines, R-A-I-N-E-S.

THE COURT: Mr. Bobier, you may inquire.

MR. BOBIER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BOBIER:

Q. Good morning, Ms. Raines.

A. Good morning.

Q. Could you tell the jury where you work, please?

A. I work at Google.

Q. What do you do at Google?

A. I'm a custodian of records and member of our legal investigation support team.

Q. Have you testified before?

A. Yes, I have.

Q. In that capacity at Google?

A. Yes.

Q. Not your first time in a courtroom then.

A. Correct.

Q. Just a few questions for you today, Ms. Raines. I want to ask you at a very high level how emails sent to or

received from email accounts hosted by Google get from A to B. Okay?
A. Okay.
Q. Are you familiar at a very high level with how that works?
A. Yes.
Q. If I have a Google account or, rather, an email account hosted by Google, and I want to send an email from that account out, does the email have to travel through a Google hosted server to get to its destination?
A. Yes.
Q. Is that true for every single email sent, that is actually sent from an email account hosted by Google?
A. Yes.
Q. Always?
A. Yes.
Q. Let me show you on your screen there an exhibit that's in evidence. It's Government's Z1.
Ms. Raines, the jury has seen this already. They heard testimony that the FBI received this from Google in response to a grand jury subpoena.
Do you see the words Grand Jury Subpoena here in the subject line?
A. Yes.
Q. Because we received this from Google, I take it you can

confirm for us this is a true and accurate response from Google.

A. Yes.

Q. And it indicates here, if you look in the body of the message from a Google legal investigations support person, that Google had no gmail servers in the State of Minnesota between January 2020 to July 2022.

Did I summarize that correctly?

A. Yes.

Q. And is that correct?

A. Yes.

Q. All right. So put simply, if I were in the state of Minnesota in that time frame and sent an email from a Google hosted email account, in order for that email to reach its destination, it would have to travel through an out-of-state server.

A. Yes.

Q. For every single email that I just described in that time period.

A. Yes.

Q. Let me show you another exhibit, if I could. This is in evidence as Z4.

Ms. Raines, safe to say this is what appears to be an email?

A. Yes.

Q. Now, the jury's heard already that emails from aimee@feedingourfuturemn.org were received by law enforcement in this investigation after they served a search warrant on Google.

So the jury's heard already that this email address at Feeding Our Future MN.org is a Google-hosted email account. Okay?

A. Yep.

Q. So let's just look at this quickly to remind the jury.

You see that this is coming from Aimee Bock; is that right?

A. Yes.

Q. To two different recipients at something called MDE?

A. Yes.

Q. And it indicates here Ms. Bock, who appears to be the sender of the email, that attached is a site application. Do you see that in the email?

A. Yes, I do.

Q. And there is in fact an attachment there; is that right?

A. Yes, that's correct.

Q. Let me just scroll down in Government's Z4. Just take a look at the second page of this exhibit. This is the attachment in the email we were just looking at.

Do you see that same name, Aimee Bock, at the bottom of the page there?

A. Yes, I do.
Q. And there's what appears to be a signature below that name; is that right?
A. Yes.
Q. And up above under Program Information, there's a program name, correct?
A. Yes, that's correct.
Q. It's a little written over, but can you make out Stigma-Free INT-Willmar?
A. Yes.
Q. Just let me go down to page 4 of the same exhibit.
Here we see similar language next to site name. Stigma-Free International, Willmar; is that right?
A. Yes, that.
Q. And an address is provided in Willmar, Minnesota; is that right?
A. Yes.
Q. All right. Ms. Raines, you told us how servers at Google work. We've been through this email which was sent from Aimee Bock on an account hosted by Google in the time frame we earlier discussed.
Ms. Raines, would this have had to have traveled through a Google hosted server to be delivered?
A. Yes.
Q. And given the time frame, we know for certain that

server hosted by Google would have been one outside the state of Minnesota?
A. Yes, that's correct.
Q. Let me show you Government's Z2.
Another email from the same Google hosted email account; is that right?
A. Yes.
Q. From Aimee Bock, true?
A. Yes.
Q. Once again, going to some recipients at MDE?
A. That's correct.
Q. And this one has another site application with another indication that there's an attachment here as well. Do I have that right?
A. Yes.
Q. Ms. Raines, this is Z2. I should have mentioned for the previous one. The jury's heard already that the Z exhibits correspond to the counts in the indictment in this case. So Z2, Count 2.
Okay?
A. Okay.
Q. So let's look a little more at Z2 here. The second page of the attachment looks a lot like the attachment we saw previously in Z4; is that right?
A. Yes, that's correct.

Q. And here there's a program name that is different than the last one we reviewed. This says ASA Limited LLC; is that right?
A. Yes.
Q. And again, we've got the name Aimee Bock at the bottom?
A. Yes, that's correct.
Q. And what appears to be a signature?
A. Yes.
Q. Two pages later on page 4, just a little more information in this page about ASA Limited; is that right?
A. Yes.
Q. And the address is on McKnight Road in St. Paul?
A. Yes.
Q. So in Z2, an email sent from Aimee Bock on a Google hosted email account, can we say with certainty that this too would have had to travel through an email server outside the state of Minnesota?
A. Yes.
Q. I'm going to show you Government's Z5. Yet another email? True?
A. Yes.
Q. Yet another email from aimee@feedingourfuturemn.org; is that right?
A. Yes.
Q. The same email address we just discussed in Z2 and Z4?

A. Yes, that's correct.
Q. All right. Now this one indicates a clarification is attached. Do you see that in the text of the subject line here?
A. Yes, I do.
Q. And this again is from Aimee Bock?
A. Yes.
Q. This is Z5 corresponding to Count 5 of the indictment.
The jury has seen this document a number of times. I'll just call out a middle part of the second page here. See the first line of this callout says, "This site is being staffed by Feeding Our Future."
Did I read at that right?
A. Yes, you did.
Q. And that's under the header FOF ASA Limited?
A. Yes.
Q. We'll go through the document.
Down at the fifth page, a similar block of text under a heading FOF S & S Catering?
A. Yes.
Q. Last page, similar block of text under FOF Safari Restaurant?
A. Yes.
Q. With the same Aimee Bock at the bottom of this whole list, right?

A. Yes.
Q. And there's a signature there?
A. Yes.
Q. All right. Ms. Raines, same question. Given the timeline and given we know this email was sent from a Google hosted email account, would this email have had to travel through an email server outside the state of Minnesota?
A. Yes.
Q. Just a few more, I promise.
Government Z8. All right. Now this is an email from a different email account; is that right?
A. Yes, that's correct.
Q. The jury's heard law enforcement received these emails as well from a search warrant provided to Google. And here that sort of makes more obvious sense because it's from a gmail.com; is that right?
A. Yes.
Q. And that's Google's email service?
A. Yes. Yes.
Q. Okay. So this comes from Safari Restaurant, and it goes to an eidleh@feedingourfuturemn.org; is that right?
A. Yes.
Q. And in this exhibit, Z8, corresponding to Count 8 of the indictment, there's an attachment or multiple; is that right?

A. Yes.
Q. We go down to the attachments here. The jury's seen several of these already and heard that these purport to represent numbers of meals served every day to children at a site that you can see in the top left corner of this document called Safari Restaurant.
Do you see that text?
A. Yes, I do.
Q. The attachment goes on for quite a few pages as I'm clicking through it. Is that fair to say?
A. Yes.
Q. Ms. Raines, same question. Given we know this was sent from an email account hosted by Google and the time frame in which it was sent, do we know for sure this had to travel through a server outside the state of Minnesota?
A. Yes.
Q. Let me show you Government's Z12, which is in evidence. So Z12 corresponds to Count 12 in the indictment.
Here, we have another sender. This one also from gmail; is that right?
A. Yes, that.
Q. Given that maybe you don't need me to tell you, but the jury's already heard that these emails also were obtained via search warrant provided to Google. So we know that this sender was using an account hosted by your company. Fair?

A. Yes.
Q. We see that this was sent to CACFP claims@feedingourfuturemn.org; is that right?
A. Yes.
Q. And among other people to aimee@feedingourfuturemn.org; is that right?
A. Yes.
Q. Sent from someone named Abdihakim Ahmed?
A. Yes.
Q. Do you see that in the subject area?
A. Yes, I do.
Q. And it says or indicates, rather, there are some attachments there from something called ASA; is that fair?
A. Yes.
Q. Just scroll down. You might already recognize similar pages to what we saw in the previous exhibit; is that right?
A. Yes.
Q. These, once again, are meal count sheets, the jury's seen many of, purporting to represent meals served to children, this time at a site called ASA Limited.
Do you see that in the top left?
A. Yes, I do.
Q. Once again, this attachment goes on for a number of pages, sort of similarly presented meal counts; is that right?

A. Yes, it appears so.
Q. And, Ms. Raines, Government's Z12, corresponding to Count 12, of the indictment, given from whom it was sent and given the time frame, can we say that this too had to travel through a Google hosted server outside the state of Minnesota?
A. Yes.
Q. Thank you.

MR. BOBIER: Nothing further, Your Honor. Thank you.
THE COURT: Any cross-examination, Mr. Udoibok?
MR. UDOIBOK: Yes, Your Honor.
Ms. Mallet, would you call up Z12.

CROSS-EXAMINATION

BY MR. UDOIBOK:
Q. My name is Kenneth Udoibok, and I represent Aimee Bock.
A. Nice to meet you.
Q. We haven't met.
Z12 you testified to is an email from Abdihakim Ahmed?
A. Yes.
Q. To a series of people, right, to Aimee Bock and Hani at Feeding Our Future, correct?
A. Yes, that's correct.

Q. I don't know how Google works. I'm not that smart.

Would Ms. Bock be able to control whether or not Mr. Abdihakim Ahmed would send her an email from Google?

MR. BOBIER: Objection. Scope and maybe vagueness.

THE COURT: Overruled.

You may answer.

THE WITNESS: I don't know.

BY MR. UDOIBOK:

Q. You don't know, you don't know whether Mr. Bock can control that or not?

A. I don't know.

Q. All right. So let's go to Z8. Do you know whether Mr. Eidleh can control whether or not Safari Restaurant would send him an email?

A. I don't know.

Q. Okay. So you, were you subpoenaed to be here?

A. Yes, sir.

Q. All right. Do you know whether any other Feeding Our Future employee was subpoenaed?

MR. BOBIER: Objection. Foundation. Lack of personal knowledge.

THE COURT: Sustained.

BY MR. UDOIBOK:

Q. All right. Let's go to -- that was Z8. Let's go to Z5.

Your testimony is based on Z5, Ms. Bock sent an attachment to MDE and a host of emails, correct?

A. Yes, sir.

Q. And the content of that email you have no opinion, do you?

A. No, sir.

MR. UDOIBOK: I don't have any further questions.

THE COURT: Mr. Montez or --

CROSS-EXAMINATION

BY MR. MONTEZ:

Q. Good morning.

A. Good morning.

Q. My name is Adrian Montez, and I represent one of the defendants in this case, Salim Said.

Are you able to tell by looking at an email who the sender is of that email, other than by looking at the email address itself?

A. Apologies. I don't understand the question.

Q. Sure. Do you know by looking at an email who the physical sender is of that email?

A. Yes, I believe so.

Q. So by looking at an email address, are you able to ascertain who the physical person is that's sending that email?

A. No.

Q. Okay. Thank you.

MR. MONTEZ: No further questions.

(A phone rings)

THE COURT: Turn it all the way off.

Any redirect?

MR. BOBIER: None, Your Honor.

THE COURT: You may step down. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: And the government may call its next witness.

MR. EBERT: Thank you, Your Honor. The government calls Abdulkadir Awale.

THE COURT: Good morning, sir. I'm going to have you come all the way up to the witness stand. Good morning.

THE WITNESS: Good morning.

THE COURT: All right. I'm going to have you stand to take the oath.

ABDULKADIR AWALE,

called on behalf of the government, was duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

THE INTERPRETER: Yes.

THE COURT: You may be seated.

THE WITNESS: Thank you.

THE INTERPRETER: Thank you.

THE COURT: And first I'll have your interpreter be sworn.

COURTROOM DEPUTY: Please raise your right hand.

(Oath administered)

THE INTERPRETER: Yes, I do, Your Honor.

THE COURT: Will this be standby only?

THE INTERPRETER: I believe so.

COURTROOM DEPUTY: All right.

THE COURT: Sir, do you wish to have an interpreter as a standby counsel, in other words, as not as a counsel but as a standby, so that you can turn to him if you need something interpreted?

THE WITNESS: Yes.

THE COURT: So otherwise do you wish to answer your question, the questions of counsel in English?

THE WITNESS: Yes.

THE COURT: All right. Then that's what we'll do.

If at any time you wish to have the interpreter interpret for you, just let us know. All right?

THE WITNESS: Thank you.

THE COURT: All right. Could you state and spell -- go ahead.

THE INTERPRETER: I like to know the name of the interpreter.

THE COURT: Yes, go ahead.

THE INTERPRETER: My name Osman, O-S-M-A-N. Last name Abdulle, A-B-D-U-L-L-E.

THE WITNESS: Thank you.

THE COURT: Could you state and spell both your first and last name for the record?

THE WITNESS: First name Abdulkadir Awale. Abdulkadir, A-B-D-U-L-K-A-D-I-R. Last name A-W-A-L-E.

THE COURT: Thank you, sir. You may inquire, Mr. Ebert.

MR. EBERT: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. EBERT:

Q. Good morning, Mr. Awale.
A. Thank you.
Q. How are you today?
A. Fair, good.
Q. How old are you, sir?
A. 42 years.
Q. Where were you born?
A. December 26, 1972.
Q. In what country were you born, Mr. Awale?
A. Somalia.
Q. Is English your first language?
A. No.
Q. What is your first language?

