UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-223 (NEB/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S** |
| | ) | **CONSOLIDATED RESPONSE** |
| v. | ) | **TO DEFENDANTS' MOTIONS** |
| | ) | **FOR JUDGMENT OF** |
| 1. AIMEE MARIE BOCK and | ) | **ACQUITTAL AND NEW** |
| 3. SALIM AHMED SAID, | ) | **TRIAL** |
| | ) | |
| Defendants. | ) | |

The United States of America, by and through its attorneys, Lisa D. Kirkpatrick, Acting United States Attorney for the District of Minnesota, and Joseph H. Thompson, Harry M. Jacobs, Matthew S. Ebert, and Daniel W. Bobier, Assistant U.S. Attorneys, respectfully submits the following consolidated response to defendants' motions for judgments of acquittal and for a new trial. Dkt. ##611, 626-27.

Defendants Aimee Bock and Salim Said were charged with conspiracy to commit wire fraud, wire fraud, conspiracy to commit federal programs bribery, and federal programs bribery. Defendant Said was also charged with conspiracy to commit money laundering and engaging in financial transactions involving property derived from unlawful activity. The indictment alleged that Bock and Said participated in a fraudulent scheme to obtain federal child nutrition program funds through the submission of fraudulent claims to the Minnesota Department of Education.

On March 19, 2025, at the end of a 21-day trial, a jury convicted Bock of one count of conspiracy to commit wire fraud, four counts of wire fraud, one count of conspiracy to commit federal programs bribery, and one count of federal programs bribery. Dkt. #581. The jury convicted Said of one count of conspiracy to commit wire fraud, four counts of wire fraud, one count of conspiracy to commit federal programs bribery, eight counts of federal programs bribery, one count of conspiracy to commit money launder, and five counts of engaging in monetary transactions involving more than $10,000 in property derived from unlawful activity. Dkt. #582.

Over 21 trial days, the jury heard from dozens of witnesses and received hundreds of exhibits demonstrating the fraudulent scheme and the defendants' role in it. Based on this evidence the jury found beyond a reasonable doubt that the defendants and their coconspirators participated in and carried out this fraudulent scheme.

Now, the defendants want the Court to disregard the jury's findings and vacate the jury's guilty verdict. The defendants ask the Court to acquit them of the charges for which they were found guilty or, alternatively, to order a new trial. The Court should do neither. The jury's guilty verdict was reasonable based on both the evidence and the law. The guilty verdict was accurate and should stand.

## I.    THE LEGAL STANDARD

When considering a motion for judgment of acquittal, the court views the evidence in the light most favorable to the government, resolves any evidentiary conflicts in the government's favor, and accepts any "reasonable inferences that may be drawn in favor of the verdict." *United States v. Jenkins*, 758 F.3d 1046, 1049 (8th

Cir. 2014). The court cannot overturn a verdict for insufficient evidence unless "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Cacioppo*, 460 F.3d 1012, 1021 (8th Cir. 2006) (citation and internal quotation marks omitted). In making that determination, the Court must look at the evidence "in the light most favorable to the government, drawing all reasonable inferences and resolving all evidentiary conflicts in favor of the jury's verdict." *United States v. Aponte*, 619 F.3d 799, 804 (8th Cir. 2010).

If the evidence rationally supports two conflicting hypotheses, the Court will not disturb the conviction. *Ortega v. United States*, 270 F.3d 540, 544 (8th Cir. 2001). Further, the government's "evidence 'need not exclude every reasonable hypothesis of innocence.'" *United States v. Baker*, 98 F.3d 330, 338 (8th Cir. 1996); *United States v. Jolivet*, 224 F.3d 902, 907 (8th Cir. 2000) (quoting *United States v. Hawkey*, 148 F.3d 920, 923 (8th Cir. 1998)). And "the essential elements of the crime may be proven by circumstantial, as well as direct evidence." *United States v. Mundt*, 846 F.2d 1157, 1158 (8th Cir. 1988) (quoting *United States v. Nabors*, 762 F.2d 642, 653 (8th Cir. 1985)). In either case, the standard is the same. *Mundt*, 846 F.2d at 1160.

