UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-223(1) (NEB/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S POSITION** |
| v. | ) | **REGARDING SENTENCING** |
| | ) | |
| AIMEE MARIE BOCK, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Rebecca E. Kline and Matthew C. Murphy, Assistant United States Attorneys, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 50 years in prison.

## I.   BACKGROUND

On March 19, 2025, a federal jury found Aimee Bock guilty of carrying out a massive fraud scheme. A scheme of unprecedented scale in this country. The ripple effects of her actions are profound, immeasurable, and will have lasting consequences for both Minnesota and the nation. Bock was the central figure in what became the largest COVID-19 fraud scheme in the United States. The brazen and staggering nature of her crimes has shaken Minnesota to its core, leaving lasting damage and eroding public trust. Her actions have permanently altered the state, and not for the better.

The Court must send a clear and unequivocal message to Bock and to anyone who might believe they can exploit state and federal safety net programs that such conduct will be met with the strongest possible consequences. Stealing funds intended to feed children is a profound breach of trust that demands accountability.

### A.    Aimee Bock's Use of Her Non-Profit, Feeding Our Future

Aimee Bock deliberately exploited a public program designed to feed children during one of the most vulnerable periods in a generation. She took a social safety net program intended to serve hungry children and repurposed it to enrich herself, her non-profit, her employees, and her co-conspirators, and to elevate her standing in the community.

Bock was not just central to the scheme but was routinely celebrated as its lynchpin. As co-conspirator Hanna Marekegn testified at trial, "Aimee was a god." The Court will recall the testimony and evidence adduced at trial regarding Bock's participation in a June 2021 event at Benadir Hall—a banquet hall unironically purchased with proceeds from the very fraud she orchestrated. At that event, Bock was openly praised by both her co-conspirators and members of the community, underscoring the extent of her influence and the culture of complicity she fostered. *See, e.g.* Gov't Ex. R-39, BB-37a.

From the outset, Feeding Our Future was a sham organization, as evidenced by its very origins. As the Court heard during trial, the Board of Directors was not legitimate. Testimony from three purported members of Feeding Our Future's Board of Directors revealed that they never attended board meetings and did no real work on behalf of the non-profit. The individual identified as the Board's "President"

2

testified that he did not actually serve on the board. Other listed board members testified that they didn't sign meeting minutes or the organization's formation documents. The testimony makes clear that the Board of Directors existed in name only, further demonstrating that Feeding Our Future was not a legitimate organization, but a façade used to carry out fraud. *See, e.g.*, Gov't Ex. A-5, A-80.

Additionally, Bock maintained complete control of Feeding Our Future from an administrative and financial perspective. She oversaw the spigot of millions of federal dollars flowing into the Feeding Our Future bank account. Scheme participants received million dollar check after million dollar check— all signed by Aimee Bock. *See, e.g.*, Gov't Ex. W-1, W-2.



*Example check distributed by Aimee Bock to her con-conspirators*

Early in the pandemic, amid widespread public vulnerability and pleas to "flatten the curve" through social distancing, Bock exploited a safety net system that had been adapted to help children. She used it to benefit herself and her co-conspirators. While many companies were struggling to stay afloat while the country was shut down, Bock aggressively pursued the enrollment of food sites to defraud the

Federal Child Nutrition Program, threatening and then ultimately suing the Minnesota Department of Education when it refused to approve new food sites sponsored by Feeding Our Future.

Bock unquestionably led the scheme. She recruited myriad participants into the fraud and exploited others to expand the scheme. Those individuals are responsible for their own conduct, and many have and will be held accountable through federal charges.  Nonetheless, many co-conspirators were particularly drawn into the fraud by the opportunity Bock created and oversaw. Dozens of conspirators were given the chance, by Bock, to exploit a program meant to benefit children, and instead used it to fund lavish lifestyles.  As the Court heard from multiple cooperating defendants in their testimony, many now regret ever joining the scheme. Bock promised the "American Dream," but it became a nightmare for so many.

Meanwhile, Bock took substantial steps to avoid the fraudulent nature of Feeding Our Future's work from being detected. She advised her co-conspirators not to be obvious— warning them against making conspicuous purchases like houses and cars that could draw attention.  She herself routed her spending of fraud proceeds through her live-in boyfriend Empress Watson's company Handy Helpers.

