UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-cr-223 (NEB/DTS)

United States of America,

Plaintiff,

v.

Ahmed Abdullahi Ghedi,

Defendant.

**DEFENDANT AHMED ABDULLAHI GHEDI'S POSITION REGARDING SENTENCING**

## BACKGROUND

On September 11, 2022, Defendant, Ahmed Abdullahi Ghedi ("Defendant" or "Ghedi") was included among a large number of defendants charged in a 61-count Indictment issued by the U.S. Grand Jury for the District of Minnesota. This Indictment was prompted by widely reported fraud in connection with Covid-era government food benefits programs. In Counts 1, 2, 5, 12, 23, 41, 43, 46, 53 and 56 of the Indictment, Ghedi was charged with committing various acts of wire fraud, money laundering and bribery in connection with a large and systemic fraud scheme overseen by co-defendant Aimee Bock ("Bock") and a nonprofit organization, Feeding Our Future (controlled by Bock).

Ghedi plead guilty to Counts 12 and 43 of the Indictment on June 26, 2025. *(PSR, ¶2).* Count 12 charged Ghedi, along with his co-defendants Bock, Salim Said ("Said") and Abdi Hakim Ahmed ("Ahmed") with a wire fraud offense committed on or about November 4, 2021 in violation of 18 U.S.C. §1343. Count 43 charged Ghedi with a money laundering offense committed on or about March 3, 2021, in violation of 18 U.S.C. §1957.

The Plea Agreement included projected guideline calculations. The parties believed that Ghedi would be placed in criminal history category I and the total offense level, depending on whether Ghedi received a two-level reduction under the zero-point offender provision would either be 23 or 21. If the total offense level was 23, the parties estimated Ghedi's guideline range would be 46-57 months and if his total offense level was 21, the guideline range would be 37-46 months. *(PSR, ¶2).* The parties also agreed that Ghedi could seek a further sentencing reduction based on the claim that Ghedi was a minor participant in the offense conduct. The parties also agreed on a restitution amount of $2,862,451.00. *(Id).*[1]

Ghedi's involvement in this fraud scheme was an outgrowth of his employment at the Safari Restaurant. The Safari Restaurant, at one time a legitimate business enterprise, began taking advantage of Covid19 waivers to enroll its site in the Federal Child Nutrition Program in April 2020. *(PSR, ¶55).* Said was one of the owners and operators of the Safari Restaurant. *(PSR, ¶57).* Ghedi was employed at Safari Restaurant at the beginning of the Covid crisis and, in September 2020, Said, Ahmed and Ghedi formed a Minnesota Limited Liability Company, ASA Limited, LLC ("ASA"). *(PSR, ¶60).* This new enterprise, in turn, enrolled a site in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future. *(Id).* Almost immediately, ASA began submitting inflated claims that it was serving 2,000-3,000 children each day from this location. *(Id).*

In his acceptance of responsibility statement, Ghedi disclosed that he visited the food distribution site, purchased equipment, established relationships with vendors and purchased some food. Ghedi admitted, after undertaking these tasks, that he "…did little, if anything, in

[1] A variety of other terms were also included in the Plea Agreement. Ghedi agreed to forfeit his interests in commercial real estate and motor vehicles which were acquired through the fraudulent activities. On June 1, 2026, the Court granted the government's motion for a preliminary order of forfeiture. *(PSR, ¶3).*

connection with distributing food to children and their families from this location." *(PSR, ¶101)*. Ghedi denied personally preparing any of the fraudulent vouchers which triggered the sizeable payments received by ASA but he also acknowledged, "I knew there was no conceivable way that ASA could have been legitimately generating these revenues but, frankly, convinced myself that I was not culpable because others were preparing the attendance documents and payment requests…" *(PSR, ¶101)*. Ghedi has conceded this was a patent rationalization for his participation in this criminal enterprise.

**GUIDELINE CALCULATIONS**

The Defendant's plea to Count 12, the wire fraud offense, has a base offense level (BOL) of 7, subject to an 18-level increase based on a loss range of $3,500,000-$9,500,000. *(PSR, ¶¶104, 105)*.[2] An additional two-level adjustment was applied because the fraud was undertaken in connection with a major disaster or emergency benefits program. *(PSR, ¶105)*. This resulted in an adjusted offense level of 27. This, in turn, forms the BOL for the money laundering count for which the Defendant plead guilty (Count 43) *(PSR, ¶112)*.