A. Somali.

Q. So I want to ask you a few questions about Somalia. Okay? How old were you when you left Somalia?

A. About 16 years, 17. I think, 16, 17, around that year.

Q. Why did you leave Somalia?

A. Well, Somalia has a civil war so -- going on there. That's why I left.

Q. Did you say there was fighting going on there?

A. Yes.

Q. When you left Somalia where did you go?

A. Kenya.

Q. Kenya?

A. Yes.

Q. And how long did you stay in Kenya?

A. About one or two years. Around there.

Q. Where were you living when you were in Kenya?

A. Nairobi capital city of Kenya.

Q. The capital city?

A. Yes.

Q. At some point did you come to the United States?

A. Yes.

Q. Where did you go in the United States when you first came here?

A. I went to Kansas City, Missouri.

Q. And how long did you stay in Kansas City, Missouri?

A. I think I stay about eight to nine months.
Q. Were you working in Kansas City?
A. Yes.
Q. What were you doing?
A. I work at I think three different place. One was McDonalds.
Q. McDonalds?
A. Yes. And other one was farm.
Q. A farm?
A. Yes.
Q. Okay.
A. And the other one was a factory.
Q. And after those months in Kansas City, then where did you go?
A. I have two friend of mine who live Sioux Falls, South Dakota. I went there to visit first, and I stay there about one or two weeks. And after -- I think one day me and three other friends of mine, we went to Marshall, Minnesota.
Q. To Marshall, Minnesota?
A. Yes.
Q. And for members of the jury who aren't familiar, where is Marshall, Minnesota?
A. I think it's west, west of Minnesota.
Q. West?
A. Yes.

Q. West of?
A. Northwest.
Q. Of our location here?
A. Yes.
Q. And is this a smaller town?
A. Yeah, a smaller town I think at that time it was 1600 -- 16,000, 16,000.
Q. Did you work in Marshall, Minnesota?
A. Yes.
Q. What did you do?
A. I work factory call Heartland.
Q. Heartland?
A. Yes, and produce turkey.
Q. So a turkey factory?
A. Yes.
Q. Called Heartland?
A. Yes.
Q. I want to talk a little bit about your education. How far did you go in your education in Somalia?
A. High school.
Q. High school?
A. Yes.
Q. Did you take any further education here in the United States?
A. I went to ESL classes. I tried to go Northwestern

University in Marshall, back that time, 1992, and that's all.

Q. At any point did you take classes at a place called Southwest State?

A. I think I take classes back that 1992, yes.

Q. In Marshall?

A. Yes, in Marshall.

Q. What type of classes did you take at Southwest State in Marshall?

A. I think English classes and math classes, and that's all I think. And I didn't go that much. It was a few months I was there. I went about two weeks in, I used to work in the morning and afternoon. I would take some classes, and that's all I go there.

Q. At some point did you relocate from Marshall, Minnesota, to the Twin Cities area in Minnesota?

A. Yes.

Q. About when did that happen?

A. Somewhere around 2,000, not 2,000. I mean '92.

Q. You think it was in 1992?

A. Yes.

Q. And when you first arrived to the Twin Cities, did you find employment here, jobs?

A. Yes.

Q. What types of jobs did you do here?

A. I think first job I have was Mall of America, which happen to be open around that time. I work there. I also work bakery factory in Eden Prairie.
Q. A factory?
A. Yes.
Q. In Eden Prairie, Minnesota?
A. Yes.
Q. At some point, at some point, Mr. Awale, did you begin to work in the restaurant or food industry?
A. Yes, I did.
Q. Can you tell the jury how you got started and when?
A. I first, first job I was involved was 1997 at small restaurant, 3200 and Chicago Avenue, Minneapolis. I owned that restaurant.
Q. What was that restaurant called that you opened in 1997?
A. Mogadishu Restaurant.
Q. Have you heard of a restaurant called Nawal Restaurant?
A. Yes.
Q. Is that a restaurant that you worked at?
A. Yes.
Q. And can you tell the jury a little bit about Nawal Restaurant?
A. Nawal Restaurant is in Burnsville, Minnesota.
Q. In Burnsville, Minnesota?
A. Yes. I own that. I worked that restaurant

through 19 -- 2019?
Q. And are you still operating that restaurant?
A. Yes.
Q. What is about the square feet of Nawal Restaurant in Burnsville?
A. I think it's about 1600 square feet.
Q. And on an average day, about how many customers come to your restaurant Nawal in Burnsville?
A. I would say around 150.
Q. And so I want to direct your attention before you opened Nawal Restaurant. Had you heard of a company called Karmel Coffee?
A. Yes.
Q. What is Karmel Coffee?
A. Karmel Coffee was a restaurant in South Minneapolis that I own 2003 to 2021.
Q. Where was Karmel Coffee located specifically?
A. It was 2940 Pillsbury Avenue.
Q. Pillsbury Avenue?
A. Yeah, Suite 100.
Q. And how large was the square feet of Karmel Coffee?
A. It was 2700 square feet. 2700.
Q. Next I want to direct your attention to a restaurant called Sambusa King. Are you familiar with that?
A. Yes.

Q. Can you explain to the jury what Sambusa King is?
A. Sambusa King is Hopkins, in Hopkins, Minnesota. Address is 126 Blake Road, Hopkins, Minnesota.
Q. Blake Road?
A. Yes.
Q. B-L-A-K-E?
A. Yes.
Q. And about what years was Sambusa King in operation?
A. I own that restaurant 2011 through 2023.
Q. All right. I want to switch direction a little bit. Okay, Mr. Awale?
A. Yeah.
Q. And I want to ask you about your involvement in this case. Okay?
A. Okay.
Q. Were you a defendant who was charged relating to the child food program?
A. Yes.
Q. And specifically were you charged with engaging in fraud with respect to the Federal Child Nutrition Program?
A. Yes.
Q. Did you do the fraud that you were accused of?
A. Yes.
Q. Did you plead guilty to those charges?
A. Yes.

Q. Has anyone with the government made any promises to you about what you might receive because you have pleaded guilty?
A. No.
Q. Have you been sentenced in your case?
A. No.
Q. Do you know later who will determine your sentence?
A. Yes.
Q. Later who will determine your sentence?
A. The judge, Nancy.
Q. Judge Brasel?
A. Brasel, yeah.
Q. And has anybody made you any promises from the government or anywhere else about what your sentence might be because you are testifying here today?
A. No.
Q. Is it your hope that the court might look favorably at you because you have testified and cooperated?
A. I hope so, but I have no promise.
Q. You hope so, but what?
A. But I don't have any promise.
Q. You don't have any promise?
A. No, I don't.
Q. Now, directing your attention to about March of 2023, at around that time, is that when you were charged with fraud?

A. Yes.
Q. And before you were charged with fraud in March of 2023, did you meet with government investigators?
A. Yes.
Q. And in one of those meetings with government investigators, before March of 2023, at that time did you have a trip planned?
A. Yes.
Q. Where was your trip to go to?
A. Was going Ethiopia.
Q. To Ethiopia?
A. Yes.
Q. Why were you going to go to Ethiopia?
A. I do have, my wife was there.
Q. Your wife was in Ethiopia?
A. Yes.
Q. And did you have a discussion with the agents about your trip to leave the United States?
A. Yes.
Q. What do you recall about that discussion?
A. I told them I'm going to about one -- one week or so I'm going to Ethiopia, and I ask if I am under investigation. And they told me, yes, I am under investigation.
And that one I decided then I don't have, I'm not going to leave anyway.

Q. You are not going to leave anyway?
A. Yes.
Q. Did you stay here in Minnesota after that conversation with the agents?
A. Yes.
Q. Or did you leave the country?
A. No. I was here in Minnesota. I didn't go anywhere.
Q. Why did you not leave the country at that point?
A. Well, as long as I, I decide as long as I under investigation I'm not going to go anywhere. And I told my wife what happened, I'm not coming.
Q. And then after that point is when you were charged with the fraud; is that right?
A. Yes.
Q. All right. Now I want to direct your attention back to about April of 2020. Okay?
A. Okay.
Q. And so at this time, as you may recall, Mr. Awale, was this about one month or so into the pandemic?
A. Yes.
Q. And just to remind the jury, in April of 2020 which of your businesses that we just talked about, which of your businesses were you owning and operating in April of 2020?
A. I was owning and operating all three restaurant, Karmel Coffee, Sambusa King and Nawal Restaurant.

Q. At some point did you become involved in April of 2020 in the Federal Child Nutrition Program?
A. Yes.
Q. How did you first become involved in the Federal Child Nutrition Program in April 2020?
A. Somewhere around April 10 to 14, I did have a visit some employees of Feeding Our Future in my restaurant at Nawal Restaurant, and they offer me to have a type of contract with Feeding Our Future and serve for free meal.
Q. To serve a free meal?
A. Yes.
Q. And do you know about how many people from Feeding Our Future came to meet with you?
A. I believe four, two gentlemen. I think first was one person I see call Shafi.
Q. Called Shafi?
A. Yes.
Q. And what do you remember about your first conversations with Shafi with Feeding Our Future?
A. I, I discuss how it worked. This program, I never seen before. I never have any kind of symbol of that institution. And he explain a little bit, and I ask, I told him that I will decide sometime in coming days. Like that was I think first I met was around April 10th or 11.
And then I did see him since, but after that I saw

him, gentleman called Abdikerm Eidleh.
Q. Eidleh?
A. Yes.
Q. And I want to show you a picture for a moment on the screen. Do you recognize the man in Exhibit Y2?
A. Yes.
Q. Who is that?
A. Abdikerm Eidleh.
Q. And so back in April of 2022, is Abdikerm Eidleh one of the people from Feeding Our Future that you spoke with?
A. '22 or '20?
Q. Excuse me. In 2020. Thank you.
A. Yes, he is. He was.
Q. What do you remember about your discussions with Mr. Eidleh in April of 2020 about the food program?
A. He explained to me that he work with a company called Feeding Our Future and since a lot of places are closed, and we have this program that you can make money.
Q. That you can make money?
A. Yes. So if I participated --
Q. And just so that we could hear, what was the last part of what you said, so that you could make money?
A. If I being participate in this program, I will make a lot of money.
Q. Make a lot of money?

A. Yes.
Q. Was that of interest to you at that time?
A. Yeah, it was interest to me.
Q. Why?
A. First of all, we have the food that COVID-19, and I don't have any customers coming. And business was going to really fail.
Q. Your business was going to fail?
A. Yeah, that because many customers, there was a restriction in the restaurant, and I was struggling.
Q. You were struggling?
A. Yeah.
Q. Did you still have workers at Nawal Restaurant in Burnsville?
A. Yes.
Q. About how many?
A. I think at that time I have three or four.
Q. And at this moment in time, April 2020, did you have workers at Karmel Coffee in South Minneapolis?
A. Yes.
Q. About how many?
A. Three or five -- four or five.
Q. Okay. And then lastly Sambusa King in Hopkins, right?
A. Yes.
Q. Did you have workers there in April 2020?

A. Yes.
Q. About how many?
A. Four.
Q. Four?
A. Yes.
Q. And so in response to your conversations with Feeding Our Future workers, did you agree in April 2020 to participate in the food program?
A. Yes.
Q. And for about how many days did you participate in April of 2020?
A. I started April 14 all three restaurant. I personally was in Nawal Restaurant. It was too many people that I wouldn't expected to come, if we were full of people. And at that time there's no more than four people alone in the restaurant, and was too many people.
Q. About how many meals did you give out each day in April 2020?
A. I think was three to four hundred.
Q. Three to four hundred meals?
A. Yes.
Q. Was it easy to prepare and give out that food in April 2020?
A. No. It was really, really difficult. I never have that difficulty in any restaurant before.

Q. You never had that type of difficulty in any restaurant before?
A. Yes.
Q. Can you explain why it was so difficult in April 2020?
A. It was too many people with, with, I cannot control it, who want to come inside and grab the food. And my employees was exhausted working so many hours inside.
Q. To give out 300 meals?
A. Yes.
Q. And --
A. And I have a lot of money to spend at the grocery stores. And after working three days I decided, three to five, some of the first time I work up to five days. Another one I only work two days and a half. I decided not to participate anymore.

And I called Eidleh, I say no, I don't want any contact anymore. I don't want any.
Q. Did he give you a response when you told him you didn't want to do it anymore?
A. Yeah. He couldn't believe. He say I'm, I'm losing good chance to get good money.
Q. He said you are losing a good chance to get good money; is that right?
A. Yes.
Q. What did you tell him?

A. I say I don't want to do it because it is too much, and also I don't know what this program is all about.
Q. The child food program?
A. Yes. And he try to encourage me to keep doing it, but I insist I'm not going to do it, and I absolutely decided not to participate. I'm out.
Q. Have you heard of a type of food called Chicken Suqaar?
A. Yes.
Q. What is Chicken Suqaar?
A. It's like a, like a chicken stew.
Q. A chicken stew?
A. Yes, like a small pieces of chicken breast.
Q. Does it have rice, Mr. Awale?
A. Rice. Comes with rice or spaghetti.
Q. And you described April 2020 in the food program as account most difficult thing you've had to do in your time with owning a restaurant; is that right?
A. Yes.
Q. Okay. And is one of the items of food that you tried to serve then Chicken Suqaar?
A. Yes.
MR. EBERT: Your Honor, if acceptable, this might be an opportune time to break.
THE COURT: Just one minute.
We can break here. We're going to come back at

1:20.

So I'll have you return to the stand at 1:20.

All rise for the jury.

THE WITNESS: Thank you.

12:19 p.m.

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: You may all be seated for a moment.

Mr. Awale, you are here with your attorney; is that correct?

THE WITNESS: Yes.

THE COURT: All right. I wanted to note for you that during this break and at any time after your testimony here today, no one is to talk to you about your testimony. No one who is a witness or a defendant in this case is to talk with you about your testimony. And you are not to talk with anyone else about your testimony.

I wanted to note that for you and to tell you that if anyone should try to talk with you, any defendant or witness, should try to talk with you about your testimony, I want you to tell your lawyer right away. Okay?

THE WITNESS: All right.

THE COURT: All right. Thank you. We'll break until 1:20.

MR. UDOIBOK: Your Honor, may I? There's an issue

I would like to, I just discovered, if I could address.

THE COURT: Yes. I will have you step down.

You may all be seated.

MR. UDOIBOK: Yes.

THE COURT: And we are on the record out of the presence of the jury.

We don't need to be on sidebar.