The defendants also move for a new trial on the grounds that the verdicts were against the weight of the evidence. The granting of a new trial is disfavored, *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002), and may occur only where "'the evidence weighs heavily enough against the verdict [such] that a miscarriage of justice may have occurred.'" *United States v. Johnson*, 474 F.3d 1044, 1051 (8th Cir.

2007) (quoting *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000)). The remedy "is reserved for exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Knight*, 800 F.3d 491, 504 (8th Cir. 2015).

## II.  ARGUMENT

The defendants ask the Court to throw out the jury's verdict and enter a judgment of acquittal or, alternatively, order a new trial on the grounds that the evidence was not sufficient for a reasonable jury to convict them. Because the evidence of the defendants' guilt was overwhelming, and their motions should be denied.

### A.    The Wire Fraud Conspiracy

Count One of the indictment charged Bock and Said with conspiracy to commit wire fraud based on their participation in a massive scheme to defraud the federal child nutrition program.

The Eighth Circuit instructs that to find a defendant guilty on a conspiracy charge, the jury "must decide whether the conspiracy existed and whether the government proved that [the defendant] had an understanding of the unlawful nature of the plan and some degree of knowing involvement and cooperation, even if she agreed to play only a minor part in the conspiracy." *United States v. Hamilton*, 837 F.3d 859, 863 (8th Cir. 2016) (internal citations omitted). And "once a conspiracy [is] established"—for example, when a defendant "readily concedes that the charged conspiracy existed but insists that he was not a member of it"—"only slight additional evidence [is] needed to link [the defendant] to it." *United States v. Bascope-Zurita*, 68 F.3d 1057, 1061 (8th Cir. 1995) (internal citations omitted). A defendant "does not

4

have to have contact with all the other members of a conspiracy to be held accountable as a conspirator." *Id*. Rather, a "single conspiracy may be found when the defendants share a common overall goal and the same method is used to achieve that goal, even if the actors are not always the same." *Id*.

### 1. Salim Said participated in the scheme to fraudulently obtain federal child nutrition program funds

Defendant Salim Said owned Safari Restaurant in Minneapolis. In April 2020, Said and his co-owners enrolled Safari Restaurant in the federal child nutrition program under the sponsorship of Feeding Our Future. By that summer, they claimed to be serving meals to 5,000 children a day, seven days a week, two meals a day. In July 2020, for example, Said signed meal counts claiming—falsely—that he and his co-conspirators were serving two meals to 5,000 children per day, seven days a week.



*See, e.g.*, Gov't Ex. B-62 at 3-12.

Said also signed meal counts claiming that he and his co-conspirators were serving meals to 5,000 kids a day, seven days a week in August 2020. Gov't Ex. B-63 at 14-30.



Along with these fraudulent meal counts, Said and his co-conspirators submitted invoices claiming that they were entitled to $950,000 a month in federal child nutrition program funds for meals served in both July and August 2020. Gov't Exs. B-62 at 13-14, B-63 at 7-8.

Based on these fraudulent documents, Bock submitted fraudulent claims to MDE. After receiving the requested federal child nutrition program funds from MDE, Bock paid the money out to Said and his Safari Restaurant co-owners. Although the federal child nutrition program funds were meant to reimburse Safari Restaurant for the cost of serving meals to children, Bock sent most of the money to shell companies created and used by Said and his co-owners to receive and launder the proceeds of

the fraudulent scheme. *See, e.g.*, Gov't Ex. B-13. In other words, Said and his partners did not use the money to purchase food; they used it to enrich themselves.

Witness testimony at trial further established Salim Said's participation in the fraud. For example, Sharmake Jama, one of the individuals who ran the Brava Restaurant site in Rochester under the sponsorship of Feeding Our Future, testified about his direction involvement with Salim Said in carrying out the scheme. Jama testified in detail that he submitted fraudulent meal counts in person every month at Safari's business headquarters at Safari's business headquarters at historic Minneapolis mansion, per instructions from Salim Said.