For 21 months, Bock submitted thousands of fraudulent reimbursement claims, one after another, day after day. Each claim represented meals for children who did not exist, yet the money was real. Taxpayer dollars were diverted to fund kickbacks for Bock and her co-conspirators. Those funds were then spent extravagantly, fueling a large-scale abuse of federal resources. Through calculated

deception, persistence, and a lack of remorse, Bock and her co-conspirators caused more than $242 million in losses. Feeding Our Future was Bock, and Bock was Feeding Our Future.  Perhaps most importantly for loss calculations in this case, Bock herself certified each false claim being submitted for reimbursement. *See, e.g.*, Gov't Ex. X-1, W-2, V-2.

> **Sponsoring Authority Certification**
> I hereby take full responsibility for ensuring that this claim accurately represents the number of meals/milks served by reimbursement category, that records are available to support this claim, that

*Aimee Bock certified each fraudulent claim.*

**B.    Aimee Bock Always Had a Work Around**

Further, Bock herself took substantial steps to ensure that the flow of funds did not turn off.  On April 29, 2020, as MDE was adapting to changes in the Federal Child Nutrition Program, Bock aggressively pushed the agency to allow for-profit restaurants to participate in the program.  Bock demanded that MDE quickly issue site identification numbers to those restaurants.  She warned that if the sites were not approved, legal action would follow.

When MDE raised concerns about the sites or pointed out serious deficiencies, Bock responded with excuses, criticized the program and staff, and made additional demands. Rather than addressing the issues, she responded with attacks whenever MDE questioned her.

> I equally hope MDE understands that the one and only reason allegations of racism will not be sprawled across the news tomorrow is because of your efforts.  It is only because Aimee and I have confidence in your professionalism and

*Bock had her attorney attack when MDE questioned anything (Gov't Ex. A-21)*

That question, to me, is the epitome of systemic racism.  While the facilities that my clients operate may not be as nice as what MDE is used to, it does not make them any less equal under the law.  There is no requirement anywhere in the

*Claims of racism were used by Feeding Our Future when questioned (Gov't Ex. A-23)*

Slap them with a defamation lawsuit.  Slander my company and my team.  Get the fuck out of here
08:52:52 pm

AB

*Text Message from Aimee Bock to Ikram Mohamed (Gov't Ex. BB-32b)*

By fall 2020, MDE had made further changes to the program, due to concerns about the high volume of meal claims being submitted. Evidence in the case, including testimony from MDE employee Emily Honer, showed that MDE repeatedly tried to curb the excessive claims submitted by Feeding Our Future. MDE ultimately decided that for-profit organizations would no longer be allowed to participate, and that all meal distribution sites would be required to operate through non-profits.

In response, Bock pivoted to falsely claiming to MDE that Feeding Our Future employees themselves would be staffing the sites, rather than the site operators. Feeding Our Future worked around the rule change and continued submitting claims, resulting in millions more in taxpayer funds being paid out. This was further supported by email evidence testified in detail during Special Agent Jared F. Kary's testimony.



🍲 FEEDING OUR FUTURE

FOF – SAFARI RESTAURANT

This site is being staff by Feeding our Future. The site operators will not prepare the meals, and funds will not be provided, given, or otherwise paid to the site to employ site staff. Only Feeding our Future's trained staff and volunteers and sponsor trained site staff serving as volunteers are permitted to distribute the meals.

*Bock's lie to MDE to circumvent the new requirement (Gov't Ex. Z-5)*

In spring 2021, MDE issued a "stop payment" to Feeding Our Future. MDE required documentation to verify that meals were actually being served to children, including rosters, invoices, and meal counts, in order to confirm that program requirements were being met. This, again, prompted retaliation from Bock and Feeding Our Future.

In the fall of 2020 and spring of 2021, Feeding Our Future filed two separate lawsuits against MDE, accusing MDE of racial discrimination and improper funding delays through the stop payment. Bock prevailed in both lawsuits. When MDE removed the stop pay and money began to flow, the co-conspirators celebrated the victory over MDE with a party honoring Aimee Bock where they circled around her and sang "Oh sweet Aimee," and presented her with awards. *See* Gov't Ex. BB-37a.

Under Aimee Bock's control, Feeding Our Future operated like a cash pipeline, open to anyone willing to submit fraudulent claims and pay kickbacks. As long as the kickbacks were made, the money kept flowing. In return, Feeding Our Future retained approximately $18 million, all derived from false and fraudulent claims.