The guideline calculations for Count 43 add one level to the adjusted offense level of 27 pursuant to U.S.S.G. §2S1.1(b)(2)(A). This results in a total offense level of 28. The PSR determined that Ghedi was an average participant and did not make any adjustment for a minor participant role. Presuming the government, as anticipated, moves for a three-level adjustment of responsibility at sentencing, the contemplated total offense level in this matter is 25. Based on the PSR's conclusion that the total offense level is 25 and Defendant has a criminal history category of II, this would result in a sentencing range of 63-78 months.

[2] This loss range reflects total amounts received by ASA from its participation in the food program.

While these calculations were generally consistent with the parties' Plea Agreement, the PSR determined that Defendant had three criminal history points, placing him in category II rather than category I. The three offenses were all single point misdemeanor crimes occurring over a three-month period in late 2016 and early 2017. Two offenses involved a failure to pay for gasoline totaling $35.00 and $34.00. *(PSR, ¶¶126-127).* The third offense involved aiding and abetting a retail theft of a controlled substance. *(PSR, ¶128).* Two of the three offenses received stays of adjudication which ultimately resulted in dismissal of the charges. Accordingly, while the State of Minnesota does not recognize these incidents as criminal convictions, each, nonetheless, received a criminal history point pursuant to U.S.S.G. §4A1.2(f).

Ghedi continues to assert he meets the criteria to be labelled a minor participant. Defendant admittedly received a sizeable, unwarranted, income stream as a result of his participation in a large-scale fraud. However, this is true of *every* defendant in this Indictment. If proceeds alone precluded a minor participant designation, no defendant in this case would receive this status. Notwithstanding the revenue he received, Ghedi still meets the criteria for a two-level reduction in the offense level as a minor participant under U.S.S.G. §3B1.2(b).

The commentary to §3B1.2(b) explains:

> This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity.
>
> A defendant who is accountable under §1B1.3 (relevant conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in the criminal activity may receive an adjustment under this guideline. For example, a defendant who is accountable under §1B1.3 for a loss amount…that greatly exceeds the defendant's personal gain from a fraud offense…may receive an adjustment under this guideline.

U.S.S.G. §3B1.2(b) (n.3(A)).

This criteria clearly applies to Ghedi. The guideline calculation included an 18-level adjustment due to a loss range of $3,500,000-$9,500,000. This is plainly a range attributable to the entire proceeds received by ASA. However, the PSR also noted that Ghedi's actual revenue was $2,223,235.15. *(PSR, ¶93).* While this is a substantial sum, it is well below the range which prompted the 18-level increase in Ghedi's guideline offense level included in PSR §105. If limited to Ghedi's actual receipts, under U.S.S.G. §2B1.1(b)(1)(I)—a loss range of $1,500,000-$3,500,000, the offense level would have been increased by 16 rather than 18 levels, and would have more fairly reflected the Defendant's culpability. Treating Ghedi as a minor participant would merely reduce his guideline offense level to an amount consistent with the Defendant's actual proceeds from these fraudulent transactions.

Moreover, Ghedi's actual involvement in the offense is also consistent with that of a minor participant. U.S.S.G. §3B1.1, n.3(C) recommends the Court consider five factors in determining whether an individual is a minor participant in a criminal enterprise. These include:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning and organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity; including the acts the defendant performed and the responsibility and discretion the defendant had in performing these acts;
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.

At least three of these factors weigh in Ghedi's favor. Admittedly, he quickly discerned the scope of the criminal activity and stood to profit from it. However, Ghedi's actual role in the criminal activity was limited. He helped to establish the façade of a distribution site but, after

that, Ghedi's sole role was to passively accept the proceeds of the criminal activities engineered by his co-defendants. This does not excuse Ghedi from culpability, and he makes no claim that he was an unwilling participant, but Ghedi's role in the actual execution of the fraud was so limited and passive that he should be recognized as a minor participant and receive a two-level reduction in his guideline calculation. This would reduce his guideline range from 63-78 months to 51-63 months.