MR. UDOIBOK: Okay. Your Honor, I didn't -- I'm not sure what it is, but it's an exhibit that I received this morning and I, I know I've shared the exhibit. I didn't want to use it with Agent Kary, but the metadata of the exhibit suggests something that I want to alert the court.

I would have preferred to introduce it, but it is sort of flamboyant, and I didn't want I want to cause a stir without first alerting the court.

THE COURT: I don't know. You said you don't know what it is?

MR. UDOIBOK: It's an exhibit. It's a grand jury exhibit that seems to have been altered by Agent Kary.

THE COURT: All right.

MR. THOMPSON: Your Honor, with all due respect, Mr. Udoibok has never raised this issue with us, and he knows the rules.

THE COURT: You've never raised this with the

government but you raise it with the court now?

MR. UDOIBOK: No. I just saw it. I put the exhibit --

THE COURT: Talk about it with them. If there's an issue, you can bring it up with me after lunch.

MR. UDOIBOK: Let me show you.

THE CLERK: All rise.

(Recess taken at 12:23 p.m. till 1:22 p.m.)

1:22 p.m.

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: You may all be seated.

We're on the record out of the presence of the jury. So does either party want to address the comments made by Mr. Udoibok at the end of the morning session or otherwise have anything to raise before the jury comes back in?

MR. UDOIBOK: May I?

THE COURT: You may.

MR. UDOIBOK: So, Your Honor, if you recall, at the conclusion, during lunch hour, I had an issue that totally wasn't quite clear about, but there's something certain that I knew and it was flamboyant. Before I did that I wanted a sidebar. I was on my headset, the jury wasn't around, and I came to the courtroom.

And specifically it's Exhibit 853. It's been around. It's a Word document, and the area of the exhibit that I thought I could cross-examine Agent Kary with related to a meeting that MDE had with its staff, specifically Emily Honer, where I'm assuming Emily wrote that the State is setting up this site for failure.

Normally, it would be, it would not come in because of hearsay document, but Agent Kary had testified throughout this process about fraud and representations to MDE.

I wanted to elicit that area of testimony. I happened to want to move from that document to another document, and I hit info, and I saw the metadata. And I recall that my client had saved, had done a PDF.

THE COURT: I'm sorry. Can you --

MR. UDOIBOK: There's so many documents that I didn't have a chance to review all of the exhibits and their properties.

So that's why I raise it. In the properties it says that Agent Kary modified it.

Now, since that statement, since the brouhaha, Mr. Thompson told me that all Mr. Kary did was to save the document. Well, that is contrary to my understanding of what a Word document does. If you save a Word document without even changing a space, it doesn't say modification.

We have a plethora of Word documents. In fact, one of the government's, a native document Excel, I think it's Z11 is an Excel document. It remained the way it is. I have saved it into my system. And if you open it now, it doesn't say modify because I haven't changed even a space.

All I wanted to know was did he just save it, did he modify it. If he did modify it, what is it he modify.

I didn't expect the reaction from Mr. Thompson, along with Agent Kary himself, and explosive outburst at the elevator resulting to I think they came to say as much as are you okay.

THE COURT: Mr. Udoibok, what you said wasn't did something happen. You didn't ask any questions. You said on the record it looks like it's been altered by an FBI agent.

MR. UDOIBOK: It is. That's what the document says. It says modified by Agent Kary. It says that. I can, I can show the court the document.

THE COURT: What was the purpose in telling the court that if you hadn't talked to the government about it beforehand?

MR. UDOIBOK: Judge, I'm entitled to cross-examine the witness. It was just courteous that I didn't do that because, Your Honor, how surprising would that have been before the jury for me to pull that exhibit at the end, the

properties to show that it says modified?

That, I think that would have been improper, but I thought I would do the proper thing by asking for a sidebar.

THE COURT: A sidebar is still on the record. So when the jury is out, there's no difference between the headset and not.

MR. UDOIBOK: True, but at least --

THE COURT: A sidebar is on the record. We're not -- the whole purpose of the headset is simply so that the jury couldn't hear us. So there's no difference between the headset or not when the jury is out of the room.

MR. UDOIBOK: True, it is, but the jury don't go back to look at the transcripts when they're making their decisions, but at the same time if there was a rationale for altering, modifying the record, it's a grand jury document. It's a document received.

It's not his document. It should not have been modified in any way. And I think under cross-examination I'm entitled to elicit that. It could be nothing to it, but I cannot ignore a document that said it was modified.

THE COURT: So this was a document that you were going to cross-examine Agent Kary about, because Special Agent Kary had completed his testimony when you brought this up.

MR. UDOIBOK: That's true, but that's why I, I

thought I didn't want to create any difficulties. So my plan was, raise this issue with the court, and two things can happen: If Agent Kary comes back in another matter, the court would give me leeway to interrogate as to that document; or in my case in chief, call back Agent Kary and elicit testimony about that.

But each of those would require me to show some kind of offer of proof before that could be done.

THE COURT: And after now having spoken with the government, are you satisfied now that there was no untoward alteration of a document by the FBI?

MR. UDOIBOK: Mr. Thompson is an honorary man. I haven't had any reason to doubt that he is an honest man. In fact, I call him very American.

But what I don't appreciate is the outburst here outside your presence and then at the elevator.

THE COURT: All right.

MR. UDOIBOK: But be that as it may, I believe the record is clear that I take the position that it's modified. I don't know what it is, was any ulterior motive. I would see what happened in my case in chief.

I may want to call him or not. But I know the record, that my document shows that it was modified.

The government's explanation, is it satisfactory to me? I don't know, I don't know Agent Kary. So I can't

say one way or the other whether he would do something.

It is what it is.

THE COURT: All right.

Mr. Thompson.

MR. THOMPSON: So, Your Honor, obviously the government didn't alter nefariously a document. The document in question was produced by the Minnesota Department of Education via a SharePoint site that they use to share documents when producing documents responsive to grand jury subpoena.

For whatever reason, this one document they produced was in a Word format as opposed to a PDF format. Agent Kary pulled it down off the SharePoint and saved it so we could produce it in discovery.

And when you do that, Mr. Jacobs, who is more tech savvy than I am, did some research of this. When you have a share document and you pull it off a share drive and safe it, it sometimes lists it as being modified.

So Agent Kary's modification of the document was nothing more than simply pulling it down off SharePoint and saving it to a document.

What I frankly don't understand, Your Honor, is why Mr. Udoibok stood up in court after Agent Kary's testified not once, but twice in this case and been subjected to hours of cross-examination and make an

accusation against him in a context where he can't even defend himself.

I think he would have remembered this document. He and I have discussed it before, not in respect to that metadata, but in respect to the substance of the document itself. And he knows that he pulled it down off SharePoint and it was a Word document.

And specifically he recalls that because we had trouble finding this document at one point in the leadup to trial.

So I don't understand today why you waited until then to do that and why Mr. Udoibok didn't raise it with us outside of the presence of the court, the jury or before agent testified, Agent Kary testified either the first or second time.

It seems like it was just an attempt to smear his reputation.

MR. UDOIBOK: Your Honor, that's not the way I practice. I haven't done that close to 30 years.

THE COURT: All right. So here's what I'm going to say:

I'm going to consider this matter put to rest. I don't want to hear about it unless you all have talked about it beforehand and there's a line of questioning that is relevant and admissible about the document.

I have not heard any evidence that anyone nefariously altered a document. What I have heard is that a document was converted from Word to PDF in order to make it accessible as an exhibit. There's nothing nefarious about that that I understand.

And I do not want some accusation like that to come out before the court before you all have talked about it beforehand. It's just not appropriate.

So that's where I'll end it.

MR. UDOIBOK: Fair enough, Your Honor.

THE COURT: Any questions about that?

MR. UDOIBOK: No, Your Honor.

MR. THOMPSON: No, Your Honor.

THE COURT: All right. Let's --

MR. UDOIBOK: Your Honor, one more issue. I like Mr. Thompson. He's been kind, fair to me. And his outburst, I would hope that it would be a little more measured, and definitely Agent Kary should not dress me down the way he did.

THE COURT: I didn't hear it. I am -- I didn't hear it. I didn't see it. I didn't hear it.

I was surprised that the sentence that came out of your mouth was to accuse Agent Kary of altering a document before raising it with him, and so I'll leave it at that. I'm sure you all can get past the issues that you have.

MR. UDOIBOK: Thank you.

MR. THOMPSON: Thank you, Your Honor.

THE COURT: We have a new interpreter, so I'll be swearing in the new interpreter.

MR. EBERT: Thank you, Your Honor.

1:35 p.m.

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: You can all be seated. We have a new interpreter who is a standby interpreter, and so I'll ask that interpreter to stand and be sworn.

COURTROOM DEPUTY: Will you please raise your right hand.

(Oath administered)

THE INTERPRETER: I do.

COURTROOM DEPUTY: Thank you.

THE COURT: And your name for the record, sir.

THE INTERPRETER: Your Honor, first name Abdulaziz A-B-D-U-L-A-Z-I-Z. Last name Sheikh, S-H-E-I-K-H.

THE COURT: Thank you.

THE INTERPRETER: Thank you, Your Honor.

THE COURT: You may continue your questioning, Mr. Ebert.

MR. EBERT: Thank you, Your Honor.

BY MR. EBERT:

Q. All right. Mr. Awale, before we took a break for lunch, I was asking you questions about your time in the federal child program in April of 2020.

Do you remember that?

A. Yes.

Q. And can you remind the jury approximately how many days did you stay with the program in April of 2020?

A. Nawal Restaurant I stay about five days, Sambusa and Karmel -- Sambusa King I think stayed three days. And Karmel only two days and a half.

Q. And all three of your restaurants in April 2020, was that underneath Feeding Our Future?

A. Yes.

Q. And you testified earlier that you, you quit after a few days because it was very difficult. Were those your words?

A. Yes.

Q. When you were involved in April of 2020, were you committing fraud?

A. I don't think so, no.

Q. In other words, were you inflating your meal count numbers those first couple days?

A. No.

Q. Were you generating invoices that were not true in those

first few days?
A. No.
Q. Were you trying to do it the right way in April 2020?
A. Yes.
Q. And was it easy?
A. No, it was not easy.
Q. Now, at a later point did you rejoin the food program?
A. Yes, I did.
Q. When did that happen?
A. I think I decided to turn in somewhere November of 2020.
Q. Early November 2020?
A. Yes.
Q. Why did you decide to rejoin at that time?
A. I did have difficulty all my three business. It -- the COVID-19 that I expected to go away, it gets more difficulty and never go away. I, I couldn't able to pay rent or pay my employees, and it was real difficult to stay open at that point.
Q. You said that you -- it was difficult to pay your rent?
A. Yes.
Q. And to keep your workers employed?
A. Yes.
Q. Did you have more conversations with people from Feeding Our Future after April of 2020?
A. Yes, I have a contact with Eidleh, and he always

advising me to join the Feeding Our Future.
Q. And what did he tell you when he was always advising you to join Feeding Our Future?
A. He was telling me that other people who stay with Feeding Our Future while I am -- while I was left, and they making a lot of money and I'm -- and he -- I told him I am struggling here, can't afford to pay rent or pay employees.
Q. And did you want to make a lot of money?
A. Yes, I do. I wanted to make a lot of money, but -- I want to make a lot of money right away, but the way he told me was different.
Q. The way that he told you was different?
A. Yes.
Q. How was it different? What do you mean?
A. He told me a lot of people are making money and making more people than they serve. And this money that, that's the way I can get more money. It's not the way I was doing it, which is to, to do everything correct way, but that's not that way. He told me different ways.
Q. He told you a different way?
A. Yeah.
Q. And was part of that way that Mr. Eidleh told you was to claim more meals than you are actually serving?
A. Yes. That would, he told me, and he told me that this money is to spend -- they have that money. Feeding Our

Future have that money to spend on, you know, can buy stores, everything you want, spend it, a lot of money.

It's not important if you, if I say I serve, got few hundred, if I serve 3,000 or, I mean, 2,000. It's not important. What's important is is to get this money and spend down the whole like stores. I buy food or supplies. I bring food to my restaurant, everything else that I want.

Q. So I want to show you a few documents, Mr. Awale. Up on the screen is Q104, which is in evidence, I believe, Q104.

Can you see that on your screen Mr. Awale?

A. Yes.

Q. And I am going to enlarge it.

A. Yes.

Q. Do you see there's a hotmail.com email address?

A. Yes.

Q. Is that yours?

A. Yes.

Q. And is this an email message that you sent to claims at Feeding Our Future on April 3rd, 2021?

A. Yes.

Q. And if we look at some of the documents, are there a series of pages attached with these meal counts on them?

A. Yes.

Q. And at the bottom, did you sign these meal counts?

A. Yes.

Q. And there's a series of numbers on there claiming how many meals were served each day. Do you see that?
A. Yes.
Q. Are those numbers that you put on these forms, are those inflated numbers?
A. Yes.
Q. Mr. Awale, why did you put inflated numbers on each of these meal count forms?
A. To get more money than I serve.
Q. To get more money than you served?
A. Yes.
Q. And where did you learn to do it that way?
A. Through Eidleh.
Q. Of Feeding Our Future?
A. Feeding Our Future, yes, employee.
Q. And each time you signed these, you are signing that the information is true and correct on there. Is that what you did?
A. No.
Q. Well, did you sign your name at the bottom?
A. Yes, I did.
Q. But to be clear, that information was not true?
A. Yes. It's not true.
Q. The more you claimed, the more money you would get?
A. Yes.

Q. All right. Now I'm showing you a copy of a file obtained from the Feeding Our Future office, and this is Exhibit Q27. And, Mr. Awale, I want to show you a few pages from here.

On the second page, do you see where it says Monthly Claim Packet?