Eventually, Safari Restaurant claimed to be serving 6,000 children a day. *See, e.g.*, Gov't Ex. B-67. In all, the defendants claimed to have served more than 3.9 million meals to children at the Safari Restaurant site between April 2020 and November 2021. Gov't Ex. X-1.

### 2. The ASA Limited and Olive Management Sites

In September 2020, Said and his co-conspirators opened two additional federal child nutrition program sites under the sponsorship of Feeding Our Future—ASA Limited and Olive Management.

On September 4, 2020, Said and two co-defendants—Abdihakim Ahmed and Ahmed Ghedi—registered ASA Limited with the Minnesota Secretary of State. Gov't Exs. C-1, C-3. A few days later, Bock applied to enroll ASA Limited in the federal child nutrition program under the sponsorship of Feeding Our Future. Gov't Ex. C-2. Within weeks, Said and his co-conspirators claimed to be delivering meals to 2,000

and then 3,000 children per day, seven days a week. Gov't Exs. C-4, C-9, C-10, C-11, C-14, C-15, C-18.



FEEDING OUR FUTURE

## SUMMER MEAL COUNTS – CLICKER

| Sponsor | FEEDING OUR FUTURE | Email | aimee@feedingourfuturemn.org | Phone | | 612.345.4922 | |
| Site | ASA LIMITED | Supervisor | | Week of | | 9/27/20 | |

| Meal Type | ✓ | BREAKFAST | | | | LUNCH | | | |

| Available Meals | | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| Number of meals received/prepared | | 3000 | 3000 | 3000 | 3000 | | | | |
| Number of meals from yesterday | | 0 | 8 | 0 | 0 | | | | |

| Meal Counts | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Number of firsts served to children | 2990 | 2992 | 2995 | 2997 | | | | |
| Number of second meals served to children (not reimbursed) | 0 | 0 | 0 | 0 | | | | |
| Number of meals served to program adults (not reimbursed) | 0 | 0 | 0 | 0 | | | | |
| Number of meals served to non-program adults (not reimbursed) | 0 | 0 | 0 | 0 | | | | |
| Number of children requesting meals if food is gone | 68 | 69 | 72 | 74 | | | | |

| Food | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
|---|---|---|---|---|---|---|---|---|
| FOOD TEMPERATURE | N/A | NA | NA | N/A | | | | |
| Number of non-reimbursable, incomplete or damaged meals | 0 | 0 | 0 | 0 | | | | |
| Number of leftover meals | 0 | 0 | 0 | 0 | | | | |
| Initials of person taking daily meal count certifying that the information is true and accurate | AA | AA | AA | AA | | | | |

| SITE SUPERVISOR: By signing, I certify that the above information is true and accurate. | | | | | | | | |
| Signature | | | | | | Date | 9/31/20 | |

In support of these claims, they submitted fraudulent invoices and attendance rosters. The attendance rosters were created using an Excel spreadsheet that included a macro that automatically generated a random number between 7 and 17 to be inserted in the "age" column of the roster. *See, e.g.*, Gov't Ex. C-20, C-21, C-22, C-23.

During the investigation, the government installed a hidden pole camera to record all people entering and leave the ASA Limited site. The pole camera video further showed that the claims submitted by the conspirators were fraudulent. Gov't Ex. C-60a through C-60g (screenshots of video introduced through FBI Special Agent Jared Kary).

8

In all, Said and his co-conspirators received more than $5 million in federal child nutrition program reimbursements for meals purported served at the ASA Limited site. *See, e.g.*, Gov't Ex. X-4. Little of this money was spent on food. Most of it was distributed to companies created and used by Said and his co-conspirators to receive and launder the proceeds of their scheme, including more than $800,000 to Said's company, Salim Limited LLC. *Id.*

Said and his co-conspirators created a second company—called Olive Management—in September 2020. Gov't Ex. E-1. E-2. After registering Olive Management with the Minnesota Secretary of State, they worked with Bock enrolled it in the federal child nutrition program under the sponsorship of Feeding Our Future. Gov't Ex. E-3. Within weeks, they claimed to be serving meals to 3,000 children per day, seven days a week. *See, e.g.*, Gov't Ex. E-40, E-41, E-42, E-43. Again, they submitted fraudulent invoices and attendance rosters in support of their claims. *Id.*

In all, the conspirators received nearly $6.5 million in federal child nutrition program funds for meals purportedly served at the Olive Management site. $1.2 million of these funds was transferred to Said's shell company, Salim Limited LLC. Gov't Ex. X-5.