Bock did whatever was necessary to keep the "bank" open. As the Court saw, Feeding Our Future distributed shirts to participants attending a rally outside MDE (Gov't Ex. AA-5), promoting the message: "FOF Feeds Our Kids—MDE Won't." Bock also exchanged text messages with her co-conspirator and co-defendant, Salim Said, discussing the support they sought to generate for their efforts.

We are doing a rally at MDE parking lot Tuesday at 11. It would be great if you guys came and brought people to help keep the pressure on

07:31:51 pm

AB

*June 25, 2021 Text Message from Bock to Salim Said (Gov't Ex. BB-30B)*

There are countless examples of Bock being questioned about site discrepancies by MDE and giving answers that were not consistent with the facts. In one example, there were multiple purported food sites operating in a nearly empty building near the Greenway in South Minneapolis. This building was not capable of serving meals to thousands of children daily. Despite this, numerous sites were within the same building were claiming to serve thousands of meals per day. Bock personally perpetuated this myth— in an email, she told MDE that the site was serving two separate groups of youth at different locations within the building.

**From:** Aimee Bock <aimee@feedingourfuturemn.org>
**To:** "Pace, Kendra (MDE)" <Kendra.Pace@state.mn.us>, Norma Cabadas <norma@feedingourfuturemn.org>
**Cc:** "MDE, FNS (MDE)" <mde.fns@state.mn.us>, "Honer, Emily (MDE)" <Emily.Honer@state.mn.us>, "Johnson-Reed, Jeanette (MDE)" <jeanette.johnson-reed@state.mn.us>
**Subject:** Re: CACFP Site Applications 2-10264

Please double check. This is correct, we have verified that it is different youth being served at each of the locations in the building.

*Email from Bock to MDE with false statements about Greenway site (Gov't Ex. A-75)*

8



*Crime Lab and No Activity (Gov't Ex. P-76)*        *False Meal Counts (Gov't Ex. P-78)*

Special Agent Jared Kary testified during trial about his review of the video surveillance of the Greenway site over multiple days on which the sites claimed to be serving thousands of meals to children. However, the surveillance showed little to no activity consistent with meal service for thousands of children taking place at this location on the days claimed. Once again, Aimee Bock lied to MDE to keep the flow of funds going.

## C. Feeding Our Future Kickbacks to Employees and Service Fees

The testimony at trial also showed that Aimee Bock, along with numerous of her employees at Feeding Our Future— including Ikram Mohamad, Hadith Ahmed, and Abdikerm Eidleh— made participation in the food program a pay-to-play scheme. Despite Bock's self-serving testimony that she was working to detect and stop fraud, the evidence is clear that she knew fraudulent activity was happening and did nothing to stop it. Instead, she continued to certify false claims to the state, allowing funds to keep flowing to herself and her co-conspirators.

**From:** Aimee Bock <aimee@feedingourfuturemn.org>
**To:** Hadith Ahmed <hadith@feedingourfuturemn.org>
**Subject:** Re: Xogmaal
**Date:** Tue, 02 Mar 2021 11:00:34 -0600

Yes, I agree.

On Sat, Feb 27, 2021 at 11:22 AM Hadith Ahmed <hadith@feedingourfuturemn.org> wrote:
> Hello boss.
>
> We took a lot of organization that don't work with children or are advocate, I am just realizing that now. For example xogmaal is a TV show program. They have no interest with children. These are the things we need to clean up.
> --
> Hadith Ahmed

*Email showing Bock knew the sites weren't providing food. (Gov't Ex. Q-85)*

In one example, Hadith Ahmed told Bock that one food site operator, Xogmaal Media Group, did not "work with children." However, Bock took no steps to stop Xogmaal from getting food program funds. Instead, she falsely certified that the organization had served meals to real children. Based on that certification, the funds were paid to Feeding Our Future, and Bock then issued payments to Xogmaal Media Group. The company never provided any meals, making the claims used to obtain those funds false.

6466

**FEEDING OUR FUTURE**
3055 OLD HWY 8, SUITE 312
MINNEAPOLIS, MN 55418

BANK OF AMERICA
ACH R/T 071214679

74-1457/712

07/09/2021

PAY TO THE ORDER OF___ Xogmaal Media Group        $ **330,770.00

Three hundred thirty thousand seven hundred seventy and 00/100*************************************************** DOLLARS

Xogmaal Media Group

MEMO

Aimee Bock

⑃006466⑃ ⑀071214579⑄ 374004673156⑃

10

*Feeding Our Future check to Xogmaal Media Group (Gov't Ex. W-222)*

In July 2021, after Xogmaal Media Group received over $330,000 in reimbursement, its owner and operator, Mohamad Noor, was required to pay a kickback to continue his company's participation in the scheme. Xogmaal then paid Bridge Consulting, an entity associated with Feeding Our Future employee Abdikerm Eidleh, over $180,000 to secure the company's continued participation in the pay-to-play scheme.