At the time Ghedi entered his plea, U.S.S.G. §4A1.3 also permitted him to seek a guideline departure based on the claim that Defendant's three criminal history points overstated his previous criminal activity and that he was more akin to a category I defendant. That guideline provision was rescinded in November 2025, after Ghedi's plea but prior to his sentencing. Presuming that guideline treatment is no longer available to Ghedi, he still believes it is a factor which should be considered by the Court under 18 U.S.C. §3553 and will discuss this concern later in this memorandum.

**STATUTORY CONSIDERATIONS**

While this Court is required to properly calculate Ghedi's guideline sentence, the Defendant's punishment must be framed according to the criteria set forth in 18 U.S.C. §3553(a). "The guidelines, while important, are not mandatory. They are simply advisory." *Booker v. United States, 543 U.S. 220 (2005).* Further, "the guidelines are not only not mandatory on sentencing courts, they are not to be presumed reasonable." *Nelson v. United States, 555 U.S. 350, 352 (2009).* Variances from the guidelines are not deemed unreasonable simply because they undercut the guideline range. *Gall v. United States, 552 U.S. 2d 38 (2007).* In determining what is a fair and reasonable sentence, the guidelines serve as a starting point as the sentencing

Court analyzes the factors set forth in 18 U.S.C. §3553 (a). *Rita v. United States, 551 U.S. 338 (2007).*

The guideposts for this Court in determining an appropriate sentence are set forth in 18 U.S.C. §3553(a):

> The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The Court in determining the particular sentence to be imposed shall consider—
>
> (1) The nature and circumstances of the offense and this history and characteristics of the defendant;
>
> (2) The need for the sentence imposed—
>
> > (A) To reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;
> >
> > (B) To afford adequate deterrence to criminal conduct;
> >
> > (C) To protect the public from further crimes of the defendant; and
> >
> > (D) To provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner
> >
> > …

The statutory criteria expressed in 18 U.S.C. §3553(a) require the Court to consider the type of sentence which is appropriate, both from a societal and an individual perspective. The needs and concerns of society in a fair and just sentence are reflected in 18 U.S.C. §3553(a)(1) which requires the Court to consider "the nature and circumstances of the offense" and in §3553(a)(2)(A) which mandate the sentence "reflect the seriousness of the offense…promote respect for the law and to provide just punishment…" The Defendant recognizes these criteria, at first blush, favor imposition of a guideline sentence without substantial leniency. This was a major economic offense targeted at a generous government and ultimately victimizing innocent

taxpayers. Moreover, as the Defendant now recognizes, these crimes were largely perpetrated by members of the Somali community. As a consequence, the entire immigrant population has been burdened by scorn, suspicion and ridicule. Ghedi has felt the unsurprising community backlash. He is no longer welcome in certain mosques. Longtime friends want nothing to do with Ghedi; his own sister has not spoken to him since Ghedi's indictment. The Defendant found himself to be unemployable in Minnesota as each disclosure of his participation in the "Feeding Our Future scandal" ends any discussion of employment. The Defendant will continue to pay this price, likely for the balance of his life, and the Court should not be blind to Ghedi's unwanted role as a social pariah in his community and among the broader public as it considers what constitutes just punishment for him.

Fortunately, the Court is not limited to these considerations. 18 U.S.C. §3553(a) also requires the Court to consider Ghedi as a unique and individual person. Here, §3553(a)(1) explicitly requires the Court to consider the "characteristics of the Defendant" in focusing on what sanction constitutes "just punishment." In doing so, the Court is to fix its gaze on what type of sentence will "afford adequate deterrence," public protection and also "provide the defendant with needed educational or vocational training, medical care or other correctional treatment…" The overarching goal of these statutory features is that that Court "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes…"

The PSR provides substantial information concerning Ghedi's background, characteristics and personal history. The Defendant was born in San Jose, California and is currently 35 years old. *(PSR. ¶135).* Ghedi's father has limited mobility and occasionally needs assistance from the Defendant. *(Id).* Ghedi's mother remains self-employed, operating a clothing

store at the Karmel Mall in Minneapolis. *(Id).* Ghedi has a younger sister and a cousin who was raised as part of his family. *(PSR. ¶136).*

The Defendant's family moved from California to Minnesota when the Defendant was approximately 10 years of age. *(PSR. ¶137).* According to Ghedi, his upbringing was filled with tension, heightened by cultural discord between his parents' traditional views and the values Ghedi encountered in the United States. *(PSR. ¶137).* Notably:

> Ghedi explained he was physically disciplined by his parents for doing things that are considered normal in the United States, such as shaking hands with a woman before marriage and listening to popular music. On some occasions, he sustained bruises from being struck. Ghedi was interested in pursuing the same interests as most of his peers and attending college and finishing high school, but his parents insisted he work to help financially support his family.