A. Yes.

Q. And beneath that there's some handwriting. Do you see handwriting after the words "Site Name"?

A. Yes.

Q. Does that say Shafi Tutoring?

A. Yes.

Q. What is Shafi Tutoring?

A. It was a small office beside Sambusa King built.

Q. Located on Blake Road?

A. Yes.

Q. In Hopkins, Minnesota?

A. Yes.

Q. Next door to one of your restaurants, Sambusa King?

A. Yes.

Q. And as we move on to pages 3 and 4 of Exhibit Q27, do we see a Sambusa King invoice?

A. Yes.

Q. All right. That's your business name in the top left?

A. Yes.

Q. And this is an invoice that's dated October 2nd, 2021. Did I read that correctly?
A. Yes.
Q. And who is the party that's being billed?
A. Who to be billed?
Q. Yes. Do you see that there?
A. Shafi Tutoring.
Q. And in this invoice were you claiming to feed all or to supply all these dollar amounts of food every day throughout September 2021?
A. Yes.
Q. And is this information inflated?
A. Yes.
Q. In other words, is this information from you false?
A. Yes.
Q. And at the very bottom does it show that the food program is being billed for just that month alone of over $260,000?
A. Yes.
Q. Why did you do that, Mr. Awale?
A. Basically to get more money than I serve.
Q. And the sponsor here is Feeding Our Future; is that right?
A. Yes.
Q. And are there more than one invoice that you provided

like this one that was false and inflated?
A. Yes.
Q. And did you do that for the same reason?
A. Yes.
Q. To get more money?
A. Yes.
Q. During the course of your time under the sponsorship of Feeding Our Future, did you pay money to any employees who worked at Feeding Our Future?
A. Yes, I paid to Eidleh.
Q. To Mr. Eidleh?
A. Yes.
Q. And I want to show you a couple of checks that are not in evidence, and I'll ask you to look at them on your screen. Okay?
A. Okay.
Q. I'm going to show you what is marked as Exhibit S91. And there are four checks here.
A. Okay.
Q. Do you recognize those checks that you see on your screen?
A. Yes.
Q. In fact, do you see your signature on each of those checks?
A. Yes.

Q. And are these copies of checks that come from some of your own bank accounts for your businesses?
A. Yes.
MR. EBERT: Your Honor, at this time the government offers Exhibit S91.
THE COURT: Any objection?
MR. UDOIBOK: No objection.
MR. MONTEZ: No objection.
THE COURT: S91 is admitted.
MR. EBERT: All right. Thank you, Your Honor.
BY MR. EBERT:
Q. All right. So you testified that you paid money to Mr. Eidleh; is that right?
A. Yes.
Q. So now let's take a look at the first page of S91. In the upper left it says Karmel Coffee; is that right?
A. Yes.
Q. One of your three businesses that you've testified about?
A. Yes.
Q. And did you write this check on January 21st, 2021?
A. Yes.
Q. Okay. How much did you make the check out for?
A. 12,000.
Q. $12,000?

A. Yes.
Q. Okay. Did you decide how much money to put on this check?
A. No. He was telling me to get that money.
Q. Who was telling you to make out the check for 12,000?
A. Eidleh.
Q. And do you see where it says the "Pay to the Order of" line?
A. Yes.
Q. Can you make out what that reads there?
A. Bridge Consulting and Logistics.
Q. Did you write that on the check?
A. No, I didn't.
Q. That's not your handwriting?
A. No.
Q. Do you know who wrote that there?
A. Eidleh wrote it.
Q. And do you know what Bridge Consulting and Logistics is?
A. No.
Q. And to be clear, did Mr. Awale -- Eidleh, rather, provide any consulting or any logistics to you such that you gave him this $12,000?
A. No, he didn't, but basically I owed this amount I was -- he was convince me to participate this programs. He was telling me that he have lawyers who work this program and

this, the consulting, he, I mean convince me to participate in this program. That why I giving him this money. That was his --

Q. And do you agree that when you did agree to participate, you were committing fraud when you participated, right?

A. Yes.

Q. And Mr. Eidleh told you to write this check; is that right?

A. Yes.

Q. And he decided the amount of money?

A. Yes, he decided.

Q. And he, in fact, he wrote on it who your check would be made out to?

A. Yes.

Q. And there are more checks that you paid to him over time; is that right?

A. Yes.

Q. So just in the following month, do we see another check from your Karmel Coffee account?

A. Yes.

Q. For how much money?

A. 27,000.

Q. $27,000?

A. Yes.

Q. Did you decide this dollar amount?

A. No, I didn't.
Q. Who did?
A. Eidleh did.
Q. Now, this one has a different name on the "Pay to the Order of" line. Do you see that?
A. Yes.
Q. What does it say?
A. Eidleh Inc.
Q. Is that your handwriting on that part of the check?
A. No.
Q. Whose is it?
A. It's Eidleh.
Q. And then down in the memo line, Mr. Awale, do you see a word down in the bottom left?
A. Yeah.
Q. Highlighted now in yellow?
A. Yes.
Q. What does it say?
A. "Loan."
Q. Was this check really a loan?
A. No.
Q. What was this check?
A. It was very much that what he was telling me, which is he consult me how to do all this practice, and I have to write down for this check too.

Q. You have to write this check?
A. Yes.
Q. Did you write the word "loan" on this?
A. No.
Q. Who did?
A. Eidleh did.
Q. And is it true or false?
A. It's false.
Q. Moving on to the next month, do we see here another check from you? Do we see a check from you on this third page, Mr. Awale?
A. Yes.
Q. Except this one is written from a different business of yours; is that right?
A. Yeah, Sambusa King.
Q. And what's the date of this check?
A. It's March 23rd, '21.
Q. And for how much money?
A. 22,000.
Q. Once again, Mr. Awale, did you decide when you made these payments, or did someone else?
A. Eidleh decided, not me.
Q. Did you decide how much money would be paid to Eidleh on March 23rd, 2021?
A. No.

Q. Who did?
A. Eidleh did.
Q. And what is the "pay to" party on your check?
A. Eidleh Inc.
Q. Did you write that?
A. No.
Q. Who did?
A. Eidleh did.
Q. Moving on to May of 2021, do we see another check from you, Mr. Awale?
A. Yes.
Q. This one for $22,050. Did I read that correctly?
A. Yes.
Q. And this, and with the other checks, is that your signature on the bottom right?
A. Yes.
Q. Okay. Did you write Eidleh Inc. on this check?
A. No.
Q. Can you explain who did?
A. Eidleh did.
Q. And then is there also more handwriting on the memo line of this check?
A. Yeah, consulting.
Q. Does that say February, March and April?
A. Yes.

Q. Did you write that on the memo line?
A. No, I didn't.
Q. Who wrote on the memo line?
A. Eidleh did it.
Q. And was the memo line writing from Mr. Eidleh, was that true or false?
A. It's false.
Q. What do you think would have happened if you had not paid all of this money to Abdikerm Eidleh?

MR. UDOIBOK: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. EBERT:
Q. Did you have conversations with Mr. Eidleh about these payments?
A. Yes, I, I have conversation about this check and this payment, and he was kept telling me that he has lawyers on funds who make sure everything is correct.
Q. Was it your understanding that you needed to make these payments to him?
A. Yes.
Q. All right. Mr. Awale, I'm showing you what is in evidence as Exhibit Z5. And this is an email message with the title "For-Profit Restaurant Clarifications."

Did I read that correctly?
A. Yes.

Q. And this is an email. Do you see the "from" line at the top?
A. Yes.
Q. And do you see a name on the "from" line?
A. Yes.
Q. What is it?
A. Aimee Bock.
Q. With a Feeding Our Future email address?
A. Yes.
Q. And does her message indicate that there's an attachment?
A. Yes.
Q. It says, "Please see the attached clarification of how Feeding Our Future will be operating some of our sites."
Did I read that correctly?
A. Yes.
Q. And if we move on to this attachment, do you see on your screen a list of different restaurants?
A. Yes, I do.
Q. And before each of them do you see the letters FOF?
A. Yes.
Q. Feeding Our Future, is that your understanding?
A. Yes.
Q. And as we continue to look through this list of attached restaurants, I want to direct your attention to the top of

the fifth page of Exhibit Z5.
A. Yes.
Q. What do you see there, sir?
A. Nawal Restaurant.
Q. Recognize that?
A. Yes.
Q. It's one of your restaurants, isn't it?
A. Yes, one of my restaurant.
Q. Now, do you see the language underneath Nawal Restaurant?
A. Yes.
Q. I'm going to read some of that aloud to you. Okay?
A. All right.
Q. Do you see where it says, underneath Nawal Restaurant, "This site is being staffed by Feeding Our Future. The site operators will not prepare the meals, and funds will not be provided, given or otherwise paid to the site to employ site staff. Only Feeding Our Future's trained staff and volunteers and sponsor trained site staff serving as volunteers are permitted to distribute the meals."
So first of all, Mr. Awale, that first sentence, "This site is being staffed by Feeding Our Future," was that true?
A. No.
Q. Can you explain why that statement in your view is not

true?
A. I don't think I participated in that program at that time. This month I was confusing to participating.
Q. Well, for the months where you did start participating, were you preparing the meals, or were staff from Feeding Our Future preparing the meals?
A. I, me and my employees, were preparing the food.
Q. So this indicates that this, this document in front of you is suggesting that Feeding Our Future staff prepared your food at Nawal Restaurant.
What is your reaction to that?
A. I think that's not true. I didn't prepare any food in my restaurant and employees from Feeding Our Future I don't have. My employees who work in my restaurant, not Feeding Our Future.
Q. What is your reaction to seeing Nawal Restaurant used in that way in this Feeding Our Future document?
A. I think it's surprise to me first for -- what month was it, by the way? Can you recall?
Q. This message was sent October 20th, 2020, according to the date line. Did I read that correctly Mr. Awale?
A. Yes. I was not in the program that time, and I don't remember any time I -- I have employees who prepared food in my restaurant. I don't remember.
Q. But you do remember doing it yourself?

A. Yes.
Q. Or through your own employees?
A. Yes.
Q. Mr. Awale, I want to direct your attention to December 2021. In that month did you attend a meeting at the Feeding Our Future office?
A. Yes.
Q. Okay. First of all, how did you, how did you learn about the meeting at the office in December 2021?
A. I think I heard from, from friends or social media. I don't know how I heard, but I remember being there. I don't know who told me, but I went there, I know. I remember.
Q. And what was your understanding of what this meeting was going to be at Feeding Our Future?
A. At that time I wasn't in the program, I don't believe, but just to, I want to see what's going on and if there's any new information. I went to the restaurant, and I went after that to the office about five miles away.
Q. The Feeding Our Future office?
A. Yes. And I went there.
Q. And when you we want there, do you remember where within Feeding Our Future your meeting was located?
A. I think it was the basement of the building.
Q. Okay. And about how many people do you remember being at this meeting?

A. I believe was about 30 to 40 people.
Q. And did you have an understanding of who these other people were?
A. I assume all of them was, mostly most of the people I assume there was Somalis.
Q. And do you know if some of these other people had participated in the food program?
A. I believe most of them were participated, but I don't really know more details of it.
Q. And at this meeting do you recall whether anyone spoke to this group of people?
A. Yes.
Q. What do you remember?
A. I remember three gentlemen who had been, to be Somalis speak about the meeting and what's about, and --
Q. What did those gentlemen say?
A. They say that they need a donation for Feeding Our Future.
Q. Did they say why they needed money for Feeding Our Future?
A. Yes. They need, they say, because they want to hire lawyers who defended for this company because it's being attacked by a justice or something. It was being attacked by the government, but being attacked because they assaulted Somali community. That's basically it.

Q. That's what they told you?
A. Yes, that's what they told us.
Q. Was Aimee Bock at that meeting?
A. Yes.
Q. Did Aimee Bock speak at that meeting?
A. Yes.
Q. What did Aimee Bock say?
A. She explain difficulty she have for the government, and she need some kind of donation so she can hire good lawyers, all that stuff.
Q. She was asking for money?
A. Yes.
Q. And was she asking for money from only you or from everyone at Feeding Our Future at that meeting?
A. For everybody. Basically most of these gentlemen, who, who are there before Aimee, but Aimee being there for just, let's say, about five minutes and talk about briefly how difficult she have, she have from the government and the lawyer she need to be hire, all that stuff.
Q. Did Aimee Bock or the other speakers say how much money they needed from you and the other people?
A. Yes. They say initially, first they say, first gentlemen who are speaking tell us, about 10,000. And after few talking, they say, tell us what we need to pay. Anybody can be like, somebody, some people pay 5,000, some people

pay maybe 10,000. But they told us how much need to be paid.
Q. And did you make payments in response?
A. Yes.
Q. Did you observe other people in the room making payments as well?
A. I believe a lot of people paid, but half of the people, again, before that payment started, I guess, because they don't want to pay, but I, I was some people who left it and pay that money.
Q. All right. I'm showing you what has been marked, but I do not believe entered, which is Exhibit S32. Is that a check with your signature on it, Mr. Awale?
A. Yes.
MR. EBERT: Your Honor, at this time the government offers Exhibit S32.
MR. UDOIBOK: No objection.
MR. MONTEZ: No objection.
THE COURT: S32 is admitted.
BY MR. EBERT:
Q. Now you said that you paid money as a result of this December 2021 meeting at Feeding Our Future; is that right?
A. Yes.
Q. On the screen is Exhibit S32. Can you explain to the jury what this check is, Mr. Awale?

A. It was donation that I intend it to be paid Feeding Our Future.
Q. In the amount of $5,000; is that right?
A. Yes.
Q. And in fact did you make another check as a result of your meeting at Feeding Our Future in December 2021?
A. Yes.
Q. Now, I'm showing you Exhibit W45. Can you explain what this check is, Mr. Awale?
A. It was same place, same day, and after those gentlemen there told us to be, was to pay those two different checks and two different names.
Q. Did Aimee Bock or the gentlemen speaking tell you why you needed to have two separate checks?
A. Basically they told us, but I don't remember.
Q. Was it your idea?
A. No.
Q. Did you decide who to make the check out to?
A. No.
Q. Who did?
A. Those gentlemen who are talking there make a decision. They told us to do this 5,000 that account, that name, and 3,800 to this name, School Age Consultant.
Q. And do you know what School Age Consultant is?
A. I have no idea, no.