After MDE attempted to bar for-profit restaurants from participating in the federal child nutrition program, Said and his Safari co-conspirators obtained a non-profit called Stigma Free International. They then opened a series of sites around the state under their newly acquired non-profit, including sites in Willmar, Mankato, St.

Cloud, and Waite Park. Almost immediately, they claimed to be serving meals to thousands of children per day, seven days a week, at these sites. *See, e.g.*, Gov't Exs. G-6, H-5, I-22, J-4.



The conspirators also submitted fake invoices and attendance rosters in support of their fraudulent claims. As the jury heard, the attendance rosters listed fake names—almost none of which matched the names of students in the local school districts. Some of the attendance rosters included the macros that inserted a random number between 7 and 17 in the age column. *See, e.g.*, Gov't Ex. C-22.

Said and his co-conspirators claimed to serve more than 5.7 million meals at the Stigma Free sites in 2020 and 2021. Gov't Ex. X-58. Based on these fraudulent claims, they received more than $14 million in federal child nutrition program funds. Gov't Ex. X-59.

### 3. Salim Said and his Safari Restaurant co-conspirators laundered the proceeds of their fraud scheme

Little of this money was spent on food. Instead, Said and his co-conspirators laundered the funds through a series of shell companies. *See, e.g.*, Gov't Exs. X-3, X-4, X-5, X-6, X-7, X-8, X-9, X-10, X-12, X-13. Then then spent millions of dollars in

federal child nutrition program funds on real estate, cars and other luxury items. Said used nearly $1 million in federal child nutrition program funds to purchase a single-family home in Plymouth. Gov't Ex. U-18. He also used federal child nutrition program funds to purchase a Chevrolet Silverado and Mercedes Benz SUV. Gov't Ex. U-16 and U-17. He and his Safari co-conspirators purchased a historic mansion on Park Avenue in Minneapolis using $2.7 million in federal child nutrition program funds. Gov't Ex. U-19. They also purchased a culinary school in Columbus, Ohio, using $2.4 million in federal child nutrition program funds. Gov't Ex. U-20.

Said and his co-conspirators ran their fraud scheme from the historic mansion (2722 Park Avenue) they purchased in south Minneapolis. At trial, the jury saw evidence obtained during the execution of a search warrant at 2722 Park Avenue, including stacks of fraudulent meal counts, fake invoices, and fake attendance roster. *See, e.g.*, Gov't Ex. FF-2 through FF-12, FF-16, FF-17, FF-22, FF-24, FF-26 through FF-31, FF-33, FF-35 through FF-39. The jury also heard from a woman who worked there and scanned and submitted fraudulent documents bat the direction of Said and his co-conspirators.

In asking the Court to set aside the jury's verdict and enter a judgment of acquittal, Said asks the Court to simply accept his own self-serving account of his involvement in the federal child nutrition program. But the jury heard—and rejected—his testimony at trial. His account of the scheme was not credible, especially in light of the millions of dollars in fraud proceeds that Said received from an array of entities involved in the scheme.

11

### B.     Defendant Aimee Bock orchestrated and carried out a massive scheme to defraud the federal child nutrition program

#### 1.     Bock certified and submitted all of the fraudulent claims

Bock was the founder and executive director of Feeding Our Future, a non-profit organization in the business of helping community partners participate in the federal child nutrition program—a government program that ensures children receive nutritious meals and snacks that adequately promote healthy physical and education development.

During the Covid-19 pandemic, USDA and MDE modified some of the federal child nutrition program regulations to allow flexibility to ensure children received the meals they needed even when school was not in session due to the pandemic. Defendants Bock and Said, and their co-conspirators, took advantage of these changes to fraudulent obtain millions of dollars in federal child nutrition program funds for meals that were not actually served to children.