*Xogmaal Media Group kickback payment to Abdikerm Eidleh (Gov't Ex. W-66)*

Mohamad Noor, the operator of Xogmaal Media Group, has pleaded guilty to his role in the scheme and is awaiting sentencing. He admitted to making kickback payments to remain in the program.

This is just one example of how the scheme operated. The Court heard many similar accounts at trial. Co-conspirator Qamar Hassan of S&S Catering testified, "If I say no, I'm not getting any more money." And co-conspirator Hanna Marekegn of Brava Café stated, "If I don't pay kickbacks, I would lose the contract and wouldn't

get paid." Marekegn was ultimately excluded from the program after refusing to pay Bock a $1 million cash kickback.

Another witness testified about his own observations about Bock's awareness of and involvement in the kickback scheme. Mohamed Hussein, the operator of the SAFE food site in Faribault, testified he observed Feeding Our Future employee Abdikerm Eidleh on a FaceTime call with Bock during a SAFE site visit. Eidleh collected a kickback payment from Hussein while he was on the phone with Bock. Hussein further testified: "The kickbacks were so that Feeding Our Future would not terminate us from participating in the program."

As proven at trial, Aimee Bock personally received kickbacks from the Feeding Our Future scheme by orchestrating a sham transaction involving the purported sale of a nonexistent daycare. Through this fraudulent "sale," Bock obtained funds as a disguised personal payment derived from the scheme.

**Purchase Price**

3.  The Parties agree that the Purchase Price for the Assets will be allocated among the Assets as follows subject to required adjustments that are agreed upon by the Parties:

| | |
|---|---|
| Business equipment | $75,000.00 |
| Goodwill | $235,000.00 |
| Purchase Price | $310,000.00 |

*Purported sale of Learning Journey Child Care (Gov't Ex. HH-26)*

Aimee Bock was not operating a legitimate nonprofit; she was running a sham organization designed to funnel money to fraudsters. As testified by Feeding Our

Future employee Hadith Ahmed during the trial of *United States v. Abdiaziz Farah et al.* (File No. 22-CR-124, Trial Tr. Vol. XII, p. 2781): "I think the best way to put that is Feeding Our Future was a bank. You come and you get money." Bock herself was aware of and perpetuated Feeding Our Future's perception in the community.



*Text Message from Aimee Bock to Hadith Ahmed (Gov't Ex. BB-40a)*

### D.    Bock's Conduct During and After Trial

Aimee Bock placed Minnesota at the center of a significant and damaging chapter in the state's history. Bock herself claimed that her goal was to make Feeding Our Future "nationally recognized."  She has met that goal. Feeding Our Future is now synonymous nationwide with one of the largest fraud schemes in Minnesota history.



*Text message from Aimee Bock to Ikram Mohamed (Gov't Ex. BB-32F)*

Bock has never accepted any responsibility or shown any remorse for her crimes.  On the contrary, not only did Bock testify falsely at trial, but she also showed

complete contempt for the Court and the criminal justice system.  She repeatedly sought to minimize her involvement in fraudulent activity.  Instead, she pointed the finger at her absent co-defendants, Hadith Ahmed and Abdikerm Eidleh, as well as other members of the Feeding Our Future staff— as if she did not even have oversight of the company at all.  She also repeatedly blamed MDE for not doing more to prevent fraud and claimed that site participants (her co-conspirators) had concealed the fraud from her.  She claimed that she had legitimately brought on and regularly met with each of Feeding Our Future's board members. She self-servingly claimed she was doing everything in her power to "root out fraud."  Finally, she lied about having sold a daycare to Cosmopolitan Business Solutions, alleging that there was a real daycare there.   However, the jury flat-out rejected her testimony.

In the year since Bock's conviction at trial, she has used the media and the public domain to repeatedly deny any criminal culpability and point the finger at others. In February 2026, she gave an interview to CBS News from her jail cell.[1] She took zero accountability for her crimes. She claimed that she was a "scapegoat," who relied on state administrators to approve Feeding Our Future's site applications and claims. She denied being the mastermind of the scheme and claimed that she "believed in accountability. If I had done this, I would have pled guilty."  She claimed that she was relying on the state to see red flags.