*(PSR. ¶137).* Ghedi found support from his aunt, but she had personal health issues and died from complications related to kidney transplant surgery in 2013. *(PSR. ¶139).* Ghedi reported that she was a buffer from the physical and verbal abuse he episodically received at home. After her death, Ghedi reported, "he often stayed at friends' houses to avoid his parents."

Following his graduation from high school, Ghedi worked at a series of low paying jobs at manufacturing companies. *(PSR. ¶140).* In 2017, Ghedi began his employment as a line cook and delivery driver for Safari Restaurant. *(Id).* The Defendant immensely enjoyed this position which, ironically, led to Ghedi's involvement in the offense for which he is now being sentenced. Ghedi reported that he has suffered social isolation as a result of the publicity surrounding his indictment in this scheme. *(PSR. ¶141).* During and after the collapse of Feeding Our Future and its vendors, Ghedi suffered symptoms of anxiety and panic attacks and sought treatment a M Health Fairview in Edina, Minnesota. *(PSR. ¶146).* Ghedi also had a mental health diagnostic assessment at the Midwest Center for Personal and Family Development in Burnsville,

Minnesota on December 5, 2022. This resulted in diagnoses of panic disorder due to problems related to his legal circumstances. *(PSR. ¶147).*

Ghedi is in overall good physical health. He suffers from Type 2 diabetes which remains, despite his efforts, "poorly controlled," according to his medical records. *(PSR. ¶145).*[3] This has resulted in diabetic ketoacidosis. The Defendant has also suffered from low blood potassium and hypertension and has an ongoing prescription regimen which is outlined in the PSR. *(PSR. ¶145).*

The PSR noted the seemingly contradictory outcomes of the dual statutory criteria in this instance. While the overall nature of the criminal conduct by the defendants calls for serious punishment *(PSR. ¶192),* Yet, Ghedi seems unlikely to reoffend and does not need a lengthy prison sentence to afford adequate deterrence. *(PSR. ¶193).* The PSR correctly noted that Ghedi's primary motivation was a desire to lead a better, more affluent lifestyle and a feeling that he was trapped into a series of low income employment positions due to the lack of support within his family for ongoing education. The PSR suggested Ghedi might benefit from both educational and vocational opportunities while in custody. *(PSR. ¶194).* The Court should also recognize Ghedi's ongoing medical needs and the social cost he has already encountered in framing his sentence. Moreover, Ghedi believes that his minor criminal history is more akin to a category I offender and, further, his lack of any significant time in custody demonstrates that a shorter prison sentence would be more meaningful to Ghedi as a deterrent sanction than to a more experienced inmate.[4]

---

[3] Defendant has requested a letter from his physician providing more information about his current status and hopes to provide this correspondence to the Court in the near future.
[4] For example, if Ghedi was treated as a minor participant and a category I defendant, his guideline sentence would be 46-57 months.

A final factor to be considered by the Court in determining a just and appropriate punishment for Ghedi is to assure that his punishment is not harsher than similarly situated defendants. In that vein, the PSR noted that from 2021-2025, for defendants with a total offense level of 25 and a criminal history category of II "who received a sentence of imprisonment…the average length of imprisonment imposed was 53 months…." Based on these criteria, the Defendant is asking the Court to impose a sentence of imprisonment ranging between 30-48 months. While this is shorter than the average length of imprisonment for a similarly situated defendant, it also takes into account the challenges of meeting Defendant's significant medical needs while imprisoned and the likely lifelong consequences the Defendant will continue to suffer following his release in the form of public approbation and isolation.

**CONCLUSION**

For the above-stated reasons, Defendant respectfully requests the Court impose a sentence ranging from 30-48 months in this matter.

Dated: August 12, 2026

Respectfully submitted,

GLENN P. BRUDER, P.A.
*/s/ Glenn P. Bruder*
Attorney for Defendant
9531 West 78th Street
Suite 210
Eden Prairie, MN 55344
(952) 831-3174