Q. You just wrote down what you were told that day?
A. Yes.
Q. Mr. Awale, thinking back to this December 2021 meeting, did you have any concerns about paying money in this way to Feeding Our Future?
A. I don't have any clue actually. I just -- they tell us that office of Feeding Our Future has some problem, I need a donation. And half that money on my, just decided to wrote down those checks.
Q. As you were told?
A. To support this company and Aimee. Basically Aimee was the person we are helping.
Q. Because they had said she had helped you?
A. Yes.
Q. Looking back on your time in the Federal Child Nutrition Program, Mr. Awale, do you know how much money came to you in your bank accounts?
A. I don't remember. It was a lot of money.
Q. Millions of dollars?
A. Millions of dollars, yes.
Q. What did you do with all of that money, Mr. Awale?
A. Most of the money was, I was funders for other group of people, and most of that money go to them, go with them.
Q. Did you say you gave much of that money to other people?
A. Yes.

Q. Why did you do that?
A. Because, for example, the money that come from Karmel, I was a vendor.
Q. A vendor?
A. Yes. For one that I know, and I basically, I was keeping about 10 percent. The rest is going to her.
Q. Back to that person?
A. That person, yes.
Q. And for some of your other involvement involving Feeding Our Future, for example Sambusa King, Nawal Restaurant, what conversations, if any, did you have with Feeding Our Future workers about what you should do when you got money into your bank account?
A. To spend in any way possible.
Q. To spend in any way possible?
A. Yes.
Q. Who told you that?
A. Basically Eidleh told me that and that what he was talking about when he talking about consult, consulting. So --
Q. His consulting was to tell you to spend the money any way possible?
A. Yes, because he saying the government wanted to spend it this money, and so it can be, spend it everywhere, for example, whatever. I buy supplies or if I want to buy

something or if I -- supplies for my restaurant.
Q. Or even writing all of those checks from the food program back to Mr. Eidleh, right?
A. Basically, yes.
Q. Of Feeding Our Future?
A. Some of the expenses, too. That was part of the expenses that I'm being -- the way I understand was, I waited for long time to see if this thing's right time, because I could have started in April and go all the way down. But I stopped to wait if this through, if they talking about reasonable or -- and I waited almost six months or so, and many people I knew, their checks keep coming.
Q. And you wanted money too, right?
A. I struggle, but it comes to my restaurant at the same time, because, you know, three different places is three different rent and three different employees, all that stuff. So on all of the money I have was run out.
Q. And when you rejoined the program, it's your testimony that you were engaged in fraud; is that right?
A. Basically it's right, yes.
Q. And when you engaged in fraud, did you make a lot of money?
A. Yes, I did.
Q. And your testimony is, you gave a lot of that money to

other people, including friends?
A. Yes.
Q. Did you also put a large, almost $300,000 payment toward your home?
A. Yes.
Q. Looking back on all of this, Mr. Awale, how do you feel about what you did with your participation in this fraud?
A. I really feel bad about it. I wish I would never go that way. I was so hesitant for long time to wait, and the time was difficult, but at the end I should never participated. I wish I never had.
Q. Thank you.
A. Thanks.

THE COURT: Mr. Udoibok, cross-examination.

MR. UDOIBOK: Thank you.

CROSS-EXAMINATION

BY MR. UDOIBOK:
Q. Mr. Awale, my name is Kenneth Udoibok, and I represent Aimee Bock.
A. Hi.
Q. We haven't met, have we?
A. No, I don't think so.
Q. Except we didn't speak but in the hallway, correct?
A. No, we didn't. I didn't see you.
Q. Oh, I thought we met.

A. I don't remember.
Q. Okay. I just have a few questions for you, and that is, I believe back in -- you were indicted in this case way back. Do you know when you were indicted?
A. I don't remember exactly, but was somewhere March 2023.
Q. Yes. And then after the indictment, you had a plea agreement with the government, correct?
A. Plea agreement, yes.
Q. Plea agreement?
A. Yes.
Q. All right. And before that plea agreement and during the negotiations for the plea agreement, you were represented by counsel, weren't you? You had a lawyer.
A. Yeah, I have a lawyer. I do have a lawyer.
Q. Did you have a lawyer to negotiate the plea agreement for you?
A. An attorney, when I indicted, I -- the government told me to have a lawyer. I couldn't have a lawyer for a while. I look and I called quite a few different companies. And probably worried me to take my case.
And I think I called the government, and I say I want to talk this case, and I want to take a plea deal, and government refused. They advised me to have a lawyer first before I accept anything.
Q. All right. So when you went, when you signed your plea

agreement, how many lawyers did you have?
A. I have two lawyers.
Q. You had two lawyers?
A. Yes.
Q. Is that Christa Groshek?
A. Yes.
Q. And also Aaron Roy?
A. Yes.
Q. Two lawyers? Okay. I just want to make sure.
And that plea agreement you, you were telling the truth, weren't you?
A. Yes.
Q. All right. All right. Now I'll come back to the plea agreement, but you met with, with the FBI in this case, didn't you?
A. Yes.
Q. Would it, is it fair to say that you met with the FBI multiple times?
A. Yes.
Q. More than once?
A. More than once, yes.
Q. Okay. I want to see whether you recall meeting with the FBI way back in January 20, 2022. That would have been the first meeting.
A. I don't recall -- 2022?

Q. Yes.
A. Yes, I remember I did met.
Q. All right. And during that meeting, do you recall having discussions about your activity with Feeding Our Future?
A. Yes, that investigator that contact me and talk about.
Q. Do you recall also talking about your activity with Partners in Nutrition?
A. I don't remember, but we talk all the, basically I think we talk Feeding Our Future and Partners in Nutrition too.
Q. You talked about Partners in Nutrition, correct?
A. Yes.
Q. All right. Did you also engage in fraud with Partners in Nutrition?
A. I think, yes.
Q. All right. I want to -- why don't you name me -- I believe you testified to your, one of your businesses, the Karmel Coffee, correct?
A. Yes.
Q. And then what is the name of the other one, the next one, because you got three.
A. Sambusa King.
Q. You have Karmel Coffee, Sambusa King and which other one?
A. And Nawal Restaurant.

Q. And Nawal Restaurant. You were a vendor, weren't you? You know what a vendor is, don't you?
A. Yes.
Q. And so you submitted receipts to Feeding Our Future?
A. Yes.
Q. All right. And you also submitted receipts to Partners in Nutrition, correct?
A. No, I didn't do that.
Q. You didn't submit any receipts to Partners in Nutrition?
A. I didn't sent any receipts to Partners in Nutrition myself. The vendor was doing it.
Q. Who was doing it?
A. The vendor, the -- that's who I was vendor for.
Q. You mean the vendor?
A. Yeah.
Q. And the Partners in Nutrition vendor?
A. The person who I, who I was vendor for was doing all the documentation to Partners in Nutrition.
Q. Who is that person?
A. I think was Anab Awad.
Q. Who?
A. Like Anab Awad.
Q. Okay. So the, was the -- did you know that -- then that person was sending fraudulent receipts to Partners in Nutrition?

A. I don't know what she was doing. All I know she got big checks from Partners in Nutrition, and I was reimbursing to my account and getting back myself about 10 percentage, whatever that was.
Q. So you got 10 percent?
A. Yes.
Q. And did you deliver any food?
A. No.
Q. Do you know who is Hobyo? Who is that?
MR. EBERT: Your Honor, I'm going to object as beyond the scope.
THE COURT: Sustained.
MR. UDOIBOK: All right.
BY MR. UDOIBOK:
Q. So when you spoke with the officer, with the FBI agent in 2022, you discuss more than Feeding Our Future fraud, correct?
A. Yes. I tell the truth what I know at that time.
Q. All right. Okay. I just need to clarify this. Throughout your involvement with Feeding Our Future, did you ever write a check to Aimee Bock?
A. No.
Q. Did you ever give cash to Aimee Bock?
A. No.
Q. So you met with the officer again on January 31st, 2023.

Do you recall that meeting?
A. Yes.
Q. And do you know where that meeting was? Was it in Bloomington?
A. Yes, it was in Bloomington.
Q. All right. Where in Bloomington was that?
MR. EBERT: Objection, Your Honor. I'm going to object to this line of inquiry based on the report. It is improper.
THE COURT: Sustained.
BY MR. UDOIBOK:
Q. You met with the officer, and you also disclosed your fraudulent activity, correct?
MR. EBERT: Your Honor, I renew the same objection to this line of inquiry. It's improper.
THE COURT: Sustained.
BY MR. UDOIBOK:
Q. All right. In your January 31st, 2023, meeting, did you tell the officer that you give money to Aimee Bock?
A. No, I did not tell.
Q. All right. Now I want to go to your meeting. Do you recall your meeting you had with the officer on February 8, 2023?
A. Who did I meet?
Q. Did you meet with an agent, FBI agent, on February 8,

2023?

A. I don't remember, but --

Q. But at any time during your meeting -- let me back up.

Do you recall having any meeting with an FBI agent in 2023?

A. Yes, I think I have a meeting in this building somewhere.

Q. Was there any time that you disclose that you gave money personally to Ms. Bock?

A. No, I don't remember, no.

Q. Okay. Now, I want to go to, see if you recall meeting with FBI agent April, sometime in April 2023.

A. Yes.

Q. Yes. And at that meeting do you recall --

MR. EBERT: Your Honor, I renew my objection to this entire line of inquiry based on these statements. I think this is improper.

THE COURT: Sustained. It's improper impeachment.

MR. UDOIBOK: All right.

BY MR. UDOIBOK:

Q. Was there any time throughout your relationship with Feeding Our Future that Ms. Bock asked you for cash?

A. No.

Q. A check?

A. No.

Q. You talked about I believe during your direct examination that you were asked for donation. Do you recall that testimony?
A. Yes.
Q. Was it Ms. Bock that asked you for donation?
A. Yes, was Ms. Bock and other speakers of that place who asked us.
Q. I believe you testified that Ms. Bock was there for about five minutes.
A. I think it was five minutes.
Q. Yes. And it was a donation, correct?
A. Yes. She told us that her company, which is Feeding Our Future, needed some lawyers, and she had difficulty to get all that money, so hope, and I was the one that participated.
Q. You testified that as she needed help to pay, is it to pay lawyers because she was in a lawsuit?
A. Yes.
Q. All right. And at that time you had not participated in the program, had you?
A. At that time I don't believe so, no.
Q. And there were other people who were not part of the food and nutrition program at that meeting, wasn't there?
A. I think all the people are. I don't know what they up to, but my understanding was everybody was part of this

Feeding Our Future.
Q. But you were not, though?
A. I wasn't at that time.
Q. So you don't know whether there were other people who were not like you?
A. I don't know what they are, other than the person we are giving money. We have to help send them who has difficult.
Q. Now, I believe during your direct examination you talked about Eidleh, correct?
A. Yes.
Q. All right. And was Eidleh the Feeding Our Future staff that you met regularly?
A. Yes.
Q. It wasn't Ms. Bock, was it?
A. No.
Q. Okay. Now, just to make clear, it was Mr. Eidleh that showed you how to make money. I believe you testified he showed you how to make money, correct?
A. Yes.
Q. It wasn't Ms. Bock, was it?
A. No.
Q. Okay. So when you pled guilty, you pled guilty for all the fraudulent activities that you had engaged in, correct?
A. Yes.
Q. The one at Partners and also the one at Feeding Our

Future, correct?
A. Actually, I tell all my activity, but I don't know if I pled guilty or not for Feeding Our Future -- I mean Partners.
Q. I don't understand what you said. You are not sure whether you included Partners?
A. I don't know if it was part of it, but I tell if it's, all my activity in there.
Q. You told everything.
A. Yes.
Q. All right. And you told everything, and it included Partners?
A. Yes.
Q. Okay. So you owned a restaurant, right? And did you work with other sites at the restaurant?
A. Did I work other sites?
Q. Yeah. Did you send, did you send invoices -- let me back up. Did you send invoices to other sponsors, other than Feeding Our Future?
A. I don't personally send invoices other than Feeding Our Future.
Q. But your friend, you said your other person sent out invoices?
A. Yes.
Q. Okay.

MR. EBERT: Objection. Asked and answered to this line of inquiry.

THE COURT: Overruled for that question.

BY MR. UDOIBOK:

Q. It was a yes, right?

A. What was the question?

Q. That your, the friend that you work with sent out other invoices?

A. Yes.

Q. Okay. Now before you had contact with the FBI, did you report Mr. Eidleh to anybody?

A. No.

Q. Before you had contact with FBI, did you report your suspicion to the police?

A. No.

Q. All right. When you received the checks, did you return it?

A. No.

Q. You spent it, didn't you?

A. Yes.

Q. And you changed, now changed your mind because you're looking at the seriousness of what you did, correct?

A. I don't understand that.

Q. Would you have returned the check if the FBI didn't contact you in 2022?

A. No, because I don't have it to return.
Q. Was there any, was there any FOF staff that ever worked in any of your restaurant?
A. Any staff who work my restaurant?
Q. Yes.
A. Feeding Our Future staff?
Q. Yes.
A. I don't remember personally.
Q. You don't remember it, but you could have had an FOF staff, Feeding Our Future staff, that worked there?
A. I don't remember.
Q. You don't remember?
A. I don't remember, and I don't remember. I don't see anybody. One thing I'm sure, nobody work in the restaurant. I don't know if they work somewhere else.
Q. So, but you were a for-profit restaurant, correct? You were not a nonprofit. You could make money.
A. Yes.
Q. Was there any Feeding Our Future volunteer that work at your site, at your restaurant?
A. I don't remember.
Q. You don't remember.
No further questions.
THE COURT: Mr. Montez or Mr. Colich.
MR. MONTEZ: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MONTEZ:

Q. Good afternoon, sir.

A. Good afternoon.

Q. My name is Adrian Montez. I represent Salim Said.

Now, before you became involved with the child nutrition program, you owned your restaurant; is that correct?

A. Yes.

Q. And you began participating in the program initially the first time in April of 2020; is that correct?

A. Yes.

Q. Did you have your own employees at that time?

A. Yes.

Q. How many?

A. I think each restaurant I have three to five, say.

Q. Okay. So approximately three to five employees working in each restaurant at that time?

A. Yes, maybe six, but I don't remember all of it.

Q. Okay. And when you initially started participating the first time I think you told the jury that you weren't committing any fraud; is that correct?