Bock and Feeding Our Future sponsored nearly 200 federal child nutrition program sites in 2020 and 2021. Bock enrolled each of the sites in the federal child nutrition program. Within weeks of their enrollment, the sites claimed to be serving meals to thousands of children a day, seven days a week. In support of these claims, the site owners (including Salim Said) sent Bock and Feeding Our Future fraudulent meal counts purporting to document the number of children served each day. These meal count forms were fraudulent on their face—many of them purporting to show that the sites served the exact same number of children each day. *See, e.g.*, Gov't Ex.

B-20, C-9, C-15, Z-14. The site owners also submitted fake invoices and attendance rosters in support of their fraudulent claims. *See, e.g.*, Gov't Ex. B—38, C-22, Z-14.

After receiving the meal counts and other fake documentation, Bock submitted her co-conspirators' fraudulent federal child nutrition program reimbursement claims to MDE. Bock certified that each and every one of these claims was true and accurate to the best of her knowledge. *See, e.g.*, Gov't Ex. V-3.



But, in reality, the evidence showed that Bock knew the claims were fraudulent but submitted them anyways.

### 2.    Site owners testified about Bock's involvement in the scheme

Several individuals who ran sites under the sponsorship of Feeding Our Future testified at trial. For example, the owner of Lido Restaurant, Lul Ali, testified about her role in the fraud scheme. Ali explained that she enrolled her restaurant in the federal child nutrition program under the sponsorship of Feeding Our Future. Ali testified that Feeding Our Future employee Abdikerm Eidleh taught her how to open a site and instructed her to claim to be serving 1,000 children a day—even though that was impossible for Ali and her small storefront restaurant in Faribault. Eidleh

13

also told Ali she needed to pay $30,000 cash each month in exchange for Feeding Our Future's sponsorship of her site. Eidleh came to Faribault every month to pick up the cash from Ali. After Ali gave him the cash, Eidleh made a video call to Bock to confirm that he received the money.[1] Ali explained that she had to pay the money to participate in the program: "If you don't pay, you don't enjoy the program. That's part of the deal." Ali testified that Bock talked to her during some of the video calls. According to Ali, Bock  Sometimes she talked to her. Bock would tell her to open another facility. As Ali put it, more sites meant everybody would make more money ("More invoices, more money").

Ali's husband, Mohamed Hussein, also testified at trial. Hussein opened a site in the name of his nonprofit organization, Somali American Faribault Education ("SAFE"). Like his wife, Hussein regularly met with Eidleh to discuss his site. During these meetings, Eidleh would make video calls to Bock. Hussein testified that during these calls, Bock told him to say he was serving meals to 1,000 children a day, every day. Bock told Hussein that doing so would allow him to get big money, large checks, and to live the "American dream."

Hussein testified that he paid $30,000 a month in kickbacks to Eidleh. According to Hussein, Eidleh came each month to pick up the $30,000 in cash. Eidleh called Bock on FaceTime and told her he had the cash. According to Hussein, Eidleh would say: "I have the money in my hand" – Aimee would say thank you, you're doing

---

[1]    Bank records confirm that Ali withdrew massive amounts of case from the Lido Restaurant bank accounts to pay these kickbacks. Gov't Exs. W-225 through W-228.

good."[2] At some point, Hussein had troubled withdrawing so much cash from his nonprofit. As a result, he began writing checks to shell companies that Eidleh had created and used to receive and launder kickbacks and fraud proceeds, including Bridge Logistics. The jury saw these checks, which corroborated Hussein's testimony. Gov't Ex. Q-47.

Hussein testified that Bock told him he could "serve" 2,000 kids a day at SAFE. Later, Bock moved that number of kids up to 2,500. Hussein had no way of serving that many children but submitted fraudulent claims anyways. As Hussein explained, "I was greedy…we were after the money." Hussein testified further that "Aimee trained us, if you make more invoices you get more money."