---

[1]    https://www.cbsnews.com/minnesota/video/woman-convicted-as-key-player-in-minnesota-fraud-scheme-speaks-out/

Subsequently, Bock took egregious steps, in violation of the Court's Protective Order, to turn media coverage and public opinion in her favor. As explained in the government's motion for sanctions (ECF No. 848), she directed one of her sons to send emails to Minnesota state legislators and media outlets from an anonymous email address, claiming that "Tim Walz, Keith Ellison, and the Minnesota Department of Education intentionally set Feeding Our Future and Aimee Bock up as a scapegoat." In jail calls, Bock claimed she "wasn't even supposed to be convicted at trial." She also described to her son an interview she did with the Star Tribune for an upcoming article about fraud in the Federal Child Nutrition Program, purporting to discuss an uncharged individual and "why she never got indicted, including all the evidence that exists against her." Bock went on to direct her son to share material from her Dropbox with the Star Tribune. The same reporter who Bock spoke to also represented to witness lawyers that he had in his possession numerous interview reports from government witnesses and cooperators. In an April 19, 2026, call with an unidentified female, Bock said that someone had given the Star Tribune reporter "every interview the FBI did with people." She added that her criminal defense attorney, Kenneth Udoibok, and the editor of the Star Tribune were making plans as to when to publish the article to garner the most strategic advantage.

Just as Bock said would happen, on Sunday, May 17, the Star Tribune published its article on claims that fraud warnings about the Federal Child Nutrition

Program were not acted on by state officials.[2]   The reporter repeatedly referenced interviews that MDE witnesses did with the FBI during the government's investigation, including screenshots of the interview reports themselves.   The article noted the Court's recent rulings on the government's motion for sanctions against Bock but did not deny that the Star Tribune received the interview reports from Bock.

> A federal judge recently rebuked Bock for allegedly conspiring with her adult son to provide copies of FBI interviews and other records to the Star Tribune and other media outlets. The Minnesota Star Tribune obtained the records through multiple people, who requested anonymity.

The reporter detailed his interview with Bock, including her self-serving claims that she herself "was the one raising concerns about fraud among other nonprofits and operators in her organization – and being ignored by state officials." Perhaps most preposterously, Bock claimed that she had given prosecutors evidence of fraud "on a silver platter."  Bock herself sought the publication of this on the eve of her sentencing. Bock's brazen post-sentencing conduct evidences someone who has zero respect for the law and no remorse for the untold harms she has caused.

## II.   THE GUIDELINES RANGE

Bock raised substantial objections about the Guidelines range applicable to her case.  However, the government agrees with the PSR's conclusions about all of the applicable Guidelines calculations, including the loss amount.

---

[2]   https://www.startribune.com/an-open-secret-new-records-reveal-officials-failed-to-act-on-fraud-warnings/601838325

16

The base offense level is 7 pursuant to Guidelines § 2B1.1(a)(1). PSR ¶101. The base offense level is increased by 26 levels pursuant to Guidelines § 2B1.1(1)(N) because the loss was more than $150 million but less than $250 million. PSR ¶102. The government's position is that the entire loss of $242 million that Feeding Our Future obtained from the Federal Child Nutrition Program should be part of the loss, as the testimony at trial established that Bock personally submitted all of the site applications, monitored all of the sites, and signed each and every claim for reimbursement and check to participants in the program. Bock also controlled Feeding Our Future's bank account and the organization as a whole.  Accordingly, Bock is responsible for all fraudulent claims submitted on behalf of all the sites.

The offense level is increased an additional 2 levels pursuant to Guidelines §2B1.1(b)(9)(A) because the offense involved a misrepresentation that Bock was acting on behalf of a charitable or educational organization. PSR ¶103. The offense level is increased 2 levels pursuant to Guidelines § 2B1.1(b)(10) because the offense involved sophisticated means. PSR ¶104. The offense level is increased 2 levels pursuant to Guidelines § 2B1.1(b)(12) because the offense involved conduct described in 18 U.S.C. § 1040 (Fraud in Connection with a Major Disaster or Emergency Benefits). PSR ¶105.

The offense level is increased by 4 levels because Bock was an organizer or leader of the criminal activity involving five or more participants under Guidelines § 3B1.1(a). PSR ¶ 107. The offense level is increased by 2 levels pursuant Guidelines § 3C1.1 because Bock willfully attempted to obstruct or impede the administration of

17

justice with respect to the investigation of the offense on account of her lawsuit on behalf of Feeding Our Future, alleging misconduct by MDE in their oversight of the food program. PSR ¶ 108.