A. Yes.

Q. Now at that time you testified that there was so many people coming to get food that you couldn't keep up with it;

is that right?
A. Yes.
Q. You couldn't control the people, right?
A. Yes, I can't control.
Q. And you estimated that you had served approximately three to four hundred meals during that time; is that true?
A. Yes.
Q. And that was with three to four or five employees?
A. Some relative time, friends, relatives are helping me, but that was only the employees on the payroll.
Q. Okay. And you testified that after you were done serving those meals for the day, you and your employees were exhausted; is that true?
A. Yes.
MR. MONTEZ: Thank you, sir. I have no further questions.
THE COURT: Mr. Ebert, any redirect?
MR. EBERT: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. EBERT:
Q. Mr. Awale, counsel for Ms. Bock asked whether, asked you some questions about your December 2021 meeting at Feeding Our Future.
Do you remember that?
A. Yes.

Q. And in response, was it your testimony that Ms. Bock asked you and others in the room for money?
A. Yes.
Q. And in response, you wrote two checks; is that right?
A. Yes.
Q. And is one of the checks you wrote this one in Exhibit 45?
A. Yes.
Q. And it's made out to School Age Consultant; is that correct?
A. Yes.
Q. And you don't know what that is, do you?
A. No, I don't know.
Q. You just wrote it there because you were asked to do it?
A. Yes.
Q. Looking at the first page of this exhibit, do you see who the account owner is for School Age Consultant?
A. Yes.
Q. What does it say for account owner?
A. Aimee Marie Bock.
Q. Does it list any other names besides Aimee Marie Bock?
A. I think that's the name, the owner's name.
Q. The only one, right?
A. Yes.
MR. EBERT: Thank you, Your Honor.

THE COURT: You may step down, sir. Thank you.

Do you have something briefly?

MR. UDOIBOK: Yes.

THE COURT: Very briefly.

RECROSS-EXAMINATION

BY MR. UDOIBOK:

Q. Ms. Awale, did you have a tutoring business?

A. Do I have --

MR. EBERT: Objection, Your Honor.

THE WITNESS: No, I don't think so.

MR. EBERT: Beyond the scope.

MR. UDOIBOK: Testified to. He opened the door.

THE COURT: No. The objection is sustained.

BY MR. UDOIBOK:

Q. You are looking at Exhibit 45. Let's pull that exhibit up. W45. Go to 56 please. The check you just pulled up. Put it in the proper form.

All right. What's in the memo section of Exhibit 45?

A. Shafi Tutoring.

Q. That's your business, isn't it?

A. Yes, but I don't know who wrote that. That's not my handwriting.

Q. But you shown Shafi Tutoring?

A. No, it's not.

Q. Do you own Shafi Tutoring?
A. No, I don't.
Q. Are you sure?
A. I don't own Shafi Tutoring. I own Sambusa King, and I don't know who wrote down that name. It's not my handwriting.
Q. Whose signature is that?
A. The signature is mine.
Q. All right. And did Ms. Bock write down?
A. I have no idea. I have no idea. I didn't produce it, and I didn't write down that memo.
MR. UDOIBOK: Thank you.
THE COURT: You may step down. Thank you.
THE WITNESS: Thank you.
THE COURT: You are all finished.
THE INTERPRETER: You are all done.
THE COURT: Yes. Thank you.
THE INTERPRETER: Judge?
THE COURT: You are all finished. You are done. Thank you.
MR. BOBIER: Your Honor, the government calls Beth Shipman.
THE COURT: Good afternoon. I will have you come all the way up by me. Would you stand to take the oath.
THE WITNESS: Yep.

BETH SHIPMAN,

called on behalf of the government, was duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

THE COURT: Thank you. You may be seated.

And when you are, please state and spell both your first and last name for the record.

THE WITNESS: It's Beth Shipman, B-E-T-H, S-H-I-P-M-A-N.

THE COURT: Mr. Bobier, you may inquire.

MR. BOBIER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BOBIER:

Q. Good afternoon, Ms. Shipman.

A. Hi.

Q. How are you?

A. Good.

Q. Can you tell the jury where you work please?

A. I work for Bridgewater Bank.

Q. How long have you been at the bank?

A. I have been there nine years.

Q. What did you do before you came to Bridgewater?

A. Pretty much the same thing.

Q. So I suppose I should ask, what do you do at Bridgewater Bank?

A. I work in the compliance and BSA, Bank Secrecy Act area.

Q. The jury heard a few weeks ago from a BSA officer of a different bank, but if you could refresh us briefly. What does that mean? What is a BSA officer?

A. Basically we're looking for money laundering in particular. The way we look at it is, kind of, is the money coming in legitimate, is the money going out legitimate. So looking for opportunities for them to get money into the financial institution system to make the money look good.

Q. You said "opportunities for them." Who is "them?"

A. Entities or individuals opening accounts at the bank.

Q. At Bridgewater where you work?

A. Yes.

Q. You also mentioned compliance. Is that the word you used?

A. Yes.

Q. What is compliance at a bank?

A. Compliance is regulatory compliance, so there is certain rules and regulations that financial institutions have to adhere to. And so there's two components of, regulatory compliance is one piece. Sometimes BSA is combined with that in one department, and sometimes it is separated. In our institution it is combined.

Q. And you said there are two parts. Just to make sure I have those, what are those two parts?

A. It's the regulatory compliance and the Bank Secrecy Act.
Q. Now, I interrupted you earlier. You said that before you were at Bridgewater you were doing, I think you said, something similar but at a different institution?
A. That is correct.
Q. Where was that?
A. That was for American National Bank.
Q. You were working in compliance there too, I take it?
A. Compliance and BSA, yes.
Q. How long were you there?
A. I was there for four years.
Q. Before those four years where did you work?
A. At I was at Highland Bank prior to that.
Q. If I had to guess, would I be right if the answer is compliance work?
A. Correct.
Q. How long across all of the financial institutions you've been employed by have you worked in compliance or Bank Secrecy Act related tasks?
A. Out of my entire career, I would say that is probably 35 years.
Q. Now, what is your actual title at Bridgewater?
A. My title is senior vice president, compliance and BSA.
Q. Is there a staff that works underneath you at Bridgewater in service of the compliance and BSA efforts you

just described for us?
A. Yes, there is.
Q. About how many folks is there at Bridgewater?
A. We have ten on our staff.
Q. Where is Bridgewater Bank headquartered?
A. It is in St. Louis Park, Minnesota.
Q. Is that where your brick and mortar bank locations are located in Minnesota?
A. Yes, all of our locations are in Minnesota.
Q. So, Ms. Shipman, today I want to talk to you about two things. The first is a little more about your role in compliance at Bridgewater, and the second which we will get to a little later is some of the systems that your bank customers use to tract business.
Okay?
A. Mm-hmm.
Q. Let's start at the top and talk about compliance. You've told the jury in general what that is, but why does that matter? Why do banks have people like you who work in compliance?
A. There's regulatory requirements that all banks have to adhere to, which is the anti money laundering, and so we adhere to that. We get examined by regulators by that. We want to make sure that we are a safe and sound institution and that the types of clients that we want to bank.

Q. What are the types of clients that you want to bank?
A. Obviously legitimate companies and entities, people who run the business the way we would expect a business or an entity or individual to operate their account.
Q. So when the bank sees indications in accounts held at Bridgewater that do not appear from the bank's perspective to be legitimate, what sorts of steps do the folks who work for you take?
A. We do multitude of steps. We do a risk rate each new client that comes to the bank, and it's from a BSA perspective. It's not like a safety soundness or a credit facility type thing. It is truly for a Bank Secrecy Act purpose.
We are given guidelines by the regulators of what kind of is a higher risk entity or a higher risk individual. So we monitor against that, give them a rating, and then we do periodic monitoring, if necessary, if it's deemed to be a little bit higher risk to us.
Q. So I think you described at least three things there. The first was assessment of a bank customer at, I'll call it, intake; is that fair?
A. Yes.
Q. When a new relationship is formed?
A. Yes.
Q. What sorts of things does the bank undertake at that

initial step when a new entity or a new person comes to Bridgewater and tries to open an account?
A. We look at what their -- if it's an entity, we look at the business purpose. So what industry are they in, because that would dictate to us if it's higher risk or not from a BSA perspective.
We also get volumes from them. So the types of activities that they are going to be doing, are they going to do wires, are they going to do international wires, what's the dollar amount of those wires on a monthly basis.
We ask for cash activity, are they going to be involved with cash, how much cash do they plan to deposit, how much cash do they expect to take out each month.
Q. And fundamentally, what's the purpose of asking all of those types of questions of new account holders at the bank?
A. It's to help us get an understanding of what their business is and to be able to compare to that information down the road as they develop the relationship.
Q. So, for example, if someone opened a bank account with you in January, gave you that type of information in response to the bank's questions, and by November the type of transaction activity in their account didn't align with the expectations you developed in January, what might the bank do?
A. Obviously we would be monitoring if it's deemed a higher

risk account already from the initial review. If it wasn't, we do have automated monitoring systems that alert us to activity that starts to get out of the norm. And so it just says it may be all right, but take a look at this account and just make sure that everything is on the up.

Q. So we talked about intake. I think you've now moved to item two, which is monitoring; is that right?

A. Yep, that's part of the monitoring.

Q. And you said a purpose of monitoring is to capture or identify activity outside the norm; is that right?

A. Right. I mean, it -- our automated systems are set up to say this is typically how an account would work, and just because it alerts to that particular account doesn't mean that there is anything is wrong with it.

It just says take a peek and make sure that it makes sense to you from a visual eye doing our investigation, digging into the account activity, looking at what they said initially they were going to do.

Q. So to be clear, when your systems give bank personnel that kind of alert, that's when additional investigation that you just mentioned is something the bank engages in?

A. Right. That's one piece of it. Another piece we do is, we'll do outreach to the customer. We have our customer facing personnel ask directed questions to get a response so that we get a full picture to help us understand what is

going on in the account.

And sometimes that puts the pieces together for us to say there's nothing here, this all makes sense based on what they've told us.

Q. When you say "outreach," you are talking about the bank reaching out to --

A. The bank does reach out, yes.

Q. To whom, though? To the customer?

A. To the customer.

Q. To ask them about what you were seeing in their accounts that either set off those automated alerts or give the personnel who work under you some concern; is that fair?

A. Correct.

Q. So the last thing I think you mentioned was risk. What types of things does the bank evaluate when looking at the risk of banking with a person or a company?

A. It's the risk to the bank that we would be involved with a customer that is laundering funds. We don't want to be having that reputation for that, and so we have asked customers to leave because we believe that they are doing something that we're not comfortable with; or it could be that the amount of volume of activity that they're doing is more than we can physically handle, and so they need to go to a larger institution to handle that activity.

Q. And that on occasions actually happens?

A. Yes, that does happen.
Q. You ask people to exit the bank and take their business elsewhere?
A. We do. I mean, it's not an easy decision to make. I mean, we're in the business to have deposit accounts. We want them to be here, and that's why we do that outreach, to make sure that we have the full picture.
Q. So given that it's an important decision, and of course banking is a business and you want people to bank with you, what sorts of things need to happen before Bridgewater Bank decides to ask someone to leave, to kick them out of the bank?
A. We have to do our full investigation, and then our BSA team, we make the recommendation to close the relationship, so all accounts that they would have. Whether we saw activity in only one or three accounts, it doesn't matter. We want the whole relationship gone.
And then we reach out to whoever services them on the front lines, so who is directly working with the client and say this is our recommendation, and hopefully they concur which is, 99 percent of the time they will concur with our decision.
Q. Defer to the experts?
A. Correct.
Q. Now, you mentioned that sometimes when you reach out or

the personnel who work for you reach out to the customer, the answers you get back satisfy your initial concerns. That happens sometimes?
A. It does.
Q. And I take it from your testimony that sometimes that doesn't happen; is that right?
A. That is correct too.
Q. In other words, sometimes after an automatic alert is triggered or your personnel identifies something that raises their concerns and your personnel reach out to the customer, the answers you get back do not satisfy you as to the risk of banking with that person?
A. That is correct. And there have been times where we'll reach back out again to get clarification. Maybe it wasn't a clear response to us that we think may satisfy us, but we just want to make sure we have that confidence.
Q. And are there types when even after a second or third reach-out, the answers still don't satisfy you that the conduct in the account is legitimate?
A. That's correct.
Q. In which case what happens?
A. That's where we move to recommend closure.
Q. Kick them out of the bank?
A. Correct.
Q. Ms. Shipman, I want to ask you about one investigation

your bank undertook in particular, if that's okay.
A. Yes.
Q. Are you aware of an entity called Victory LLC?
A. I am.
Q. Why are you familiar with Victory LLC?
A. They came to our attention for what we call structuring. So they were taking cash withdrawals out that were just under the threshold of filing a currency transaction report, and that's not allowed. If you know you need the funds, take the funds all at one time.
So we looked into the account and we didn't -- we believed that they were structuring and talked to the individual who owned the account, and that's where we came into the name Salim Said.
Q. Let me ask you a few questions about that if I could.
A. Sure.
Q. You said that you noticed some transactions this entity Victory LLC was engaging in; is that right?
A. That's correct.
Q. I take it to mean that when you describe Victory, then, you are describing an entity that had an account at Bridgewater?
A. That is correct.
Q. Do you remember roughly the timeline of the investigation into Victory or at least the year?

A. I want to say late 2020 to early 2021.
Q. The first thing you mentioned that triggered your attention to Victory LLC was, I think you said, possible structuring. Is that the word?
A. Correct.
Q. Can you tell the jury what structuring is?
A. Structuring is cash in or out of the bank over $10,000, but they stay below that threshold.
So if you bring in cash in or out of the bank over $10,000, we have to report a currency transaction report to the United States Treasury. Nothing wrong with that. We do it all the time. It's not a big deal.
But when you try to avoid that filing, that's when it becomes a concern.
Q. You have mentioned twice now something called a currency transaction report; is that right?
A. That is correct.
Q. And you said those have to be submitted by the bank --
A. Correct.
Q. -- to the U.S. Treasury Department; is that right?
A. That is correct.
Q. Are law enforcement able to access those reports when you make them, if you know?
A. I believe they can.
Q. So you told us what structuring is. Why on the basis of

your three plus decades of experience working in compliance, why do some people or companies engage in structuring?