Hussein also testified about a meeting that Bock held at Feeding Our Future for people who had sites sponsored by Feeding Our Future. During the meeting, Bock warned people not to buy flashy cars or houses because the fraud scheme would become obvious and the government would stop the program.

### 3. Bock fought MDE when it became suspicious about the claims being submitted by Feeding Our Future

When MDE became suspicious about the number of sites and claims under the sponsorship of Feeding Our Future, Bock took active steps to evade their suspicious and sidesteps their efforts to slow down the fraud. In the fall of 2020, MDE employees became suspicious about the dramatic increase in sites being enrolled by Bock and Feeding Our Future as well as the dramatic increase in the number of meals claimed

---

[2]    These and other quotes are drawn from the government's notes of the witness testimony.

to be served—and federal child nutrition program funds being paid out. In October 2020, MDE took steps to address the issue. Among other things, MDE announced that for-profit restaurants would no longer be allowed to operate federal child nutrition program sites and that any for-profit sites would not be able to operate in the program after October 31, 2020. Gov't Ex. F-6.

In response, Bock sent an email with the subject line "For-Profit Restaurant Clarifications." In an attachment, Bock claimed that Feeding Our Future would actually be staffing the for-profit restaurant locations and that Feeding Our Future employees and volunteers would be distributing the meals at the for-profit restaurant sites, including Safari Restaurant, ASA Limited, Olive Management, Lido Restaurant, and S&S Catering. Gov't Ex. F-7.

**FOF – SAFARI RESTAURANT**

This site is being staff by Feeding our Future. The site operators will not prepare the meals, and funds will not be provided, given, or otherwise paid to the site to employ site staff. Only Feeding our Future's trained staff and volunteers and sponsor trained site staff serving as volunteers are permitted to distribute the meals.

**FOF - ASA LIMITED**

This site is being staff by Feeding our Future. The site operators will not prepare the meals, and funds will not be provided, given, or otherwise paid to the site to employ site staff. Only Feeding our Future's trained staff and volunteers and sponsor trained site staff serving as volunteers are permitted to distribute the meals.

**FOF – LIDO RESTAURANT**

This site is being staff by Feeding our Future. The site operators will not prepare the meals, and funds will not be provided, given, or otherwise paid to the site to employ site staff. Only Feeding our Future's trained staff and volunteers and sponsor trained site staff serving as volunteers are permitted to distribute the meals.

16

Although they continued to have suspicions about these sites and their massive claims, MDE employee Emily Honer testified that she and her MDE colleagues felt like they could not bar the for-profit sites from their continued participate in the program after Bock claimed Feeding Our Future was actually running the sites.

In the wake of Bock's claim that Feeding Our Future was running these sites, Bock submitted claims that these "Feeding Our Future-staffed" were serving meals to thousands of children per day. For example, the ASA Limited and Olive Management sites claimed to be serving meals to 2,000 or 3,000 children a day. *See, e.g.*, Gov't Ex. B-14, B-20.

Bock also told MDE that Feeding Our Future staff operated the S & S Catering site. Gov't Ex. F-7. The owner of S & S Catering, Qamar Hassan, testified at trial and admitted the S & S Catering site was part of the fraud scheme. Bock also claimed that Feeding Our Future operated the Nawal Restaurant site. But Nawal's owner, Abdulkadir Awale, testified at trial that Feeding Our Future did not staff his site. Awale, who pled guilty for his role in the fraud scheme, also testified that his site was part of the fraudulent scheme.

Bock later filed a lawsuit against MDE, accusing its employees of racism and discrimination against Feeding Our Future and the sites under its sponsorship. But, in reality, Bock knew that MDE employee's concerns were valid and that its employees were not motivated by racial animus.

### 4. Bock and Feeding Our Future had their own fraudulent food sites

In addition to the sites under its sponsorship, Bock and Feeding Our Future also had their own fraudulent food distribution sites. One of the site purported to be located at Sir Boxing, a basement boxing gym in St. Paul. Bock submitted claimed that Feeding Our Future distributed meals to 2,500 children a day at the site. See, e.g., Gov't Exs. P-6 through P-14. But the owner of Sir Boxing testified that his gym was not involved in the food program and that no one ever distributed meals to 2,500 children a day at or near his gym. Or as he so colorfully put it, "that math ain't mathin'."