Because all of her counts of conviction group together, the adjusted offense level is 45, reduced to 43. PSR ¶ 112. With a Criminal History of I, her Guidelines range is life. The statutory maximum is 1,200 months or 100 years. PSR ¶ 168.

## III.  GOVERNMENT'S SENTENCING RECOMMENDATION

### A.  Nature and Circumstances of the Offense

Bock participated in one of the largest fraud schemes in the history of the District of Minnesota, and the single largest COVID-19 fraud scheme in the country. She took advantage of a once-in-a-century global pandemic to enrich herself and obtain glory. She abused the generosity of Minnesotans and the state's substantial social safety net, a system designed to ensure that no child goes without food.

Bock's Feeding Our Future served as the central component of a massive fraud scheme, enabling significant amounts of taxpayer funds intended to feed children to be diverted. She and her conspirators used the money for personal enrichment, including international travel, commercial real estate purchases, luxury vehicles, homes, and other lavish spending.

Bock claimed she was opening the door for the community to achieve the American Dream. Instead, her actions led to criminal charges and convictions, with dozens of defendants now facing lengthy prison sentences for their actions.

### B. History and Characteristics of the Defendant

Bock's history and characteristics reveal a career centered on non-profit work involving advocacy or direct services. Prior to founding Feeding Our Future, Bock was a co-founder of another sponsor of the Federal Child Nutrition Program, Partners in Nutrition. Bock attended college and previously worked at a daycare. She had a middle-class upbringing and her parents remain involved in her life. While she and her ex-husband had financial difficulties during their marriage, there is nothing to indicate in Bock's history anything that would have predisposed her to this conduct.

### C. The Need for Deterrence and to Protect the Public

Bock was the leader of one of the largest fraud schemes in the history of the District of Minnesota, and the single largest COVID-19 fraud scheme in the country. But Bock didn't just take advantage of the COVID-19 pandemic to enrich herself and her co-conspirators. She took advantage of our state's compassion and its efforts to ensure no child went hungry. Make no mistake, Bock's fraud has done great damage to the state. It has eroded trust in the government and raised questions about the sustainability of the state's system of social services. Her crime undermined and endangered legitimate nonprofit organizations that rely on donations and taxpayers' funds to carry out necessary and important charitable work.

Bock has suggested that she "opened doors" for a disadvantaged community. In a tragic sense, that is true. But the door she opened was not one of opportunity or feeding hungry children. It was a door that led to federal indictments, convictions, and prison sentences.

19

To this day, Bock has denied responsibility for her crimes. She has not expressed an ounce of remorse for her actions. She appears to have felt no shame. Cases like this are difficult to investigate and prosecute, which results in the widely held belief that perpetrators routinely get away with these crimes. The Court must send a message that fraud schemes like this are not worth it and will be met with severe sanctions.

Bock has continued to portray herself as a victim or scapegoat in this deplorable fraud scheme, despite the evidence presented against her. She has not accepted responsibility and instead, has sought to manipulate the public record to present herself as a scapegoat. She has gone so far as to anonymously leak protected materials in order to harm others. Her actions since her conviction alone warrant a serious punishment.

Protection of the public is also paramount. The defendant's conduct was not impulsive. It was sustained, organized, and defended aggressively. Even under oath, facing overwhelming evidence, she chose dishonesty over responsibility. That speaks directly to her risk of reoffending and her respect for the rule of law, particularly given her lengthy career in the non-profit industry.

Taking into consideration the Sentencing Guidelines, as well as all of the other factors required to be considered under § 3553(a), the government respectfully suggests that a sentence of 50 years in prison appropriately reflects the seriousness of Bock's crimes, promotes respect for the law, provides a just punishment, and

creates adequate deterrence not only to Bock, but to all other individuals who take advantage of the state and believe that they are above the law.

## IV.   CONCLUSION

For the reasons stated above, the government respectfully requests that the Court impose upon Aimee Bock a sentence of 50 years in prison.


Dated:  May 18, 2026                          Respectfully Submitted,

                                              DANIEL N. ROSEN
                                              United States Attorney

                                              _/s/ Rebecca E. Kline_
                                    BY:   REBECCA E. KLINE
                                              MATTHEW C. MURPHY
                                              Assistant U.S. Attorneys

21