A. Sometimes people just think they don't want the government in their business. We get that a lot. Other times they are trying to hide the real purpose of the funds, whether it's the funds being deposited or the funds being withdrawn.

Q. So if I wanted to take out $30,000 all at once from my Bridgewater account, that would trigger a report, right?

A. That would be correct.

Q. But if I took out $9,000 three times and then another $3,000, so it's four separate transactions, each of them below ten grand --

A. Right.

Q. -- no report is triggered?

A. No report is triggered, and we would not file, but we would look at it for suspicious activity because we are trying to figure out what they are doing. We are trying to understand.

And it has to be in a short window of time. I mean, if you do it once every three months, we're probably not going to say anything, but if you are doing it multiple days in a row why did you not get it all at one time.

Q. All right. Now to take us back to Victory LLC. They had an account at Bridgewater.

Sorry. For the record yes?
A. Yes. Sorry.
Q. And your staff at the bank had concerns that the Victory LLC transactions through your bank might be structure; is that correct?
A. That is correct.
Q. Do you know from the intake process that you described to us earlier what type of business Victory LLC was involved in?
A. I believe they stated they were a food service business.
Q. Do you know anything else about, from their representations to you, what they were supposedly doing?
A. Not at the time of account opening, but we did ask follow-up questions.
Q. And what answers did you receive from Victory LLC when you asked those follow-up questions?
A. That they were starting up a food program and that they were looking for a spot to place this restaurant, but they had not found that location yet, but they needed the account to start depositing funds.
Q. Now at the time that you hear from Victory LLC that they are in the restaurant business; is that right?
A. Mm-hmm.
Q. And they tell you they don't have a spot yet, right?
A. Correct.

Q. They don't have a physical location at that time?
A. No.
Q. They don't have a restaurant yet?
A. No. That's what we were told.
Q. At the time you were told that, were you already seeing transactions in that account?
A. We were.
Q. What type of transactions?
A. It was those cash transactions which triggered more concern for us in the sense of if you don't have the restaurant, what were the purpose of those funds.
Q. Can you explain more about that?
A. Yes. So the person withdrawing the funds told us that it was, I believe, to buy a refrigerator or a freezer. I can't remember which one it was. But that raised concerns because if you don't have a physical location where are you going to put this equipment.
Q. Now, you mentioned there were a series of cash transactions through Victory LLC that gave you some pause, right?
A. Correct.
Q. Did you also investigate the source of the primary funding going into that account?
A. Yes.
Q. And what did you find?

A. They received a check from Salim Said.
Q. Salim Said?
A. Yes. Thank you.
And mentioned that they would be getting more of those types of checks because they were a shareholder in one of the businesses.
Q. You mentioned Salim Said. Did you then undertake any investigation into that name or any accounts related to that name?
A. I don't believe right at that time. I believe there was one other account tied to him at that time, but it was operating as it should. Nothing raised suspicion at that time.
Q. So this is the end of 2020. We're talking about your bank's focus on Victory LLC, right?
A. Right.
Q. And part of the concern with that account that you thought might be engaging in illegitimate activity was substantial funds coming from Salim Said; is that right?
A. Correct.
Q. At a later point in time, did Salim Said open one or more accounts at your bank?
A. Yes, they opened multiple accounts.
Q. Do you remember how many?
A. I want to say four.

Q. Do you remember what they were?
A. Now you are testing my memory. ASA Limited is one. Cosmopolitan Business Services, which was doing business as Safari Restaurant. There was 3017 LLC and Salim -- sorry. I can't pronounce it.
Q. Salim Limited?
A. There. Salim Limited.
Q. Safari Restaurant. Sorry. Cosmopolitan Business doing business as Safari Restaurant; is that right?
A. Correct.
Q. ASA Limited?
A. Correct.
Q. Salim Limited?
A. Correct.
Q. And 3017 LLC, is that what you remember?
A. Yes, that is what I remember.
Q. Four accounts at your bank at that time?
A. Four relationships. Some of them had multiple accounts.
Q. Okay. Let's talk about that a little.
Let me show you on your screen there Government Exhibit W26, which is in evidence.
I take it you recognize this.
A. I do.
Q. This is a standard account agreement from your bank; is that right?

A. That is correct.
Q. And at the top here we see this is the Salim Limited LLC account; is that right?
A. Yes.
Q. Located here in Minneapolis?
A. Yes.
Q. And the date opened is October 2020.
A. Correct.
Q. New account?
A. Correct.
Q. At the bottom here, can you tell us what this set of six boxes represents?
A. The signature lines or --
Q. Yeah. Why are those there? What do those mean?
A. Okay. Those are the individuals who can sign on behalf of the account, on behalf of the entity.
Q. So the first block there, that has Salim Said written below it; is that right?
A. That's correct.
Q. There's a signature above it?
A. Yes.
Q. So to be clear, is Salim Said the only signatory on this account?
A. Yes, on this document.
Q. Meaning that at least as far as this document shows and

of this date, he's the only one who can control the money in and out of the Salim Limited account?
A. That is correct.
Q. Now at some point after Salim Limited opened this account at Bridgewater Bank, did you undertake a compliance investigation into it, into Salim Limited?
A. We did.
Q. Why?
A. One, it was part of our new account process, so we were looking at it from that aspect. And the activity that we saw, we saw deposits coming in from Feeding Our Future and then the funds going out to various resources.
Q. Now, you mentioned you saw when you looked at the Salim Limited account primary funding coming from Feeding Our Future; is that right?
A. That's correct.
Q. Now, the jury's heard plenty about Feeding Our Future, but in October 2020 what was the bank's understanding of what Feeding Our Future was?
A. Our understanding was that it was to give funds to businesses to help feed school age children who were out of school because of COVID.
Q. Did you understand that to be a reimbursement program?
A. Yes.
Q. So on the basis of you seeing most of the money going

into the Salim Limited account coming from Feeding Our Future and your understanding that that money was meant to be used for a reimbursement program, what type of action did you take in terms of further investigating the conduct of that account?

A. Well, we looked at where the funds were going to because most of the funds were coming from Feeding Our Future.

And there were multiple individuals, multiple entities, some of which are interrelated. There were some that appeared legitimate, meaning that they were for food, but a majority were to individuals or entities that didn't appear food related.

Q. You're describing the bank paying attention to the outflow I think at this point?

A. Correct.

Q. The flow of money out of the Salim Limited account at your bank?

A. Correct.

Q. And you said some of it looked like it was going towards legitimate food purchases; is that right?

A. Correct.

Q. But a lot didn't look that way to the bank at the time; is that right?

A. Correct. I would say a majority.

Q. The majority. Why did the majority of the money flowing

out of the Salim Limited account not seem to the bank at the time to be going toward legitimate food purchases?
A. A lot were made to individuals. They were even dollar amounts, which raised concerns for us. Even some of the vendor invoices were even dollar amounts, appearing that no sales tax was being charged or anything like that.
Q. Even dollar amount, you mean 50,000 even, that sort of thing?
A. It could be, yeah. It could be $3,000, you know, no cents type of thing.
Q. And why is that unusual?
A. For us as individuals, it's not usually how you get paid. There are circumstances where that might be legitimate, but from just looking at the account, it did not appear to be legitimate.
Q. I take it then based on the bank's experience with other customers, that for this type of business was not typical?
A. Correct.
Q. You mentioned some related accounts. I want to show you Government's W37, which is in evidence. Another account agreement, right?
A. Correct.
Q. From your bank once again?
A. Correct.
Q. Now, this is from 3017 LLC. Do you see that?

A. Yes, I do.
Q. This one in Columbia Heights, Minnesota, according to the document, right?
A. Yes.
Q. New account, same time opened as the last one, October 2020?
A. Yes.
Q. The signatories here, there is only one; is that right?
A. That is correct.
Q. And this one is Abdulkadir Nur Salah. Do you see that?
A. Yes, I do.
Q. And there's a signature?
A. Yes.
Q. Now, you mentioned that the four accounts you described were either Salim Said's accounts or you described them I think as interrelated?
A. Correct.
Q. What did you mean by "interrelated"?
A. There would be multiple signers on some of the accounts that gave us the indication that somehow they were related.
Q. And from the bank's perspective, when you talk about accounts being interrelated, are you also talking about the flow of funds?
A. Definitely. I mean, we saw funds going between all of these four accounts that we had at the bank.

Q. Sometimes back and forth?
A. Back and forth, to other financial institutions.
Q. Now, the jury's already heard about Abdulkadir Nur Salah as a defendant in this case, just not in this trial, and as a partner with Salim Said, the name you know, in the Safari group.
Let me show you another exhibit. This one is also in evidence as W4.
Same question: Another account agreement from your bank; is that right?
A. That is correct.
Q. Is this another one of those accounts that during the bank's compliance investigation of Salim Limited you found to be related to the Salim Limited account?
A. Yes.
Q. What's the account owner here?
A. The account is Cosmopolitan Business Solutions doing business as Safari Restaurant.
Q. Opened on the same day as the other two, August 16, 2020 {sic}; is that right?
A. Yes.
Q. And the date here -- I'm sorry -- the address, Minneapolis, Minnesota?
A. Correct.
Q. Now on the signature block we see now two names we

recognize; is that right?
A. That is correct.
Q. We've got Salim Said on the right?
A. Yes.
Q. And we've got about Abdulkadir Nur Salah, his Safari Restaurant partner, on the left; is that right?
A. Correct.
Q. And again, when we're looking at these signature blocks, that just means who controls these accounts, who has access to the money?
A. Correct.
Q. One more. This is already in evidence as W14.
All right. Is this the account agreement from your bank for the fourth of those accounts you mentioned that were related to Salim Limited?
A. It is.
Q. This is the ASA Limited account?
A. Yes, it is.
Q. October 2020 for the opening date again?
A. It is.
Q. And this one's at McKnight Road in St. Paul, Minnesota.
A. Yes.
Q. Two signatures here as well?
A. Yes.
Q. And again, one of them Salim Said?

A. Correct.
Q. Ms. Shipman, as part of your review and your staff's review, after identifying these other interconnected accounts, did you undertake investigation into those other accounts as well, in addition to Salim Limited?
A. We did.
Q. I want to ask you a few things about ASA Limited.
A. Okay.
Q. Did your staff look at that account as part of your compliance investigation?
A. We did.
Q. Did you see anything in the ASA Limited account that was memorable or significant to your investigation?
A. Off the top of my head, I can't remember that.
Q. And the Salim Said account you described large volumes of transactions; is that right?
A. Yes.
Q. You see the same thing with ASA?
A. We did.
Q. Payments going back and forth between related accounts and Salim Said Limited account?
A. Related accounts and I believe similar individuals at times.
Q. And you saw the same or similar type of conduct with the ASA Limited account; is that right?

A. That would be correct.
Q. You mentioned the round figures going to what appeared to be maybe employees?
A. Yes, we thought that they could be employees. We did reach out to the customer for followup and were told that they were contractors and that they would be getting 1099s.
Q. When you say you reached out to the customer, who did the bank talk to?
A. Salim Salah.
Q. Salim Said?
A. Yes.
Q. And what did the bank ask Salim Said about the activity that was raising some concerns in the bank's view about these accounts that he was either a signatory on or related to?
A. He said that they were all contractors and that they would be getting those 1099s.
Q. All of these entities receiving transactions, payments in round numbers?
A. Correct.
Q. What was the bank's reaction to hearing from Mr. Salim Said that all of these entities, individuals receiving money from his accounts, were simply contractors?
A. It's possible.
Q. Did the bank take any further action to investigate

whether you believed that was a true and accurate response?
A. I don't believe we did, but that's not our obligation. Our obligation is just to identify what we believe to be unusual activity.
Q. Well, let's talk about what else you did do then.
A. Okay.
Q. When you were told by Mr. Said that all of these various individuals and entities were contractors, did you undertake any investigation into when those contractors had been formed?
A. Yes, the contractors, as far as vendors were concerned, many of the entities we noticed were newly established, I want to say within eight months to a year old.
Q. What do you mean "newly established"?
A. They filed with the State of Minnesota to be a new entity operating --
Q. I'm sorry.
A. -- operating in Minnesota.
Q. New businesses?
A. Correct.
Q. Was that significant to you?
A. It is unusual when that many come in in such a short period of time.
Q. Why?
A. It's not typically what we see.

Q. What you typically see is vendors who have an established business, perhaps?
A. Correct.
Q. So this was unusual; is that right?
A. Yes, unusual.
Q. When you were looking into these supposed contractors that Mr. Said identified, all of the individuals, all the entities receiving these funds, did you look into whether those contractors had existing physical operations?
A. We did.
Q. What did you find out?
A. Many times we could not find a physical location.
Q. At all?
A. At all.
Q. What did that suggest to you?
A. That they did not exist.
Q. Was that concerning?
A. Very concerning.
Q. Why is that very concerning?
A. Because if the purpose of the funds from Feeding Our Future was to feed children, then they needed a physical site to be able to do that.
Q. So let me take a step back just to make sure I have this.
The bank undertakes this investigation into Salim

Limited and the related accounts; is that right?
A. Yes.
Q. You find out that the majority of the funds flowing into and among these accounts coming from Feeding Our Future, right?
A. Yes.
Q. Which you understood to be funds for a reimbursement program to feed kids.
A. Correct.
Q. But when you looked at all of the entities that are receiving the payments from these accounts, which Salim Said told you were contractors, you weren't able for many of them to identify any history of business dealings, right?
A. Correct.
Q. Nor were you able for many of them to identify any physical operations whatsoever?
A. Correct.
Q. You said Salim Said got back to you with some responses. You've talked about those contractor comments he told you; is that right?
A. Yes.
Q. Did those satisfy the bank's concerns about the activity you were seeing?
A. Not really. The activity was still continuing, but shortly after we had reached out, the even dollar payments

ceased. So they stopped.
Q. Make sure I've got that too. Shortly after you reached out to Mr. Salim Said and asked about the even dollar payments, as one of the things giving the bank concern, that pattern of transactions stops?
A. Correct.
Q. That indicate anything to you?
A. That to us it indicated that he knew that they weren't valid.
Q. Why is that?
A. Why would you stop doing something if you believed that it is legitimate.
Q. You've said his responses did not satisfy the bank's concerns.
At the end of this investigation, after looking into the contractors, purportedly, supposed vendors, what was the bank's conclusion about the Salim Limited account and these related three entities we just looked at?
A. We did not feel that it was meeting the business purpose of what the entity was established for, any of the entities, so we did ask to close the accounts, and we did end up closing the accounts.
Q. Now, you described at the beginning of your testimony that that's a pretty serious step; is that right?
A. It is.