Bock also claimed that Feeding Our Future ran two food distribution sites at a small and desolate building located at 2854 Columbus Avenue in south Minneapolis. Bock claimed that the so-called "Southside Youth" and "FoF Taylor" sites each distributed meals to 2,000 children a day, seven days a week. *See, e.g.*, Gov't Exs. P-63, P-78.

But, as the jury heard, the government had a pole camera outside of 2854 Columbus Avenue in December 2021, which showed that these claims were fraudulent. Indeed, on December 1, 2021, a Minneapolis Police Department crime lab unit came to the site as part of an unrelated investigation. The pole camera shows that no children received meals at the site that day. However, Bock claimed that 1955 children were

served at the Southside Youth site that day as well as 2,003 children were served at the "FoF Taylor" site that day. Gov't Exs. P-63, P-78. When MDE asked Bock about two sites being at this same address, Bock assured them that she "had verified that it is different youth being served at each of the locations in the building."

| |
|---|
| **From:** Aimee Bock <aimee@feedingourfuturemn.org><br>   **To:** "Pace, Kendra (MDE)" <Kendra.Pace@state.mn.us>, Norma Cabadas<br>   <norma@feedingourfuturemn.org><br>   **Cc:** "MDE, FNS (MDE)" <mde.fns@state.mn.us>, "Honer, Emily (MDE)"<br>   <Emily.Honer@state.mn.us>, "Johnson-Reed, Jeanette (MDE)" <jeanette.johnson-<br>   reed@state.mn.us><br>**Subject:** Re: CACFP Site Applications 2-10264<br>   **Date:** Mon, 04 Oct 2021 10:00:55 -0500 |

> 2. Two sites at address 2854 Columbus Ave in Minneapolis, newly created Southside Youth (9000019278) and the existing approved site application for Feeding Our Future Taylor (9000019273). Please double check. This is correct, we have verified that it is different youth being served at each of the locations in the building.

The jury heard more evidence about the fraud at Feeding Our Future. For example, the jury heard how Bock had a sham board of directors and forged documents and signatures purporting to make it looks like her nonprofit had a real board of directors. Her board members testified about how the signatures were fake and that they had never attended any board meetings and were not aware of their board position.

The jury also heard how Bock diverted more than $1 million in fraud proceeds from Feeding Our Future to her live-in boyfriend, and which he used to pay for travel, luxury automobiles, and lifestyle. *See, e.g.*, Gov't Ex. X-100.

C.    The Wire Fraud Counts

In their motions, Bock and Said argue that with respect to the wire fraud counts of which they were convicted, because they did not create the underlying documents sent via the charged wire communications  or because they did not send the charged wire communications themselves, they are somehow not guilty of wire fraud. However, as the Court properly instructed the jury, the law is clear that a defendant need not have sent or received an actual wire communication or specifically intended that a wire communication be used. *See United States v. Miller*, No. 20-cr-232 (JRT/DTS), 2024 WL 2218446, at *5 (D. Minn. May 15, 2024); Dkt. #580, Jury Instructions ("It is not necessary that the defendant himself or herself contemplate the use of an interstate wire communication or specifically intend that an interstate wire communication be used. It is sufficient if a wire communication was in fact used to carry out the scheme and the use of a wire communication by someone was reasonably foreseeable.") For the reasons explained above, including the substantial and overarching involvement of both Bock and Said in the fraud scheme, each of the wire communications was reasonably foreseeable and in furtherance of the fraud scheme.

Moreover, neither Bock nor Said provide any explanation for why their convictions should not stand under vicarious co-conspirator liability. Under Pinkerton liability, and as the Court correctly instructed the jury, "[b]ecause a member of a conspiracy is responsible for a crime committed by any other member of the conspiracy" Bock and Said may have committed the crime of wire fraud under a co-conspirator liability theory. Under that theory, Bock and Said are guilty of wire

21

fraud if a co-conspirator committed the crime of wire fraud, the co-conspirator was a member of the conspiracy, the wire fraud was in furtherance of the conspiracy, and the wire fraud was within the scope of the conspiracy. Here again, even if Bock and Said did not send the wire communication charged in the indictment, they are still guilty of wire fraud.

### D.    The Kickbacks

Both Bock and Said were convicted of federal programs bribery and conspiracy to commit federal programs bribery. They challenge their convictions on the grounds that the government failed to show the payments were kickbacks or bribes offered or paid before an official act.

As the Court instructed the jury, the kickback statutes distinguish between prohibited bribes and non-prohibited gratuities. The Court properly instructed the jury that "bribes are payments made or agreed to *before* an official act in order to influence the official with respect to that official act." Dkt. #580 at 34 (emphasis in original). The instructions contrasted that gratuities, which are not prohibited by the statute, and which the Court defined as "payments made to an official *after* an official act as a token of appreciation." *Id.* (emphasis in original).

Said argues that the kickback convictions cannot be sustained because he paid the kickbacks after Bock enrolled his entities in the federal child nutrition program. With respect to the Counts charging Said with paying kickbacks to Eidleh, the Court instructed that the jury must find that "the payment, or the agreement to make the payment, occurred before an official act in order to influence Abdikerm Eidleh with respect to that future official act, meaning sponsoring or *continuing the sponsor* Salim

22

Said and/or his co-conspirators' fraudulent participation in the Federal Child Nutrition Program." Dkt. #580 at 36 (emphasis added). Similarly, the Court instructed that with respect to the kickback paid to Bock, the jury must find that "the agreement to make the payment occurred before an official act in order to influence Aimee Bock with respect to that official act, meaning sponsoring or continuing to sponsor Cosmopolitan Business Solutions' fraudulent participation in the Federal Child Nutrition Program." *Id.* at 40.

Here, the evidence showed that Said paid kickbacks to Eidleh and Bock in exchange for their continued sponsorship of his company's participation in the federal child nutrition program and submission of their fraudulent claims to MDE. Indeed, several witnesses testified about the Feeding Our Future's kickback requirement. Mohamed Hussein, for example, paid kickbacks to Eidleh and testified that "the kickbacks were so that Feeding Our Future would not terminate us from participating in the program." Similarly, Hannah Marekegn testified that Bock made clear that "If I don't pay kickbacks, I would lose the contract and wouldn't get paid." Qamar Hassan testified about being asked to pay money to Bock and said her understanding what that "If I say no, I'm not getting any more money."

Here, too, Said regularly paid Eidleh payments in exchange for his and Feeding Our Future's continued sponsorship of his fraudulent participation in the federal child nutrition program. Said's unsupported claim that these were mere consulting payments flies in the face of the evidence of his obvious kickback and bribe payments. Similarly, Said and Bock's attempt to portray the $310,000 payment to Bock as

involving the sale of a daycare fails. As the jury heard, there was no daycare. There were no kids. There were no teachers or child care workers. Instead, Said paid Bock $310,000 so that he and his co-conspirators could assume control over the Southcross site and so that Bock would continue to sponsor the site and its fraudulent participation in the food program.

### E.    Money Laundering

Finally, Salim Said was convicted of several money laundering counts. He challenges his conviction on those counts on the grounds that he was not aware that the funds involved in those transactions were the proceeds of the fraud scheme. But the jury convicted him for his role in the fraud scheme. And, as explained above, the jury's verdict was well-supported by the evidence and testimony at trial.

## III.    CONCLUSION

For the reasons stated above, the government respectfully requests that the Court deny defendants' motions for judgments of acquittal and motion for a new trial.

Date:  May 21, 2025                              Respectfully submitted,

                                                 Lisa D. Kirkpatrick
                                                 Acting United States Attorney


                                          BY:  /s/ *Joseph H. Thompson*
                                               JOSEPH H. THOMPSON
                                               HARRY M. JACOBS
                                               MATTHEW S. EBERT
                                               DANIEL W. BOBIER
                                               Assistant U.S. Attorneys