Q. You are a bank. You are in the business of banking, right?
A. Correct.
Q. You want people to bank with you?
A. We do.
Q. And you only ask them to leave if the end of your compliance investigation leaves you without the answers you need.
A. Correct.
Q. Is that what happened here?
A. It is.
Q. And you asked Salim Said to take all four of those accounts, all of his business, somewhere else?
A. Yes, we did.
Q. We talked a little bit about compliance. I also want to talk to you about the bank's systems.
A. Okay.
Q. Are you familiar at a very high level with how your bank's systems operates whether an account holder initiates a transaction?
A. Yes.
Q. Let me start maybe with cashier's checks. Been in banking 30 years. I assume you are familiar with a cashier's check?
A. I am.

Q. For anyone on the jury who might not know, could you just quickly tell us the difference between a cashier's check and a personal check?
A. A cashier's check is actually funds that the bank is supporting that tells you that the funds have already been collected, so the funds in the account are good. You can almost guarantee that that check will be paid.
Now, there are fraudulent cashier's checks out there, like any check, but generally cashier's checks are the standard to say those funds are good; where a check drawn off an account, there might not be sufficient funds. And that account could be overdrawn, and the bank that's paying it will choose not to pay it and return it.
Q. And when you say a cashier's check indicates those funds are good, you're not expressing an opinion about whether funds and a cashier's check are legitimate or not, right?
A. Correct. Not legitimate, just that the funds are available.
Q. Just that they're available.
So if I go into your bank and I have an account, I can purchase a cashier's check as long as the amount of money in my account is sufficient to cover the balance I'm trying to buy; is that right?
A. Correct.
Q. I could walk out with a $10,000 cashier's check in my

hand?
A. You could.
Q. Okay. Do you know which bank systems have to be accessed at a high level if I walk into your bank and buy a cashier's check?
A. Yes.
Q. Do you know where those systems are located geographically?
A. Well, we have servers in Minnesota, but in order for the transactions to produce nightly reports for us, it actually has to go to our software provider, and those are out of state.
Q. So to put that in a nutshell, if I buy a cashier's check from Bridgewater Bank, I have necessarily kicked off a process that ends in an out-of-state server being accessed; is that fair?
A. Yes.
Q. Okay. Is an out-of-state server also accessed if all I do at your bank is initiate a transfer from one Bridgewater account to another Bridgewater account?
A. Yes. That's how we get our daily reports.
Q. Even --
A. Those transactions have to run through.
Q. Even though Bridgewater has all of its brick and mortar locations in Minnesota?

A. Correct.
Q. So if I go into a location in St. Louis Park and I transfer money from that branch to a branch location in Minnetonka, still for the money to get from A to B a server outside this state has to be accessed; is that right?
A. Correct.
Q. Okay. Is the same true if I send a wire transfer from your bank?
A. It is.
Q. How is that different? What's a wire transfer?
A. A wire transfer is just an electronic means to move funds. It gives more immediate access to the party that's receiving it. So a lot of businesses like to use it because their vendors get paid that day that it's received by that other financial institution.
Q. Let me talk to you about three transactions in particular. Okay? I'll pull up Government's W26 which is in evidence.
Now we've looked at this already; is that right?
A. This account agreement, yes.
Q. That's the account agreement for Salim Limited, and we saw that was opened in October 2020?
A. Correct.
Q. This is one of the four accounts associated with Mr. Salim said that your bank eventually closed; is that

right?
A. Yes, it is.
Q. When you kicked him out; is that right?
A. Correct.
Q. Now, let me pull up on the other side of the screen Z42, which is in evidence.
Now the jury has heard that our Z exhibits correspond to the counts in the indictment, Z42, Count 42.
Have you seen this before, this document here?
A. I have seen it.
Q. What is this?
A. This is the cashier's check. This is the backside that the bank keeps the record. The one that the customer would take with them would be more pretty. It would be Bridgewater Bank plastered over it. Colors would be on it, that sort of thing, but this is what is processed through our systems.
Q. This is a cashier's check; is that right?
A. That is correct.
Q. And on the right, this is -- the right of Z42, this is the back of the cashier's check; is that right?
A. That is correct, showing it came out of Bridgewater Bank Branch 1.
Q. Okay. And if we look at the left side, a purchaser is identified; is that right?

A. That is correct.
Q. That's Salim Said?
A. That is correct.
Q. When we looked at W26, who is the only person that has signing access who can access the money on this account?
A. Salim.
Q. Okay. Can you tell, Ms. Shipman, where this check is going, in other words, to whom it's made out?
A. Yeah. It's payable to Lupient Chevrolet.
Q. Do you know who Lupient Chevrolet is?
A. Yes, they are a vehicle dealership in Bloomington.
Q. So this is a cashier's checks for $47,000 from Salim Said to a car dealership?
A. Yes.
Q. Out of your accounts.
A. Yes, the funds are from Salim's account using a cashier's check.
Q. Now, because this cashier's check -- well, let me ask you this: Do you know whether this cashier's check was deposited with Lupient Chevrolet?
A. Yes. We have reconciled, and that has cleared our account.
Q. Because of that, are you able to say with confidence that the purchase of this cashier's check had to access the servers out of state that we talked about earlier?

A. Yes.
Q. And to be clear, this was one of the four accounts you described associated with Salim Said where you described the majority of the funds coming in are from Feeding Our Future?
A. Correct.
Q. For the reimbursement program?
A. Yes.
Q. To feed kids; is that right?
A. Yes.
Q. Let me pull up W26 for you again. It's in evidence.
Same account we were just talking about; is that right?
A. Yes, it is.
Q. Which one is that?
A. Salim Limited.
Q. Okay. On the right side, let's look at Z51, which is in evidence. Do you recognize this document, Ms. Shipman?
A. I do.
Q. What is it?
A. It is another cashier's check.
Q. Is it from your bank?
A. It is from our bank.
Q. You can see Bridgewater on the right side, which you've told me is the reverse side?
A. Correct.

Q. Now this is also purchased by Salim Limited LLC, correct?
A. Correct.
Q. Remind us. Who is the only person that can control money going in and out of the Salim Limited account?
A. Salim.
Q. Mr. Said?
A. Correct.
Q. This one is for, looks like, a quarter of a million dollars; is that right?
A. Correct, $250,000.
Q. And it's directed to Micasa LLC?
A. Correct.
Q. Do you have any understanding what Micasa LLC is?
A. I believe in our investigation we found that to be related to a real estate company.
Q. So based on your investigation, what do you understand this quarter of a million dollars to be a payment toward?
A. Probably the purchase of that property, the address that's listed.
Q. This here in sort of where you put the memo line on a check?
A. Correct.
Q. 5150 Alvarado Lane; is that correct?
A. Correct.

Q. Now same question. Do you -- can you say with confidence that the purchase of this check had to access those out-of-state systems we were talking about earlier?
A. Yes.
Q. And looking at that address, 5150 Alvarado Lane, I'll pull up Government's U6, which is in evidence. Do you see the address on the top of that photo?
A. I do.
Q. Does that appear to be the same address we were just looking at on that cashier's check from the Salim Limited account?
A. The street address is the same.
Q. All right. Just one more, Ms. Shipman. Let me show you Government's W82, which is in evidence.
Now, this last transaction I want to talk about, this is from an account called Cosmopolitan Business Properties LLC; is that right?
A. That is correct.
Q. Now, earlier we were talking about Cosmopolitan Business Solutions doing business as Safari; is that right?
A. Correct.
Q. Is this the same account, or is this a different one?
A. This is a different account.
Q. What's the address on this, according to the account agreement?

A. 2722 Park Avenue South, Number 100, Minneapolis, Minnesota.
Q. When we go down to look at the signatories on Cosmopolitan Business Properties LLC, we see some names we recognize?
A. I do.
Q. We see Salim Said, right?
A. Correct.
Q. We see Abdulkadir Nur Salah, his Safari Restaurant partner right?
A. Yes.
Q. And these two, the jury will recognize, Ahmed Sharif Omar-Hashim and Ahmed Ghedi as defendants in this case, just not in this trial.
And those are the four signatories on that account, right?
A. Yes, it is.
Q. The four folks who can control money going in or out of it?
A. Correct.
Q. Let me take you down to page 9 of that exhibit.
Tell the jury what we're seeing in page 9 of W82?
A. This is a Bridgewater Bank client wire form for domestic wires. So when a customer wants to send wires, we have to collect certain information, and this is the form that we

collect it on.
Q. Sending a wire you told us earlier, that's just transferring money?
A. Correct.
Q. Now in this particular wire form, it looks like the bank collected some information; is that right?
A. Correct.
Q. And one of the things written here is, "Verified ID in person."
Is that right?
A. That is correct.
Q. What do you understand that to mean?
A. That they were physically in a branch location.
Q. "They" meaning the person --
A. The person that initiated this request.
Q. The person that sent the money?
A. Correct.
Q. And the bank personnel verified their ID?
A. Correct.
Q. Meaning made sure that person was allowed to access this account and send the money?
A. Correct.
Q. Then at the top right, some more information. Do you see "spoke to" on this form?
A. Yes.

Q. And the name is Abdulkadir Nur Salah; is that right?
A. Correct.
Q. That's the name we've seen as a cosigner on several of the accounts at the Bridgewater Bank that we've looked at this afternoon.
Is that right?
A. That's correct.
Q. And that's Salim Said's Safari business partner, as the jury has heard.
Ms. Shipman, how much is this wire for?
A. $2,735,000.
Q. Almost three million bucks?
A. Yes.
Q. Now, the originator, that's just where the money is coming from; is that right?
A. That is correct.
Q. And it's Cosmopolitan Business Properties, meaning the account we just looked at at your bank, right?
A. Correct.
Q. And the beneficiary, that's the person or entity receiving the money, right?
A. That is correct.
Q. Who is receiving this?
A. First American Title Insurance Company, National Commercial Sales.

Q. What's a title insurance company?
A. Title companies help facilitate real estate transactions.
Q. So based on that, and your experience in banking, what do you understand this $2.7 million wire transfer to be?
A. To purchase some type of property.
Q. Let me show you on the other side of the page Government's Z52, which is in evidence. It corresponds to Count 52.
Just a little bit of information here, Incoming Wire Details Report. Do you see that?
A. Yes, I do.
Q. Does this appear to correspond to the same wire we were discussing on W82 at page 9?
A. It does.
Q. You can see --
A. There is a sending bank.
Q. And who is the receiving bank, it looks like --
A. The receiving name is First American Title.
Q. Okay. And again, we see the amount is the same on each. Remind us what that is?
A. $2,735,000.
Q. Ms. Shipman, if we go down a few more pages in Government's 82, there's a little more information attached to this wire.

Is that right?
A. Correct.
Q. Are these bank records kept related to wires sort of in the ordinary course?
A. Yes.
Q. Let me go down a little here.
All right. Ms. Shipman, same wire we were just discussing, right?
A. Correct.
Q. According to the bank records, $2.7 million and change; is that right?
A. Correct.
Q. Who is the wire requested by?
A. It is -- I'm sorry. I don't know how to pronounce the first name.
Q. Abdulkadir Nur Salah, that name we've seen before?
A. Yes.
Q. And --
A. And Salim.
Q. And Mr. Salim Said; is that right?
A. Yes.
Q. Both of their names are there?
A. Both are there, yes.
Q. As the folks who requested this $2.7 million wire; is that right?

A. Correct.
Q. Ms. Shipman, in order for this wire to be completed, were those out-of-state servers necessarily accessed?
A. Yes, they were.
Q. And do we know that this wire was in fact completed?
A. Yes, it was.
Q. You've been able to confirm that?
A. Our records have been balanced.
Q. Ms. Shipman, do you remember how long the Salim Limited and related accounts that opened in October 2020, as we've seen, had open accounts at your bank?
A. We closed them out in July of 2021.
Q. From October 2020 to early July 2021; is that right?
A. Correct.
Q. Less than a year?
A. Yes.
Q. Ms. Shipman, in that seven-, eight-month period, do you know how much money flowed through the Salim Limited account and those related accounts we were just discussing?
A. It was just shy of 24 and a half million dollars.
Q. Thank you.
MR. BOBIER: No further questions, Your Honor.
THE COURT: Mr. Udoibok, do you have any questions?
MR. UDOIBOK: Just one or two.

CROSS-EXAMINATION

BY MR. UDOIBOK:

Q. Ma'am, my name is Kenneth Udoibok. I represent Aimee Bock.

A. Okay.

Q. Did Ms. Bock have any account with Bridgewater?

A. Pardon?

Q. Did Ms. Bock have an account with Bridgewater?

A. No, she did not.

Q. Did Feeding Our Future have an account with Bridgewater?

A. No, they did not.

Q. Do you know any mechanism after you write a check to an entity to control where that check is deposited?

A. No.

MR. UDOIBOK: No further questions.

THE COURT: Mr. Colich or Mr. Montez?

MR. MONTEZ: No questions, Your Honor.

THE COURT: Mr. Bobier?

MR. BOBIER: Nothing further, Your Honor.

THE COURT: All right. Thank you.

Everybody, we're going to break for the day here.

You may step down.

THE WITNESS: Thank you.

THE COURT: The court has a 4:00 hearing, so I'm going to break to do that, and we'll see you tomorrow

morning at nine.

All rise for the jury.

3:42 p.m.

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: All right. We're in recess until 9:00 tomorrow morning.

Thank you.

(Court adjourned at 3:43 p.m., 02-24-2025.)

* * *

I, Renee A. Rogge, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR